CHRISTOPHER CHIOU
Acting United States Attorney
Nevada Bar No. 14853
SUSAN CUSHMAN
CHRISTOPHER BURTON
Nevada Bar No. 12940
DANIEL CLARKSON
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Susan.Cushman@usdoj.gov
Chris.Burton4@usdoj.gov
Daniel.Clarkson@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>    v.<br><br>PAUL ENGSTROM,<br><br>              Defendant. | Case No. 2:21-cr-00190-APG-EJY<br><br>**Government's Response in Opposition to Defendant Engstrom's Motion for District Judge Review of Magistrate Judge's Detention Order [ECF No. 63]** |

**CERTIFICATION:  This Response is timely filed.**

        Defendant Paul Engstrom is both a risk of flight and a danger to the community.

He was the leader of a drug trafficking and money laundering organization ("DTMLO")

that sold and distributed large amounts of cocaine across the country in exchange for

cryptocurrency payments processed through the dark web. Engstrom was caught red-

handed surrounded by several kilograms of cocaine during a takedown of a stash house

used by the DTMLO. He has multiple prior felony convictions, including a prior federal

controlled substances conviction in this district. Magistrate Judge Brenda Weksler ordered

that Engstrom be detained pending trial on two separate occasions. Nothing presented by

Engstrom in his *pro se* Motion for District Judge Review of Magistrate Judge's Detention

Order (the "Motion") merits his release pending trial. This Court should deny the Motion.

## FACTUAL BACKGROUND

Defendant Paul Engstrom was arrested on June 21, 2021, during a takedown of a

large-scale drug trafficking and money laundering operation, of which Engstrom was

determined to be the leader (the "Engstrom DTMLO"). On that date, police officers

executed search warrants at several premises, one of which was used by Engstrom and his

co-defendants as a stash house to store, package, and distribute large amounts of cocaine.

This takedown was the culmination of a months-long investigation into the Engstrom

DTMLO, which yielded overwhelming evidence that Engstrom and his co-defendants were

using a dark web marketplace to take orders for cocaine from numerous customers,

processing and packaging those orders in Las Vegas, sending cocaine nationwide using

U.S. Priority Mail, and then laundering the criminal proceeds through a series of

cryptocurrency transactions.

On several occasions during the investigation, law enforcement agents surveilled

defendants Engstrom, Cuomo, Elliott, as they arrived and entered stash houses used by the

DTMLO. After the defendants remained in the stash houses together for some time, one of

the defendants would exit the premises and hand off cocaine-filled Priority Mail envelopes

to a runner (co-defendant Joseph Krieger), who would deposit the envelopes at different

post offices in the Las Vegas area. *See* ECF No. 1, Complaint ¶¶ 3-9. During the

investigation, law enforcement agents seized 44 such envelopes that they surveilled the

Engstrom DTMLO deposit in post office drop boxes; *all* 44 seized envelopes contained

heavily wrapped white powder that field tested positive for cocaine. *Id.* ¶ 10. And all the Priority Mail envelopes seized by law enforcement during the investigation bore the same characteristics in terms of how they were labeled, the type of envelope used, and the way the postage was paid for. *Id.* ¶ 5, 12.

The DEA also conducted three undercover purchases of cocaine from an online moniker ("Insta") associated with the Engstrom DTMLO through an illicit dark web marketplace called White House Market. Law enforcement had identified "Insta" from an earlier investigation as an entity that was using Priority Mail to distribute cocaine across the country from the Las Vegas area. Due to similarities between the location and methods of distribution used by "Insta" and the Engstrom DTMLO, the DEA suspected that the Engstrom DTMLO was behind the "Insta" moniker. Confirming this suspicion, in each instance when the DEA placed an undercover purchase through "Insta," Priority Mail envelopes containing the purchased amount of cocaine were sent to the undercover address provided by the DEA when making the purchase. In two of these instances, law enforcement agents surveilled the Engstrom DTMLO deposit the cocaine-filled envelopes addressed to the DEA-provided location and seized them before they were mailed. *Id.* ¶ 12 (describing the first two of the three undercover transactions).

