Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

```
_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
              COUNSEL/PARTIES OF RECORD

        | NOV - 1 2021 |

        CLERK US DISTRICT COURT
          DISTRICT OF NEVADA
BY: _____ DEPUTY
```

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CASE NO: 2:21-cr-00190-APG-EJY |
| Plaintiff, | **Defendant's Reply in Support of Motion** |
| VS. | **for District Court Review of Magistrate** |
| | **Judge's Detention Order (ECF No. 63)** |
| **PAUL ENGSTROM** | |
| Defendant, | |

CERTIFICATION: This Reply is timely filed. (Reply due by November 5, 2021 by Order of Judge Youchah (ECF No. 77))

The Government's Response in Opposition to Defendant Engstrom's Motion for District Judge Review of Magistrate Judge's Detention Order (the "Response"), fails to address many material issues that are presented in Mr. Engstrom's motion, including failing to address Mr. Engstrom's objections to Judge Weksler's factual findings. Additionally, the government misrepresents facts of the case; attempts to pass on allegations, assertions, and conclusory statements as evidence; and commits numerous violations of statute, Federal Rules of Criminal Procedure, and Local Rules; all in an effort to keep Mr. Engstrom detained pending trial. What is lacking in the record, and the government's response, is any evidence that Mr. Engstrom poses a flight risk or a danger to the community going forward. Therefore, this court should find that the government has not met their burden of proving by the preponderance of the evidence that Mr. Engstrom is a flight

risk, or their burden of proving by clear and convincing evidence that Mr. Engstrom is a danger to the community, ultimately warranting revocation of the Magistrate Judge's Detention Order.

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant's reply to the specific portions of the government's response are addressed below.

1. **Government misstates that a "presumption in favor of detention" applies (Response p. 10)**

In their argument the government states, "Here, there is a presumption in favor of detention." Defendant submits that this is a misstatement of law, that there is a presumption in favor of bail deeply ingrained in United States criminal law, and that presumptive pretrial release is a right protected by and continued in the Bail Reform Act of 1984.

The Bail Reform Act of 1984 (BRA) left the presumption in favor of pretrial release undisturbed. See *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993) (The presumption of innocence guarantees that defendants pending trial are entitled to a concomitant presumption in favor of bail in this country. The Bail Reform Act "mandates release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." quoting *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)) The Eighth Circuit addressed the presumption of release as it relates to the BRA in *United States v. Orta*, 760 F.2d 887 at n. 14 (8th Cir. 1985), stating:

> The difference between the legal standard set forth in subsection (b) and that found in subsections (c), (e), (f), and (g) reemphasizes congressional intent to preserve the statutory bias favoring pretrial release for most defendants. Subsection (b) directs release unless release "will not reasonably assure" the defendant's appearance, or "will endanger" the community's safety.  18 U.S.C. § 3142(b). Although the judicial officer may impose further restrictions upon a finding that the legal standard for either the flight or the danger concern is not met, a determination that a defendant's release "will endanger" the community will be rare. In contrast,  subsections (c), (e), (f), and (g) change the legal standard to require release if any set of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community * * *." 18 U.S.C. § 3142 (c), (e), (f), (g). The change from the negative to the positive in the flight determination standard and from "will" to "will reasonably assure" in the dangerousness evaluation criterion renders it more difficult to find the defendant a flight and safety risk.

It appears that the government is confusing cases, where, when a detention hearing is warranted, there exists a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community, with other instances where congress has in fact created a presumption of detention. Compare 18 U.S.C. § 3142 (pretrial release) with 18 U.S.C. § 3143(a)(2) (post-conviction detention mandatory) and 8 U.S.C. § 1226(c)(1)(A)-(D) ("The Attorney General shall take into custody any alien," when an enumerated factor applies).

Comparing 18 U.S.C. § 3142(b) and 18 U.S.C. § 3143(a)(2) makes congressional intent obvious, where the former requires that "The judicial officer shall order the pretrial release of the person," while the latter requires "The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained."