In addition, through investigation of financial records and publicly available cryptocurrency transaction records, the DEA identified Engstrom as the defendant who was receiving cryptocurrency payments made through the dark web and then conducting a series of transactions to launder those proceeds. Those transactions included the use of "mixers" and "tumblers," which are tools that help holders of cryptocurrencies mask the source of their funds. *Id.* ¶ 7. Based on an analysis of the "Insta" account as well as the

physical surveillance of the Engstrom DTMLO, agents estimated that, in just a five-month period in early 2021, the Engstrom DTMLO had distributed over 20 kilograms of cocaine. *Id.* ¶ 14.

Law enforcement executed a search warrant on June 21, 2021, at multiple locations associated with the Engstrom DTMLO. One of the locations searched was a stash house located at 6145 Harrison Drive, #4. Defendants Engstrom, Cuomo, and Elliott were all present in that stash house when the warrant was executed, ostensibly filling dark web orders for cocaine. During their search of the Harrison Drive location, law enforcement recovered over six kilograms of white powder that field tested positive for cocaine. Most of the cocaine was found in the back office where Engstrom had locked himself, including multiple bricks of cocaine stored in a lockable freezer.[1] A key to this freezer was found in the same room on a keychain that also held Engstrom's car keys. The stash house also contained filing cabinets with numerous Priority Mail envelopes, sealed containers labeled with various amounts of cocaine, and other indicia of the Engstrom DTMLO and drug trafficking, such as scales. Agents found four Blink security cameras located throughout the premises, including one camera in the office where Engstrom was apprehended.

The initial entry and securing of the Harrison Drive stash house was conducted by the Henderson Police Department (HPD).[2] HPD's entry into the facility required the use of

---

[1] Since Engstrom's most recent detention hearing, the DEA has completed laboratory testing on approximately 20 samples of the white powder recovered from the stash house, including several of the large bricks found in Engstrom's office. To date, all samples tested have returned positive results for cocaine.

[2] The government obtained body camera footage from several members of the HPD team that entered and secured the premises. The government filed those videos manually with the Court prior to the August 4 hearing on Engstrom's Motion to Reopen Detention Hearing.

4

detonation charges, due to the presence of a tinted security film on the front entrance. Due to the amount of time it took HPD to place the charges, announce their presence, and enter the premises, the defendants had significant time to react to HPD's arrival before they were taken into custody. When HPD officers entered the building, defendants Cuomo and Elliot had already fled.[3] HPD officers attempted to open an internal door across from the front entrance and found it locked. HPD officers then battered open this door. After gaining entry to the room beyond that door, HPD found another locked door to a back office. HPD officers once again announced their presence and ordered anyone in the back office to exit; no one came out. Officers then used the battering tool for a second time and found Engstrom behind the door, along with a large amount of cocaine.

In the area between the first locked interior door and the second locked door, there was a room with a toilet. It appeared that cocaine had recently been flushed down the toilet, as officers found a white powdery substance around the toilet bowl, two spoons in the toilet, and a metal tray with white powdery residue on the floor near the toilet.

As discussed in more detail below, this is not the first time Engstrom has been charged federally with felony violations of the Controlled Substances Act. In Case No. 2:15-cr-00255-JAD-PAL, Engstrom pleaded guilty to possession of a controlled substance with intent to distribute. Notably, Engstrom sought early termination of supervised release in that case. Case No. 2:15-cr-00255-JAD-PAL, ECF No. 126. His request was granted on January 3, 2019. Case No. 2:15-cr-00255-JAD-PAL, ECF No. 130. A matter of months

---

[3] Cuomo and Elliott were apprehended by HPD after they fled the premises, retreated into the garage when confronted by officers outside the building, and then hid under vehicles.

later, the first controlled purchase of cocaine from Engstrom, acting as "Insta," was

conducted in this case. *See* ECF No. 17.

## PROCEDURAL BACKGROUND

On June 23, 2021, Engstrom made his initial appearance before Magistrate Judge

Brenda Weksler on a Criminal Complaint charging him with one count of Conspiracy to

Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and one

count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

Judge Weksler held a detention hearing at which the government moved for Engstrom's

detention pending trial. Judge Weksler found that that the government showed by a

preponderance of the evidence that no condition or combination of conditions of release

would reasonably assure Engstrom's appearance in court and ordered his detention. ECF

No. 11 (Detention Order). Judge Weksler found that the government had not shown by

clear and convincing evidence that Engstrom was a danger to the community. *Id.*

The grand jury subsequently returned a nine-count Indictment, which charged

Engstrom with eight counts relating to illegal distribution of cocaine and one count of

Conspiracy to Commit Money Laundering. ECF No. 17. Multiple charges against

Engstrom carry a mandatory minimum sentence of ten years in prison if he is convicted.