The rebuttable presumption provisions of 18 U.S.C. § 3142(e) do not alter the presumption of bail. First, 18 U.S.C. § 3142(f)(1) requires a detention hearing to be held only upon motion of the attorney for the Government in cases that where the underlying offense is enumerated in 18 U.S.C. § 3142(f)(1) (A)-(E). 18 U.S.C. § 3142(f)(2) requires a detention hearing to be held upon motion of the attorney for the Government or upon the judicial officer's own motion in cases where there is a serious risk a person will flee or obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. In either of these cases, no detention hearing is automatically triggered by the underlying offense. Outside of a motion by the government or the court, the default result would always be pretrial release, even for cases that involve offenses that are enumerated in 18 U.S.C. § 3142(f)(1) (A)-(E). By statute, the triggering of the rebuttable presumption provisions of 18 U.S.C. § 3142(e)(2)-(3) therefore occurs at the discretion of the government or the judge. This fact alone belies any contention that congress intended there to be a presumption of detention, for if presumptive detention was their intention it would not be discretionary. The nature of a rebuttable presumption leaves the judge with the

discretion to credit or reject the inference, without shifting the burden of proof to the defendant. See *United States v. Hernandez-Escarsega*, 886 F.2d 1560 at n. 10 (9th Cir. 1989). The defendant argues that only after the judge exercises the required discretionary function of crediting or rejecting the inference transcribed by congress can the propriety of release or detention be determined.

Mr. Engstrom also submits that the drug offender / flight problem may be overstated in general. The congressional findings related to the increased risk of flight for drug offenders is discussed in Appendix B of *United States v. Jessup*, 757 F.2d 378 (1st Cir. 1985). Courts have interpreted these findings to support a belief that drug offenders fail to appear at an astonishing high rate, but that simply is not the case. For example, in *United States v. Orta-Castro*, 104 F. Supp. 3d 190, 195 (D.P.R. 2015) the court cites  "Bail Reform" Hearings Before the Sub-committee of the Senate Judiciary Committee, 97th Cong., 1st. Sess., Sept. 17, Oct. 21, 1981 at 67, 70 (graphs 1, 2)(Comm. Print 1982), stating that in the ten districts studied, drug offenders account for approximately 1/6 of all crimes charged but 1/2 of all bail jumping. The charts cited are included in Appendix B of *Jessup*, and the data does not support that conclusion. First, Chart 1 in *Jessup* discusses the percentage of all defendants prosecuted who were charged with drug offenses, it breaks these numbers down into two subsets and two times periods. South District of Florida and Nationally are the subsets, and 1-Year Ending June 30, 1979 and 1-Year Period Ending June 30, 1980 are the specified time periods

| Graph 1 – Percent of all defendants prosecuted who were charged with drug offenses | | |
| --- | --- | --- |
| | 1-Year Period Ending June 30, 1979 | 1-Year Period Ending June 30, 1980 |
| Southern District of Florida | 54.1% | 48.8% |
| Nationally | 17.1% | 17.6% |

Chart 2 memorializes the percentage of defendants who are released and fail to appear, comparing the total percentage of failure to appears with the percentage failure to appears of drug defendants in both Southern Florida and 10 other Pretrial Services districts, all for a time period of

July 1, 1978 to June 30, 1980.

| Graph 2 – Failure to Appear from July 1, 1978 to June 30, 1980 | | |
|---|---|---|
| | Drug Defendants | All Defendants |
| Southern District of Florida | 12.9% | 8.0% |
| 10 Pretrial Services Districts | 2.3% | 1.2% |

This is the data that the court in *Orta-Castro* relied upon to come to the conclusion that drug offenders account for 1/6 of all offenders yet account for 1/2 of all bail jumping in the 10 pretrial service districts surveyed. Upon inspection, the data supports that drug offenders account for 1/6 of all offenders, but the data does not support that drug offenders account for 1/2 of all bail jumping. It isn't clear how courts arrived at their erred mathematical conclusions, but after normalizing the data to a per 1000 basis, it becomes apparent that the drug offender / flight risk problem doesn't shock the senses, at least outside the Southern District of Florida[1].

In the time period in question, in the 10 Pretrial Districts surveyed, 173.5 out of every 1000 cases would be drug related, the remaining 826.5 offenders would have been arrested for something other than drug crimes. The total percentage of failure to appears is 1.2%, so out of those 1000 offenders 12 people would fail to appear. The failure to appear rate for drug offenders is 2.3%, so if 2.3% of the 173.5 drug offenders would fail to appear, you would expect 3.99 failure to appears. Ultimately, out of every 1000 offenders only 12 would fail to appear, 4 of these would be drug offenders and 8 would be persons charged with some other type of offense. The real numbers, therefore, are that drug offenders account for 1/6 of all crimes charged but 1/3 of all bail jumping, a number still disproportionately high but quite possibly not a statistically significant deviation. One could also argue that a probability of 97.7% of all drug offenders appearing as necessary is sufficient to meet the standard of reasonable assurance.

---

[1] The numbers in the Southern District of Florida were much worse. There, in the same time period, 51.45% of all offenses were drug offenses, and 12.9% of drug offenders failed to appear. So, 514.5 out of every 1000 offenders were drug offenders and 66.37 of those offenders would fail to appear. These numbers suggest that the drug offender / flight risk problem may very well have been a late 70's early 80's drug offender problem that was isolated to the Southern District of Florida.