*See* Indictment, Counts One and Eight.

On July 29, Engstrom filed a Motion to Reopen Detention Hearing. ECF No. 30. In

support of his motion, Engstrom filed two short video clips, apparently obtained from a

Blink security camera in the front room of the Harrison Drive stash house. The first clip,

which starts after HPD had already placed charges on the front entrance and begun

announcing their presence, shows co-defendant Elliott attempt to open the door from the

front room to the secondary room that contained the doorway to Engstrom's office. After finding that door locked, both Elliott and Cuomo exit through a side door to the garage. The second video shows HPD entering the premises and then using a battering tool to force open the locked door that Elliott and Cuomo had been unable to open. After receiving these two partial videos, the government requested additional video from defense counsel that depicted the entire sequence of events surrounding the takedown. Defense counsel informed that no additional video was available. Engstrom also did not provide the government or the Court with any videos from other Blink cameras on the premises, including the camera located in the office where he was apprehended.

Engstrom claimed his video clips contradicted representations made by the government at his detention hearing that he had barricaded himself into a back office when HPD entered the Harrison Drive location. The government filed an opposition, arguing why the clips did not contradict the government's representations and did not materially change the factual basis for Engstrom's detention. ECF No. 35. The government further argued that, even if the Court considered the videos and reopened the detention hearing, the government had still met its burden to justify pretrial detention. Judge Weksler held a hearing on August 4 and reserved decision on Engstrom's motion.

After the hearing, in an attempt to provide a full account of Engstrom's movements during the takedown, the government obtained a search warrant for the cloud-based account that stored the video footage from the Blink security cameras located at 6145 Harrison Drive. Case No. 2:21-mj-0664-NJK. In response to that search warrant, the government learned that no videos remained stored on that account, including the two videos that Engstrom had provided as part of his Motion.

On August 17, Judge Weksler held a follow-up hearing regarding Engstrom's Motion. At that hearing, Judge Weksler orally denied Engstrom's renewed request for pretrial release. ECF No. 46. Engstrom filed the *pro se* Motion now before the Court on October 6. ECF No. 63. This response follows.[4]

## LEGAL STANDARD

This Court reviews the Magistrate Judge's order of detention or release *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). *See also United States v. King*, 849 F.2d 485, 491 (11th Cir. 1988); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). This Court can review the evidence presented to the magistrate judge and makes its own independent determination. *Koenig*, 912 F.2d at 1193. This Court can also hear additional evidence and argument if it chooses. *Id.*

Title 18, United States Code, Section 3142(g), specifies the factors that a Court must consider in determining whether conditions exist that will reasonably assure the appearance of the defendant and the safety of the community. Those factors are:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including -
   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
   (B) whether, at the time of the current offense or arrest, the person

---

[4] Engstrom previously filed a similar *pro se* motion seeking review of the Magistrate Judge's detention order, but that motion was dismissed without prejudice because, at the time it was filed, Engstrom was still represented by counsel. ECF Nos. 49, 51. The government filed an opposition to that motion. ECF No. 52.

| | | was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and |
| --- | --- | --- |
| | (4) | the nature and seriousness of the danger to any person or the community that would be posed by the person's release. |

18 U.S.C. § 3142(d); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Cardenas*, 784 F.2d 937, 939 (9th Cir. 1986); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

On a motion for pretrial detention, the government bears the burden of showing, by a preponderance of the evidence, that the defendant is a risk of non-appearance or, by clear and convincing evidence, that the defendant is a danger to the community. 18 U.S.C. § 3142(f)(2)(B); *Motamedi*, 767 F.2d at 1406-07. When there is probable cause that the defendant has committed "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(2), (3)(A). Although the presumption shifts a burden of production to the defendant, the burden of persuasion remains with the government. *See United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir. 1991). Where § 3142(e) imposes the burden of production, the defendant must come forward with some evidence to rebut the presumption. *Id.* But even if the defendant meets that burden of production, the presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986).