**2. Government's subsection "A. Nature of the Crime" (Response p. 10)**

Mr. Engstrom argues that the government misrepresents him as a leader of the alleged operation. This alleged leadership role is not supported by any evidence. For example, the government has not produced, or even proffered to the existence of, any witness testimony indicating Engstrom's involvement in the alleged activities. The record is equally void of any witness testimony establishing that Mr. Engstrom acted as a leader. The government has failed to produce, or proffer to the existence of, any text messages, recorded phone conversations, audio surveillance, or any other evidence that supports the conclusory statement that Mr. Engstrom was the "leader."

Mr. Engstrom argues that the government has not established a nexus connecting any cryptocurrency transactions attributable to Mr. Engstrom with dark web or other illicit activity, and in fact is aware that Mr. Engstrom has had significant cryptocurrency holdings dating back years prior to the activity alleged in this case. The governments conclusory statement, "Therefore, Engstrom's exchanges and deposits are proceeds from cocaine sales over the dark web," (ECF No. 1, p. 14 at 5-6), is purposefully and recklessly false. Mr. Engstrom submits that the government continues to misrepresent their knowledge of Mr. Engstrom's pre-2015 cryptocurrency holdings to the court. This assertion is supported by the fact that the government was aware of Mr. Engstrom's significant cryptocurrency holdings in 2015. There is evidence in the record of the government's prior knowledge of Mr. Engstrom's cryptocurrency holdings. AUSA Cushman undoubtedly had knowledge of these holdings in 2015, as Mr. Engstrom's made the required disclosures during his pretrial services interview related to his request for bail, disclosed his holdings again in his 2017 PSR (a document which the government cites in their response), with the holdings again disclosed and verified by US Probation prior to their agreeing to support his Motion for Early Termination of Supervision, (Case No. 2:15-cr-255-JAD-PAL, ECF No. 126), another document the government cites in their response. This prior knowledge contradicts the government's claim that "the DEA's investigation revealed no legitimate source of income for Engstrom." Response p. 20 at 11-12.

Mr. Engstrom submits that the nature and circumstances of the offenses charged, while

involving a controlled substance, do not included any other aggravating factors, e.g. there are no allegations of threats, violence or use of firearms or other weapons. The indicted counts, standing alone, do not support a finding of dangerousness sufficient to support detention. Defendant discusses this in depth in this reply's conclusion infra.

### 3. Government's subsection "B. Engstrom's Criminal History and Characteristics" (Response p. 12)

While the government states in their response, "the government has carefully assessed the 3142(g) factors as they apply to the facts of this case and Engstrom's criminal history, and explained why they support detention pending trial," (Response p. 18 at 4-6) this is clearly not the case. The government's submission as it relates to 3142(g)(3) "the history and characteristics of the person," is limited to a brief restatement of Mr. Engstrom's criminal history, mention of an administrative violation of supervision that occurred over twenty-years ago, leading into another recitation of the allegations of the instant offense. The government fails to disclose any information, negative or otherwise, in regard to a majority of the factors listed in 3142(g)(3)(a), e.g the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, history relating to drug or alcohol abuse, and record concerning appearance at court proceedings. The only factors addressed by the government are what negative information the government could glean from Mr. Engstrom's past conduct and his criminal history, where the government also fails to mention that he was granted pretrial release for his case in the 1990's and self-surrendered to serve his custodial sentence. Mr. Engstrom submits that the record of his June 23 and August 4 detention hearings establishes that a majority of the factors that the government fails to address are favorable to Mr. Engstrom, both militating against detention and rebutting the presumption that no conditions can be fashioned to reasonably assure defendant's appearance and the safety of the community.

The government then asserts that a Magistrate Judge's order of detention in Mr. Engstrom's 2015 case supports their position that Mr. Engstrom should be detained pending trial. Further stating

7

that, "nothing has changed in Mr. Engstrom's favor to show he is less of a danger to the community or risk of non-appearance than he was in 2015." Both of these assertions are erred.

First, detention hearings are sui generis, and must be decided on the basis of the particular record adduced. See *United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986) and *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990). Mr. Engstrom's arguments in favor of pretrial release in this case are distinguishable from his arguments in the 2015 case, with the same to be said of the government's arguments in favor of detention. In 2015, after Mr. Engstrom was arrested, he was made aware of a sealed arrest warrant out of Minnesota dating back to 2006 or 2007. Mr. Engstrom continued his detention hearing five days in an effort to obtain counsel in Minnesota and quash the warrant, as the Magistrate Judge indicated pretrial release would not be granted when there was an outstanding arrest warrant from outside of the District of Nevada. In those five days, Mr. Engstrom retained local counsel in Minnesota, but could not get the warrant quashed. Mr. Engstrom was thereafter ordered to be detained pending trial.