1

**ARGUMENT**

2

3

4

5

6

7

8

9

10

11

Here, there is a presumption in favor of detention, as Engstrom is charged by Indictment with several violations of the Controlled Substances Act that carry maximum sentences of over ten years. Engstrom cannot rebut the presumption that no condition or combination of conditions reasonably assures the safety of the community and his future appearance.[5] In addition to this presumption,[6] Engstrom's criminal history, the nature of the allegations against him, and overwhelming evidence in this case demonstrate he is not amenable to supervision. Engstrom's Motion – which focuses heavily on his interpretation of his arrest conduct and barely addresses the nature of the charged crime, his criminal history, or the evidence against him – does nothing to demonstrate that this Court should reverse the Magistrate Judge's finding and grant pretrial release.

12

**A.     The Nature of the Crime**

13

14

15

16

17

The first factor for the Court to assess is the nature and circumstances of the crime charged, including "whether the offense [] involves a narcotic drug." Engstrom is charged with leading a large-scale drug trafficking operation, through which he and his co-defendants sold cocaine over the dark web and then sent it to numerous recipients across the country. The charges relate to criminal conduct starting at least as early as August 2019

18

19

20

21

22

[5] This Court's *de novo* review permits it to find that Engstrom is a danger to the community despite that the Magistrate Judge did not do so. However, Engstrom's request for another hearing before this Court makes such a finding is flawed. Engstrom has had two detention hearings and been given full opportunity to be heard on the issue of detention, and specifically danger to the community. The parties are not seeking to include any additional facts as related to danger to the community and therefore, this Court can decide the issue without conducting an unnecessary third hearing.

23

[6] Despite Engstrom's claim that the government relied exclusively on this presumption in its argument, the record below and the instant response show that the government provided numerous arguments warranting detention.

24

and continuing until Engstrom was arrested in June 2021. In addition, Engstrom is charged with conspiring to distribute more than five kilograms of cocaine, a violation that carries a ten-year mandatory minimum sentence if he is convicted. Engstrom is also charged with laundering his operation's drug trafficking proceeds through a series of sophisticated cryptocurrency transactions that allowed him to convert the payments he received over the dark web from one type of cryptocurrency into other cryptocurrencies – masking the origins of those payments – and eventually to convert the money into U.S. currency. Because Engstrom is charged with distributing large amounts of narcotics and using sophisticated efforts to conceal his operation, the nature and circumstances of the crimes weigh in favor of detention.

Engstrom's arrest conduct also indicates that he is a risk of flight and danger to the community.[7] When agents searched the stash house at 6145 Harrison Drive, they discovered evidence that cocaine had recently been flushed down the toilet. As detailed above, that toilet was in a room that only Engstrom appeared to have access to, given that his co-defendants were unable to open the door that led to the room before they fled through the garage, and Engstrom was found in an adjoining room behind a second locked door. This supports the inference that Engstrom destroyed evidence of his crimes when

---

[7] The Magistrate Judge found Engstrom's arrest conduct to be of primary concern in denying him pretrial release, and Engstrom devotes much of his Motion to arguing that his arrest conduct does not weigh in favor of detention and that the Magistrate Judge mischaracterized his arrest conduct. The government submits that Engstrom's arrest conduct weighs in favor of detention. Moreover, while the Magistrate Judge focused significantly on Engstrom's arrest conduct, the government contends that Engstrom's actions in the underlying case and prior criminal history also strongly militate in favor of detention.

HPD arrived at the stash house and makes it unlikely that Engstrom would comply with conditions if released pending trial.

Engstrom attempts to refute this inference by arguing that (1) HPD gained access to the secondary room with access to the toilet only 23 seconds after breaching the front entrance, thus not giving Engstrom sufficient time to flush drugs down the toilet, and (2) there was another doorway from the garage that provided access to the secondary room where the toilet was located, presumably insinuating that his co-defendants could have reentered that room and flushed cocaine down the toilet. The government submits that Engstrom remains the likely culprit for this action, given that the co-defendants fled into the garage and were taken into custody by law enforcement in the garage. Moreover, the 23-second time frame referenced by Engstrom is misleading. As Engstrom acknowledges, it took significantly longer than 23 seconds for HPD to enter the second room *from the time they initially announced their presence*. Thus, Engstrom had sufficient time to destroy evidence from when he learned of HPD's presence.