Mr. Engstrom submits, contrary to the government's position, that there are substantial changes in his favor since 2015. First, Mr. Engstrom has no outstanding warrants. Immediately upon release from his previous case Mr. Engstrom traveled to Minnesota on multiple occasions to address the charges outstanding against him. Ultimately, Mr. Engstrom pled guilty to a gross misdemeanor, while agreeing to pay immediate restitution of ~$1600, the amount alleged to have been unpaid when a post-dated check was not honored. Mr. Engstrom's willingness to travel to Minnesota to answer the charges there indicate that he will appear as necessary in front of this Court as well. It should also be noted that, although Mr. Engstrom is no stranger to the criminal justice system, he has never had a failure to appear. The absence of any failure to appears on his record also weighs in Mr. Engstrom's favor. Mr. Engstrom also believes that this Court could find instructive that after being detained pending trial in his 2015, as both a flight risk and danger to the community, he was classified as minimum security by the Bureau of Prisons and designated to Taft CI - Camp, a minimum security facility with no walls – the private equivalent of a Federal Prison Camp – where Mr. Engstrom

served his custodial sentence without incident. Following his custodial sentence, he was sent to the halfway house in Las Vegas, completing that program without incident. Mr. Engstrom then was slated to serve a three-year term of Supervised Release, where he performed so exceptionally well that he was granted early termination on the merits of his case. Since 2015, Mr. Engstrom's family and community ties have also strengthened. He enrolled in UNLV, where he is a senior with a 4.0 GPA. Additionally, with the help of his friend and mentor Frank Famiano, he has started an ATM business that he hopes to pass on to his son one day. All of these factors weigh in Mr. Engstrom's favor while belying the government's assertions that detention is warranted.

**4. Government's subsection "C. Weight of Evidence Against Engstrom" (Response p. 14)**

The weight of the evidence, which the defendant has been told is the least important factor, also appears to be where the defendant's and the government's positions are the most divergent. The government has purported the evidence to be "overwhelming" (Response p. 2 at 11) further labeling Mr. Engstrom the "leader" without presenting any evidence in support of this assertion. Mr. Engstrom view of the evidence is quite different.

The majority of the evidence the government relies on against Mr. Engstrom are seven instances from December 29, 2020 to March 29, 2021, where Mr. Engstrom, or his car, were observed in the vicinity of 304 E Silverado Ranch Boulevard. The DEA has labeled this location a "stash house." See ECF No. 1, p. 7 at 20-22. The problem with the determination that this was a "stash house" becomes apparent after it was searched pursuant to a search warrant on June 21, 2021, (Case No. 2:21-mj-515-DJA) where no evidence of illicit activity was found. The government has offered no additional evidence supporting their determination that this was a "stash house", leaving the only possible conclusion that this was not a "stash house" after all, yet the "stash house" designation persists in subsequent filings. The remainder of the evidence the government relies on against Mr. Engstrom are a handful of instances where he is observed at the property located at 6145 Harrison Ave, including the day of his arrest. Mr. Engstrom's argues that the government's evidence against him is limited to his proximity to cocaine found during the search of 6145 Harrison Ave,

where a finding of guilt would require the government to prove that Mr. Engstrom had constructive possession of contraband that was located in a property that wasn't under his control and where the contraband was not in plain sight in the room where he was located. Mr. Engstrom argues that the government's evidence against him is tenuous at best, and unlikely to survive the adversarial process.

**5.  Use of Mr. Engstrom's PSR from a previous case violates Local Rule LCR 32-2**

Mr. Engstrom objects to the government's use of the Presentence Investigation Report (PSR) from his previous case in their response (see Response p. 12 at 19 and p. 13 at 1-2). Local Rule LCR 32-2(a) dictates that the PSR is confidential and is not to be reproduced or distributed to other agencies or other individuals without permission of a determining official (defined as a district court judge, magistrate judge, or the Chief Probation Officer (after consultation with the Chief Judge) of the District of Nevada). Local Rule LCR 32-2(c) further requires that one must apply for Disclosure of Presentence Investigation Reports for Purposes other than sentencing, and that this application must be made by, submitting to a determining official, a written application accompanied by an affidavit describing the records sought, explaining their relevance to the proceedings, and stating the reasons the information contained in the records is not readily available from other sources or other means. Mr. Engstrom sees no evidence that the government has made an effort to comply with the requirements of Local Rule LCR 32-2(c).