**B.    Engstrom's Criminal History and Characteristics**

As for Engstrom's criminal history, he was convicted in this Court of another controlled substances crime only a few years ago. *See* Case No. 2:15-cr-00255-JAD-PAL. During the investigation that led to those charges, an undercover officer made several purchases of MDMA from Engstrom's co-defendant. PSR ¶¶ 5-13. When the undercover officer inquired about purchasing a larger amount of MDMA (five ounces), the co-defendant responded that he could not complete such a transaction without involving his supplier (later identified as Engstrom). When this larger transaction was arranged, Engstrom arrived at the scene in his vehicle. When Engstrom was arrested at the scene, he

had approximately five ounces (142.0 grams) of gross weight MDMA in his vehicle. PSR ¶¶ 14-20. Engstrom was charged with conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C), and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Case No. 2:15-cr-255-JAD-PAL, ECF No. 15.

Notably, in that case, the Magistrate Judge detained Engstrom pending trial as both a danger to the community and a risk of non-appearance. *Id.* at ECF No. 13 (Detention Order). The Court found that Engstrom had a prior felony conviction (for bank robbery), a prior revocation of his supervised release, and an outstanding warrant for his arrest in another state at that time (for identity theft). *Id.* Consequently, the Court found that Engstrom had not rebutted the presumption in favor of detention and that no conditions would ensure the safety of the community and Engstrom's appearance at future proceedings. *Id.* These findings were justified and appropriate, and the government submits that nothing has changed in Engstrom's favor to show he is less of a danger to the community or risk of non-appearance than he was in 2015. Indeed, Engstrom has escalated his criminal conduct, committing more serious and sophisticated drug trafficking crimes, which carry significantly greater potential penalties than his criminal conduct in 2015. Engstrom's escalation in drug trafficking demonstrates that he remains both a danger and a risk of non-appearance.

In the above case, Engstrom pleaded guilty without a plea agreement to the charges against him and was sentenced to 24 months in prison and three years of supervised release. Engstrom later moved for early termination of his supervised release, which was granted by the Court. Case No. 2:15-cr-255-JAD-PAL, ECF No. 126. Just a few months

later, in August 2019, the U.S. Postal Inspection Service (USPIS) made a successful undercover purchase of cocaine through the dark web moniker "Insta." A few days after placing the order, USPIS received a Priority Mail envelope to the specified address containing the purchased cocaine.

As described above, subsequent investigation has shown that "Insta" was the moniker used by the Engstrom DTMLO. *See* ECF No. 17 (Count Two of the Indictment charging cocaine distribution relating to USPIS's purchase in August 2019). By August 2019, "Insta" was already an established presence on the dark web, known for distributing cocaine. The account profile on the dark web marketplace where USPIS placed its order indicated that "Insta" already had over 1,000 user reviews and had joined the service in March 2019. In other words, the evidence indicates that Engstrom likely started his drug trafficking operation either while on supervised release for his prior drug conviction or, at the very latest, within a couple months after the supervised release was terminated early. This demonstrates Engstrom's ability and willingness to manipulate the criminal justice system. When his prior drug trafficking conduct is viewed in conjunction with Engstrom's other criminal history, which includes a federal felony conviction for Bank Robbery (leading to a later revocation of his supervised release) and a gross misdemeanor conviction for identity theft, this factor weighs in favor of detention.

## C.   Weight of Evidence Against Engstrom

Although the strength of evidence is the least important factor to be considered in determining detention, the Court must take it into account. *See United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). The evidence against

Engstrom is extremely strong and has grown even stronger since Engstrom's most recent detention hearing. Most importantly, when law enforcement executed a search warrant of one of the stash houses used by the Engstrom DTMLO, they found Engstrom and two of his co-defendants physically present inside the premises. The premises contained *over six kilograms of cocaine*. Most of the cocaine was discovered in the same back office where Engstrom had locked himself during HPD's takedown of the premises. Multiple bricks of cocaine were stored in a lockable freezer in that office, and one of the keys to that freezer was discovered on a keychain belonging to Engstrom in the same office, as indicated by the presence of his car key on the chain.[8] Law enforcement also found cocaine throughout the premises contained in various containers including plastic bags and cups. Since Engstrom's most recent detention hearing, the DEA has completed laboratory testing on approximately 20 samples of the suspected cocaine seized from the stash house, including three large bricks weighing approximately one kilogram each. All of these samples were confirmed to contain cocaine.