The citation of the PSR also fails to comply with Local Rule LR IA 7-3, Citations of Authority. The PSR is not a document available in the court's electronic filing system, and the citation of "PSR" does not adequately notice defendant or the court to the source of the information referenced. If the government wishes to cite portions of Mr. Engstrom's previous PSR, assuming the disclosure meets the requirement of Local Rule LCR 32-2, the PSR should be included as an exhibit.

Mr. Engstrom does ask the court to find the fact that the government has disclosed access to the PSR as per se proof that the government is aware of the factual findings of the PSR, to be used for impeachment purposes in this and other hearings.

**6.   Government citation to http://walletrecoveryservices.com violates LR IA 7-3**

The government submits a website address, http://walletrecoveryservices.com (see Response p. 20 n. 10), as evidence that Mr. Engstrom may be able to access the cryptocurrency private keys that were seized by the government. Mr. Engstrom objects to the government's inclusion of this address, and any reliance on it by the court, as it's reference violates Local Rule IA 7-3(c)(2), which states "that neither a hyperlink nor any site to which it refers will be considered part of the official record", and "if a party wishes to make any hyperlinked material part of the record, the party mush attach the material as an exhibit." No exhibit is attached.

Mr. Engstrom further submits that there is no basis to the governments suggestion that it would be possible for Mr. Engstrom to access his cryptocurrency holdings without access to the associated private keys. Mr. Engstrom would be able to present expert witnesses that would testify that the cryptographic blockchain technology that cryptocurrencies are based on is secure against the type of brute force attack suggested by the government. This security is the underpinning of blockchain technology, where it would take the cumulative of all the computing power on earth hundreds of thousands of years to access any single bitcoin address.

**7.   Government's mention of firearms in Response (Response p. 19 at n. 9)**

The government mentions, for the first time in their response, that there were firearms found during their search of 487 Petal Dew Avenue. This is not new information, as the firearms found were legally owned by Vincent Cuomo, who, although a defendant in this case, is not a prohibited person. This is the first instance that firearms have been mentioned in relation to Mr. Engstrom. It is unclear if the government is inferring that these firearms, which have no connection to the underlying allegations, should be considered by the court as a factor in Mr. Engstrom's request for pretrial release. Mr. Engstrom holds that mention of these firearms, which the government has provided no evidence have any connection to Mr. Engstrom whatsoever, should not be considered by the court in their release determination.

**8.   Government's allegations that Mr. Engstrom stored illegal proceeds (Response p. 20)**

The government argues that Mr. Engstrom release to the house he shared with his long-time significant other is inappropriate because there was $15,000 found at that location and these were "illegal proceeds." Defendant submits that, while true that there were $15,000 in US Notes found during the search of 305 Saint Augustine, these were collectible notes, consisting of retired US Notes, US "Star" Notes, and one-hundred uncirculated, sequential, one hundred-dollar notes. These were not illegal proceeds but collectibles. There is no nexus between these notes and the alleged crimes.

**9.   Use of Obstruction as a factor in assessing risk of non-appearance**

The government argues in their response that it is appropriate that the court consider obstruction of justice as a 3142(g) factor. First, the defendant contends that this point is moot, there is no evidence that evidence was flushed as the government contends. Assuming in arguendo that the government could establish that evidence was destroyed, there is no evidence that Mr. Engstrom was the perpetrator. Second, obstruction is not a 3142(g) factor but a criteria in itself that warrants detention under 3142(f)(2)(B). The 3142(f)(2)(B) factor requires that the judicial officer find that there exists "a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." The government must prove by clear and convincing evidence not only that defendant obstructed justice but that there is a serious risk of obstruction in the future. See *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009).

**10. The government and magistrate judge violated defendant Due Process rights**

The government, in their response, discloses that after the defendant's August 4, 2021 detention hearing, "in an attempt to provide a full account of Mr. Engstrom's movements during the takedown," they obtained a search warrant for the cloud-based account that stored the video footage from the blink security cameras located at 6145 Harrison Drive (Case No. 2:21-mj-0664-NJK[2]).

---

[2] Defendant requested a copy of this warrant, the affidavit in support of the warrant, and the return of the

First, Mr. Engstrom questions the constitutionality of obtaining a warrant for the purpose stated by

the government. Specifically questioning if, "in an attempt to provide a full account of Mr.

Engstrom's movements during the takedown," lacks the requisite probable cause, as required in

accord with Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) when

obtaining a search warrant, that there exists "a fair probability that contraband or evidence of a

crime will be found in a particular place."