The premises also contained many other indicia of the defendants' drug trafficking operation, including numerous Priority Mail envelopes, postage stamps, and drug scales. There were also several electronic devices, including cellular phones and computers. Given the amount of cocaine discovered in the stash house where Engstrom was physically present, this evidence alone is likely sufficient to convict Engstrom of violations that carry a ten-year mandatory minimum sentence. In addition, the location of most of the cocaine and several cellular phones and computers in the locked office where Engstrom was

---

[8] A second key to the freezer was in the lock itself.

apprehended further support the conclusion reached by the DEA during their investigation that Engstrom was the leader of the operation.

In addition to the evidence obtained during the takedown, there is substantial other evidence of Engstrom's guilt. In the days after Engstrom and his co-defendants were arrested on June 21, 2021, the DEA observed several user comments on dark web forums indicating that "Insta" was no longer in operation and no longer responding to orders. This further confirms that Engstrom's DTMLO was behind the "Insta" moniker.

In the months prior to the takedown, agents surveilled Engstrom on numerous occasions during the investigation enter stash houses along with his co-defendants and remain in those stash houses for a period of time. Then agents surveilled handoffs of cocaine-filled Priority Mail envelopes to a runner, who would deposit the envelopes at various post offices. Every envelope seized by the DEA after such surveillance (44 in total from several different interdictions) contained cocaine and bore the hallmarks of the Engstrom DTMLO (*e.g.*, Priority Mail envelopes, printed mailing labels, return addresses to different businesses in Las Vegas, and prepaid postage stamps).

The DEA also conducted three undercover purchases of cocaine from "Insta," the dark web moniker associated with the Engstrom DTMLO. In each instance, the DEA received Priority Mail envelopes at the specified address containing the purchased amount of cocaine. In two of these instances, law enforcement agents actually surveilled the Engstrom DTMLO deposit the cocaine-filled envelopes in question seized them before they were mailed.

Moreover, through investigation of financial records and publicly available cryptocurrency transaction records, the DEA was able to identify Engstrom as the

16

defendant who was receiving cryptocurrency payments made through the dark web and then conducting a series of transactions to launder those proceeds. Those transactions included the use of "mixers" and "tumblers," which are tools that help holders of cryptocurrencies mask the source of their funds. *Id.* ¶ 7. They also involved Engstrom conducting cryptocurrency-for-cash exchanges with a third-party exchanger based in Las Vegas.

In sum, the takedown, surveillance operations, undercover purchases, drug seizures, and financial analysis provide ample evidence against Engstrom. Thus, the weight of the evidence favors detention.

### D.   Engstrom's Remaining Legal Arguments are Flawed

Engstrom spends little time in his Motion assessing the 3142(g) factors discussed above. Instead, he focuses extensively on rehashing arguments about his arrest conduct and advancing several flawed legal arguments, which the government addresses below.

First, Engstrom claims that the Magistrate Judge misplaced the burden of persuasion on him at his detention hearings. That is not the case. Engstrom's argument is based purely on the Magistrate Judge's comment that the new information presented to the Court "moved the needle," but not sufficiently to justify Engstrom's release. But as Engstrom concedes in his Motion, the Court stated in full: "While the new information has moved the needle somewhat in favor of defendant, it has not moved it enough for the Court to find that government *has not met it's burden*." Motion at 9-10 (emphasis added). Thus, the Magistrate Judge clearly understood that the government bore to burden to show that detention was appropriate, and was simply acknowledging that, even after considering the videos, the government had still met that burden.

Second, Engstrom contends that the government's arguments for detention "consist of nothing more than restatement of the criteria which trigger the rebuttable presumption." Motion at 11. But that argument is also untrue. As is clear from the detailed arguments presented above – which were also presented to the Magistrate Judge – the government has carefully assessed the 3142(g) factors as they apply to the facts of this case and Engstrom's criminal history, and explained why they support detention pending trial.

Third, Engstrom claims that he was denied due process. Motion at 11-12. Again, this argument is flawed. Engstrom's contention appears to be based entirely on his view that Magistrate Judge Weksler was not a "neutral decisionmaker" because she was not convinced by Engstrom's assertion that he had no way to access his cryptocurrency holdings if released. But simply rejecting an unconvincing assertion made by a party is no basis to find a violation of due process.