      Mr. Engstrom also objects to the continuation of his detention hearing. This continuation,

which presumably occurred so that the government could pursue the above warrant, constituted a

violation of Mr. Engstrom's substantive and procedural due process rights, at a time where his

significant liberty interests were at stake. Mr. Engstrom, through counsel, filed a Motion to Reopen

Detention (ECF No. 30) on July 29, 2021. That day, in a Minute Order from Chambers (ECF No.

33), Judge Weksler set a hearing on the matter for August 4, 2021 at 3:00pm. The prompt setting of

the hearing implies that the reopening of a detention hearing, in accordance with 18 U.S.C. § 3142(f),

should be considered a continuance of the original hearing, where the promptness required in both

Fed. R. Crim. P. Rule 5 and 18 U.S.C. § 3142 remain in effect. At the August 4, 2021 hearing,

Magistrate Judge Weksler stated orally that she would make a ruling "by the end of the week." On

August 9, 2021, in a Minute Order in Chambers, Judge Weksler set a return hearing for August 11,

2021 at 9:00am (ECF No. 39). On August 10, 2021, the August 11, 2021 hearing was vacated "Due

to an unexpected conflict with the Court's calendar." (ECF No. 40). On August 16, 2021, Judge

Weksler scheduled a return hearing for Mr. Engstrom's Motion to Reopen Detention (ECF No. 30)

for August 17, 2021, at 11:00am.

      There is no provision in 18 U.S.C. § 3142 that allows for a the court to continue a detention

hearing on their own motion. See United States v. Al-Azzawy, 768 F.2d 1141, 1146 (9th Cir. 1985)

("There is no provision for continuances on the court's own motion, even though subsection (f) does

---

warrant in an October 4, 2021 "meet and confer" letter sent to AUSA Clarkson. As of the filing of this reply
the government has not responded to this request.

permit the court, sua sponte, to make other motions, e.g., to order a medical exam."); *United States v. Maull*, 773 F.2d 1479, 1483 (8th Cir. 1985) (en banc) ("the import of the clause [18 U.S.C. § 3142 (f)] is to call for a prompt hearing on the issue of detention."); *United States v. Hurtado*, 779 F.2d 1467, 1475 (11th Cir. 1985) ("Section 3142(f) by its terms makes no provision for a sua sponte finding of good cause to extend the time for holding the detention hearing."). The court's stated reason for vacating the August 11, 2021 hearing, "Due to an unexpected conflict with the Court's calendar," is a reason disapproved of in the Ninth Circuit. See *United States v. Al-Azzawy*, 768 F.2d 1141, 1146 (9th Cir. 1985) ("The liberty interests of the individual who has yet to be tried should not be subordinated to scheduling problems of counsel or the court."). Mr. Engstrom posits that the actual reason that his detention hearing was delayed for thirteen days was to allow time for the government to seek the before mentioned search warrant. If this is the case, it infers that there was much more than an improper sua sponte continuance. Mr. Engstrom asks that this court determine the reason that his detention hearing was continued for thirteen days. If the reason for the continuance was due to a scheduling conflict with Judge Weksler's court calendar, then the inquiry would stop there. If there was no actual conflict with Judge Weksler's calendar, then Mr. Engstrom would like further disclosure as to the actual reasons behind the continuance, in order to determine if Mr. Engstrom was prejudiced by the continuance.

Regardless of the underlying reason, Mr. Engstrom argues that the continuance of his detention hearing for thirteen days, without cause, constitutes a violation of his procedural and substantive due process rights and asks that this be considered a factor in favor of his release.

**Conclusion**

Ultimately the propriety of Mr. Engstrom's release depends on multiple factors. First, the question is whether Mr. Engstrom has rebutted the section § 3142(e)(3) rebuttable presumptions of flight and danger to the community. Mr. Engstrom submits that he has satisfied the burden of production required to rebut these presumptions. Next the Court must determine if the government has proven by a preponderance of the evidence that Mr. Engstrom is a flight risk and that no

14

condition or combination of conditions will reasonably assure his appearance as required, or has

proven by clear and convincing evidence that Mr. Engstrom is a danger to the community and that no

condition or combination of conditions will reasonably assure the safety of the community. Mr.

Engstrom argues that the government has not met their burden for flight or danger.