Fourth, Engstrom cites to a district court decision from the 1980s for the purported proposition that the Court cannot consider Engstrom's destruction of evidence as a factor in assessing his risk of non-appearance, and the Magistrate Judge erred in doing so. Motion at 13. But the cited decision, even if it were binding on this Court – which it is not – does not stand for that dubious proposition. The *Mancuso* court found only that, in the context of assessing danger to the community, obstruction of justice should be considered only when accompanied by a threat of harm. *United States v. Mancuso*, 726 F. Supp. 1210, 1214 (D. Nev. 1989). Nothing in the text of Section 3142 indicates that a defendant's destruction of evidence cannot be considered when assessing that defendant's likelihood of complying with conditions of release and appearing in court. To the contrary, such evidence is clearly relevant

to the nature and circumstances of the offense as well as the characteristics of the defendant, both of which are specifically included under Section 3142(g).

In sum, none of Engstrom's tenuous legal arguments merit his release pending trial. The Court should reject them and find that Engstrom is both a danger to the community and a risk of non-appearance.

### E.    No Conditions Are Sufficient to Ensure Engstrom's Appearance and the Safety of the Community

To rebut the presumption and the evidence justifying detention, Engstrom contended at his two detention hearings and continues to contend in his Motion that he has strong ties to Las Vegas and could reside with his ex-wife pending trial. He also claimed to have business ties to the community, given his ownership of a company called "Vegas Assets Ltd." Engstrom argued that conditions such as a third-party custodian and GPS monitoring would adequately protect the community and ensure his appearance in Court.

The government submits that these conditions are not sufficient to reasonably assure the safety of the community and Engstrom's appearance. As reflected in the Pretrial Services Report, it is not clear where Engstrom was residing during his recent time in Las Vegas. Engstrom reported to Pretrial Services that he had only been living with his ex-wife at her residence for a few months and had resided primarily with Cuomo, his co-defendant, prior to that.[9] Notably, during their investigation, the DEA surveilled Engstrom on multiple occasions leaving the residence he occupied with Cuomo and going to stash

---

[9] Agents executed a search warrant at this property on June 21, 2021, as well. Inside, agents found several firearms and other indicia of Engstrom's drug trafficking (*e.g.*, Priority Mail envelopes and a money counter).

houses used to package and distribute cocaine. In addition, when executing a search warrant at the residence that Engstrom supposedly shared with his ex-wife, agents found approximately $15,000 in a tin located in a bedroom closet. When agents asked Engstrom's ex-wife about the money, she flatly denied any knowledge of the cash. The agents also discovered a duffel bag on a coffee table containing a notebook with cryptocurrency recovery seeds and other financial documents. This supports the inference that, although it appears Engstrom may not have been living with his ex-wife, he may have been using the residence to store illegal proceeds. Thus, ordering Engstrom to reside at either of these residences would not likely ensure his appearance or the safety of the community.

In addition, the DEA's investigation revealed no legitimate sources of income for Engstrom. While Engstrom reported to Pretrial Services that he is self-employed and owns an entity called "Vegas Assets LTD," the mere existence of a corporate entity that Engstrom supposedly owns does not establish a significant tie to the community. Engstrom reported to Pretrial Services that he has substantial assets, including eight to ten million dollars of cryptocurrency and several hundred thousand dollars in other assets. Cryptocurrencies can be easily transferred and/or liquidated outside of the jurisdiction and Pretrial Services is limited in its ability to monitor any such transactions.[10] This indicates

---

[10] The government acknowledges that Engstrom claimed he could not access his extensive cryptocurrency assets because investigators had seized all of his cryptocurrency wallets, which are used to store cryptocurrency. But the government cannot confirm that it has seized all of Engstrom's cryptocurrency and notes that some cryptocurrency wallets can be reconstituted without direct access to the original wallet. *See, e.g.*, Wallet Recovery Services, https://www.walletrecoveryservices.com/ (last accessed September 13, 2021).

that Engstrom has the means to flee the jurisdiction and not return. GPS monitoring is not sufficient to prevent such flight.

In short, Engstrom was the leader of a large-scale, nationwide drug trafficking and money laundering operation, an operation he started very shortly after completing his sentence for a prior federal conviction for similar drug-related conduct. His criminal history and the allegations in this case demonstrate he is an unsupervisable danger to the community and flight risk. As a result, this Court should deny his Motion.

## CONCLUSION

Based on the foregoing, the Government respectfully requests this Court deny Engstrom's *pro se* Motion for District Judge Review of Magistrate Judge's Detention Order.

**DATED** this 20th day of October, 2021.

Respectfully submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

  /s/ *Daniel Clarkson*
DANIEL CLARKSON
Assistant United States Attorney