### Flight

As it relates to flight, Mr. Engstrom does not have the foreign contacts and resources that

were congress's concern when finding that those charged with drug crimes constituted a special risk

of flight. It is these two criteria that courts have found relevant in the determination of flight risk. See

*United States v. Giordano*, 370 F.Supp.2d 1256, 1264 (S.D.Fla. 2005) ("examination requires a court

to take into account whether a defendant has substantial foreign ties, has access to considerable funds

to finance flight from the jurisdiction, or has manifested or demonstrated an intent to flee if

arrested."); *United States v. Arndt*, 329 F. Supp. 2d 182, 186 n.6 (D. Mass. 2004) ("The presumption

reflects Congressional findings that persons who deal in drugs often have the necessary resources

and foreign ties to escape to other countries." quoting *United States v. Palmer-Contreras*, 835 F.2d

15, 17 (1st Cir. 1987) ); and *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (Congress

concluded that "flight to avoid prosecution is particularly high among persons charged with major

drug offenses." S. Rep. No. 225, 98th Cong., 1st Sess. 19 (1983) at 20. It found that "drug traffickers

often have established ties outside the United States . . . [and] have both the resources and foreign

contacts to escape to other countries. . . ." *Id.* Congress then wrote its drug offender/flight

presumption.). Mr. Engstrom submits that he lacks the resources to flee, where the government has

seized almost all of his assets. Mr. Engstrom also submits that he does not have foreign contacts, has

never left the United States, and has never been issued a passport. The Ninth Circuit has held the

community refers to the entirety of the United States, not just the charging district. See *United States*

*v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("If the defendant is a United States resident, the

community to be considered must be at least as broad as in the United States." Mr. Engstrom's only

ties are to the United States, further weighing in favor of his release. Mr. Engstrom also has strong

local ties, where he has lived in Las Vegas since 2007, attends UNLV, owns a business, and where his significant other since 2009 is a lifelong resident. In regards to flight, the Court should find that Mr. Engstrom has adequately rebutted the rebuttable presumption, demonstrating that he is not the type of offender congress had in mind when it created the presumption, leaving very little residual effect of the presumption. See *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985) ("The less those features resemble the congressional paradigm, the less weight the magistrate will likely give to Congress's concern for flight.")

The government's argument on flight centers around Mr. Engstrom's past behavior, inferring that someone who has prior convictions is a per se flight risk. This reasoning has been foreclosed by various courts. The Third Circuit has found that the purpose of a flight-risk determination "is not to detain habitual criminals or deceitful persons; it is to secure the appearance of the accused at trial," *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). Mr. Engstrom submits that he has never failed to appear, often traveling distance at his own expense to appear as required. Mr. Engstrom also submits that it is informative that the Bureau of Prisons, an organization with significant experience in evaluating risk, deemed Mr. Engstrom such a low level of risk that they placed him in a Federal Prison Camp in 2017. The government fails to bring forth any evidence that Mr. Engstrom poses a serious flight risk going forward. Mr. Engstrom relies on *United States v. Dunlap*, 3 F. Supp 772, 790 (C. D. Cal. 2014) where the court found that "The [Bail Reform Act], by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward." (quoting *United States v. Barner*, 743 F. Supp. 2d 225, 228 (W.D.N.Y. 2010). Though not binding on this court, the *Dunlap* finding that the government must prove forward looking risk is well founded in 18 U.S.C. § 3142. Absence evidence that a serious risk of flight exists, this Court should find there exists a reasonable assurance that Mr. Engstrom will appear as necessary, necessitating a finding that pretrial release is appropriate.

Mr. Engstrom further submits that it is not infrequent that arrestees who are similarly situated,

or facing more serious charges, are granted pretrial release. Two of defendant's codefendants in this case have been released pending trial, both of whom have more significant criminal histories. Other examples where arrestees facing serious charges were granted pretrial release include; *United States v. Traitz*, 807 F.2d 322 (3rd Cir. 1986) (three defendants accused of extortion, racketeering, and bribery of a federal official granted pretrial release); *United States v. Leyba*, 104 F. Supp. 2d 1182 (S. D. Iowa 2000) (defendant charged with violating 841(a) and 924(c) granted pretrial release); *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (defendant charged with violation of 841(a) and firearm violations granted pretrial release); *United States v. Romo-Sanchez*, 170 F. Supp, 2d 1127, 2001 U.S. Dist. LEXIS 8304 (D. Kan 2001) (Non-US citizen charged with selling forty pounds of cocaine granted pretrial release); *United States v. Eischeid*, 315 F Supp. 2d 1003 (D. Ariz. 2003) (Hell's Angel Motorcycle Club member charged with Violent Crime in Aid of Racketeering, murder, granted pretrial release); *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108 (D. Minn. 2009) (alien charged with 841 rebuttable presumption case granted pretrial release); and *United States v. Enix*, 209 F. Supp. 3d 557, 2016 U.S. Dist. LEXIS 95319 (W.D.N.Y. 2016) (defendant charged with RICO counts, possession of a firearm in furtherance of a crime of violence, and possession of firearms in furtherance of drug trafficking granted pretrial release).

## Danger to the Community

Mr. Engstrom submits that he has sufficiently rebutted the rebuttable presumption in regards to danger. The lack of any violence in Mr. Engstrom's recent history, his exemplary conduct while on supervision, and his strong ties to the community are sufficient to meet the burden of production required. Mr. Engstrom also submits that his release would not pose a danger to the community. First, although the crimes with which he is charged are sufficient to trigger the rebuttable presumption of § 3142(e)(3), there are no aggravating factors such as threats, violence or the use of weapons. Congresses intentions in enacting the rebuttable presumption for danger as it relates to controlled substances offenses are less clear than those dealing with risk of flight, but we are not totally left without guidance. One need only look to the legislative history of the Bail Reform Act for

guidance on congressional intent for a finding of dangerousness, which states:

> Because of the importance of the interests of the defendant which are implicated in a pretrial detention hearing, the Committee has specifically provided that the facts on which the judicial officer bases a finding that no form of conditional release is adequate reasonably to assure the safety of any other person and the community, must be supported by clear and convincing evidence. This provision emphasizes the requirement that there be an evidentiary basis for the facts that lead the judicial officer to conclude that a pretrial detention is necessary. . . . [Thus], if the dangerous nature of the current offense is to be a basis of detention, then there should be evidence of the specific elements or circumstances of the offense, such as possession or use of a weapon or threats to a witness, that tend to indicate that the defendant will pose a danger to the safety of the community if released. S.Rep. No. 225, 98th Cong., 1st Sess. 5, reprinted in 9A, 1984 U.S. Code Cong. & Adm. News, Legislative History at 22.

The government, for their part, have also failed to provide any evidence that Mr. Engstrom's release would pose a danger to the community. The record is void of any argument from the government as to the fourth factor of 3142(g) "(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release," and the government has not expressed any concerns that Mr. Engstrom would commit additional crimes if released.

Defendant argues that there are a very large number of cases charged under 21 U.S.C. 841(a) each annum, where many of the individuals charged in these cases have previous convictions. If a previous conviction, standing alone, could be said to constitute clear and convincing evidence sufficient to support the entry of a detention order on grounds of dangerousness, a large number of persons accused of violations of 21 U.S.C. 841(a) would be subject to pretrial detention as a matter of course. Such a conclusion is contrary to the legislative history of the BRA, 18 U.S.C. §§ 3141-3150, which states that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." (S. Rep. No. 225, 98th Cong. 1st Sess. 6-7 (1983), reprinted in 1984 U.S. Code Cong. & Ad. News 3189). The above argument is analogous to the finding in *United States v. Ridinger*, 623 F. Supp. 1386,

1394-95 (W.D. Mo. 1985) that the presence of firearms in conjunction with a charged drug offense is not sufficient, standing alone, to constitute clear and convincing evidence sufficient to support the entry of a detention order. Further, the Eight Circuit has held that, "The passage of the pretrial detention provision of the 1984 Act did not, however, signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial," and "The legislative history stresses that "the decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. * * * It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants." Id., at 7, 12 reprinted in 1984 U.S. Code Cong. & Ad. News 9A at 9, 15." *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985). The Second Circuit has held, "it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). Mr. Engstrom argues that he is not one of the "small but identifiable group of particularly dangerous defendants" whom congress intended be detained pending trial.

**Summary**

Mr. Engstrom asks the court to consider the information in herein, in conjunction with the record and Mr. Engstrom's Motion, and find that the government has failed to prove by a preponderance of the evidence that  no conditions or combination of conditions will reasonably assure the appearance of the defendant as required and that the government has failed to prove by clear and convincing evidence that  no condition or combination of conditions will reasonably assure the safety of the community, thereby REVOKING the Magistrate Judge's Detention order, releasing Mr. Engstrom pending trial, subject to whatever conditions the Court finds appropriate.

DATED this 27th day of October, 2021.

Respectfully Submitted,

Paul Engstrom

*In Proper Person*

Legal Mail

Paul Engstrom 06890041
Nevada Southern Detection Center
2190 E Mesquite Ave
Pahrump, NV 89060

FILED _____ RECEIVED
ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

NOV - 1 2021

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEP.

United States District Court
Attn: Clerk
333 Las Vegas Boulevard South
Room 1334
Las Vegas, NV 89101

Las Vegas PRDC 89199
FRI 29 OCT 2021 PM

