JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
CHRISTOPHER BURTON
Nevada Bar No. 12940
KIMBERLY SOKOLICH
Assistant United States Attorneys
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Christopher.Burton4@usdoj.gov
Kimberly.Sokolich@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL ENGSTROM,<br><br>Defendant. | Case No. 2:21-cr-00190-ART-EJY<br><br>**Government's Response in Opposition to Defendant's Motion for Return of Property [ECF No. 132]** |

CERTIFICATION: This response is timely.[1]

**I.   Introduction**

For at least two years, Defendant Paul Engstrom made millions of dollars selling cocaine for cryptocurrency over the dark web. He then undertook sophisticated laundering efforts to conceal the nature and source of those proceeds before exchanging them into U.S. currency, which he then used to purchase various items and pay for living expenses. As a result of his

---

[1]      Although Engstrom's Motion is date stamped February 28, 2022, and the docket reflects that is when the motion was filed, the government received notice of Engstrom's motion on April 29, 2022. *See* LCR 12-1(a)(2) ("Responses to pretrial motions and notices must be filed and served within 14 days from the date of service of the motion[.]"); Government's Exhibit 1.

crimes, Engstrom has been indicted and is awaiting trial on nine criminal counts, with five forfeiture allegations. As Engstrom has no right to the return of property that constitutes the fruits and instrumentalities of his crimes, his motion should be denied.

## II.    Factual Background

In late 2020, Drug Enforcement Administration agents began an investigation into suspicious financial transactions between Engstrom and a cryptocurrency exchange company named BitLiquid. During the investigation, DEA agents identified a physical location that was being used by Engstrom, as well as co-defendants Vincent Cuomo and Abraham Elliot, and suspected it of being a potential "stash location" where controlled substances were being stored and distributed. On December 29, 2020, law enforcement surveilled the location and observed Engstrom, Cuomo, and Elliot arrive within approximately two hours of each other to the stash location. After all were at the location for a short period of time, Elliot left and met with co-defendant Joseph Krieger in a nearby commercial parking lot. Elliot and Krieger both opened the hatchbacks of their respective vehicles and Elliot transferred something from his vehicle to Krieger's car. Elliot and Krieger both left the parking lot shortly after.

Krieger then proceeded to a U.S. Post Office where he deposited 15 Priority Mail envelopes containing prepaid postage. A canine unit alerted on four of those envelopes and each was found to contain between 66 and 104 grams of cocaine. Over the course of the next six months, DEA agents observed numerous incidents where the same general pattern was followed by Engstrom and his co-defendants. Agents would observe Engstrom, Elliot, and Cuomo arrive at the suspected stash location. Elliot would then leave and drive directly to Krieger, who would take possession of a black filing box before proceeding to a U.S. Post Office and depositing 20-40 envelopes at a time. All the envelopes were Priority Mail and contained prepaid postage. The return addresses would be for different local businesses near the location of the Post Office.

DEA also identified a second stash location and continued to interdict and serve search warrants on some of the envelopes appearing to originate from both stash locations, finding cocaine in all envelopes searched.

During DEA's investigation, U.S. Postal Inspection Service ("USPIS") agents indicated they believed there was a connection between the mailings and a prior investigation they had conducted into a person selling cocaine on the dark web under the account name "Insta". On August 6, 2019, USPIS used an undercover identity to purchase cocaine from "Insta" on the dark web. The cocaine had arrived in a Priority Envelope with prepaid postage and a return address for a commercial business in the Las Vegas area. USPIS agents took specific note of the fact that the envelope contained prepaid postage as opposed to metered postage paid for with cryptocurrency, which is more common in dark web transactions.

In March 2021, DEA tested the theory that Engstrom and his co-conspirators were selling cocaine on the dark web under the "Insta" account. They located the "Insta" account on a dark web marketplace called "White House Market" and used an undercover account to make two controlled purchases of cocaine. DEA observed that White House Market required "Monero" for all transactions. Monero is a cryptocurrency intended to provide more secrecy to its users because its blockchain hides most transaction details, unlike other cryptocurrencies such as Bitcoin or Ether, which make all transaction details viewable to the public. To make undercover purchases from "Insta" on White House Market, agents set up an undercover account and added Monero. According to information provided by White House Market, once a buyer makes a purchase, the required Monero is placed in an escrow account controlled by White House Market. Once the cocaine (or other contraband) is received, the purchase is validated by the buyer and the Monero in the escrow account is released to the vendor ("Insta" in this case).

On March 13, 2021, DEA purchased seven ounces of cocaine from "Insta" over White House Market. Although DEA was unable to surveil the delivery or intercept the package following the controlled purchase, four days after the order was placed and confirmed, the purchased cocaine arrived at the undercover address in a Priority Mail envelope with the characteristic return address label, packaging, and prepaid postage as other envelopes that DEA intercepted during the investigation.

For the second controlled purchase, DEA successfully surveilled and intercepted the envelope. On March 25, 2021, DEA agents made a controlled purchase of cocaine from "Insta." Four days later, DEA surveilled the first identified stash location and observed vehicles belonging to Engstrom, Elliott, and Cuomo parked in the near vicinity. Agents then observed Elliott exit the garage and drive from the stash location to a nearby commercial parking lot where he met with Krieger. After a short period of time, Krieger left the parking lot and drove to two U.S. Post Offices, dropping off a total of 43 envelopes. Among the envelopes dropped off at the second Post Office, agents located a Priority Mail envelope addressed to the undercover identity used to make the purchase from "Insta." Inside was the cocaine agents had purchased from "Insta." Agents were thus able to confirm that Engstrom and his co-defendants were using the "Insta" moniker to sell cocaine on the dark web.[2]

On June 18, 2021, investigators executed an anticipatory search warrant to interdict Priority Mail envelopes meeting certain descriptive requirements that Engstrom and his co-defendants attempted to mail. Law enforcement surveilled the conspirators and observed a similar

---

[2]    On May 10, 2021, DEA agents performed a third undercover buy of seven grams of cocaine from "Insta" on White House Market. DEA agents thereafter surveilled the second identified stash location on May 11 and observed Cuomo, Elliott, and Krieger working in concert to mail 33 Priority Mail envelopes at two different U.S. Post Offices. One of the envelopes was addressed to the undercover identity and contained the cocaine agents ordered from "Insta."

4

*modus operandi* as previously described. Engstrom, Cuomo, and Elliott arrived at the stash location and, after some time, Elliott left and met up with Krieger at a nearby commercial parking lot. There, Elliott and Krieger exchanged black plastic filing boxes and Krieger then proceeded to two Post Offices where he deposited Priority Mail envelopes in the drive-thru drop boxes. Investigators intercepted 29 total Priority Mail envelopes that Krieger attempted to mail and executed the search warrant on all of them. Inside each envelope, investigators found cocaine. In one envelope alone, law enforcement found over 300 net grams of cocaine.

On June 21, 2021, law enforcement executed federal search warrants on three residences and two stash locations associated with the drug trafficking conspiracy. Engstrom, Cuomo, and Elliott were all present and in the process of packaging cocaine for shipment at one of the stash locations when the search warrant was executed.

While searching the stash location itself, investigators found a white powdery substance around a toilet bowl, two spoons in the toilet, and a metal tray with white powdery residue on the floor near the toilet. It appeared that an unknown quantity of a white powdery substance had been flushed down the toilet. Law enforcement officers also found multiple open plastic zipper bags on a television tray filled with a white powdery substance. There was a paper drinking cup filled with a white powdery substance next to two scales. Four pressed bricks of a white powdery substance with the embedded insignia "BMW" were recovered from the same office where Engstrom was located by law enforcement.[3] Two of the bricks were located in a freezer equipped with a lock. A key to open that lock was found on Engstrom's key ring. Law enforcement also found two cell phones, numerous flash drives, and two laptops in the same office. There were two large black

---

[3]       The embedded insignia "BMW" on the bricks of cocaine found at the stash location are consistent with photographs from the "Insta" account advertising the sale of cocaine.

filing cabinets that contained approximately 100 Priority Mail envelopes already packaged and sealed in containers labeled with various quantities of cocaine. Random field tests on samples of the white powdery substances all returned positive for cocaine. In total, investigators seized 6,800 grams of presumed cocaine from the stash location.[4]

Investigators also executed a search warrant at Engstrom's residence. During that search, they found a Monero "wallet"[5] later identified to belong to Engstrom and found to contain access to approximately 284 Monero cryptocurrency coins.

During the investigation, law enforcement attempted to determine how much cocaine Engstrom and his co-defendants distributed and how much money they received for it. In reviewing the "Insta" account on White House Market, investigators noted it required a minimum purchase of 3.5 grams of cocaine, and the price at which Engstrom sold cocaine on the dark web under the "Insta" account was approximately three times the street value of cocaine in Las Vegas. White House Market also permits verified buyers to post reviews for vendors and products, similar to websites such as Yelp! Verified buyer reviews found on White House Market show that the "Insta" account made over 3,990 cocaine sales between February 1, 2020,[6] and July 24, 2021. Of those sales, 2,837 transactions had buyer reviews that specified the amount of cocaine purchased while the remaining 1,153 sales did not. Assuming the 1,153 sales for unspecified

---

[4]    Investigators also found three ATM machines in the lobby of the stash location. The machines were not operating and did not contain any currency.

[5]    Although cryptocurrency holdings remain on a blockchain, a cryptocurrency "wallet" stores keys that can be used to access an individual's cryptocurrency holdings. Without these keys, cryptocurrency cannot be accessed, exchanged, or transferred. *See* COIN BASE, https://www.coinbase.com/learn/crypto-basics/what-is-a-crypto-wallet (last visited May 10, 2022).

[6]    The "Insta" account was created on White House Market in January 2020. However, as noted, the "Insta" account was previously on other dark web marketplaces and when the "Insta" account was opened on White House Market, customer reviews from prior sales that "Insta" made on other marketplaces were imported and viewable on White House Market.

amounts were each for the minimum purchase of 3.5 grams, the most conservative estimate is that "Insta" sold over 26 kilograms of cocaine for more than $1.7 million on White House Market alone. Further, White House Market imported customer reviews for the "Insta" account from other dark web marketplaces, showing a total of 7,562 other confirmed completed sales.[7]

Monero, the form of cryptocurrency White House Market transactions required, is an "untethered" cryptocurrency, meaning its value is not pegged to the value of any commodity or fiat currency, and is subject to market fluctuations. To minimize those market fluctuations, dark web vendors frequently convert untethered cryptocurrency to tethered cryptocurrency, such as Paxos Standard. While investigating Engstrom and his co-defendants, law enforcement reviewed Currency Transaction Reports (CTRs) filed by BitLiquid, which showed that Engstrom had exchanged large quantities of Paxos Standard for cash during the same time that "Insta" was selling cocaine on White House Market.

Agents were able to identify two wallets belonging to Engstrom that are accessible on the public blockchain, meaning the associated transactions can be publicly viewed. Analysis of these two wallets revealed Engstrom received large amounts of cryptocurrency into the wallets from tumblers and coin swapping services. Tumblers, sometimes called mixers, are crypto services whereby users can input their cryptocurrency into the service and then receive the same value of cryptocurrency back a short time later, but with a different code or in a different form.[8] This operation is carried out, in part, by the commingling of various user's cryptocurrency holdings.[9]

---

[7]     To again provide the most conservative estimate, the sales "Insta" conducted on dark web marketplaces prior to White House Market are not being counted as part of the total sales for forfeiture purposes, except for the undercover sale to USPIS agents on August 6, 2019.

[8]     *See* Taylor Locke, *Criminals are Using 'Mixers' to Launder Millions in Crypto. They're Not Illegal Yet.*, FORTUNE (March 26, 2022, 5:30 AM PDT), https://fortune.com/2022/03/26/what-are-crypto-mixers/.

[9]     *Id.*

1   Because they function to further anonymize cryptocurrency transactions and the sources of those

2   transactions, they are frequently used by criminals to launder illegal proceeds.[10] The specific

3   tumblers used by Engstrom are capable of transferring Monero into other publicly accessible forms

4   of cryptocurrency, such as Paxos. After leaving these tumblers, investigators tracked Engstrom's

5   cryptocurrency entering his two wallets before proceeding to other wallets, with a majority going

6   into a wallet controlled by BitLiquid.

7       Based on a review of CTRs and subpoenaed transaction records from BitLiquid, Engstrom

8   conducted more than one hundred cryptocurrency-for-cash transactions with BitLiquid and its

9   owner between October 2019 to June 2021. Investigators identified 99 CTRs filed for a total of

10  $4,795,811. Another 14 transactions were identified that required a CTR, but for which one was

11  not filed, totaling $414,338.[11] Finally, there were three transactions that did not require CTRs

12  totaling $12,837. In total, Engstrom received $5,222,986 in cash/bank wires from BitLiquid and

13  its owner in exchange for Engstrom's cryptocurrency. According to CTRs and subpoenaed

14  documents, Engstrom received cash for the vast majority of his BitLiquid exchange transactions.

15  Following the illegal proceeds that Engstrom received from BitLiquid, he would then use that

16  money to fund daily living expenses as well as purchase substantial assets.

17      Given the significant amount of cocaine being sold by Engstrom and his co-defendants on

18  White House Market and the substantial sums of money Engstrom received from cryptocurrency

19  exchanges, investigators attempted to identify any legitimate employment or source for

20  Engstrom's finances. Engstrom was released from prison for a prior conviction in 2017 and an

---

[10]   *Id.*

[11]   The owner of BitLiquid was interviewed and admitted that he sometimes did not file CTRs, sometimes lumped several transactions into one CTR, and also often would not specify on the CTR whether he provided cash or wired the money to Engstrom's bank account.

examination of his tax returns for 2017, 2018, 2019, and 2020, showed he reported no income. Investigators also served the Nevada Department of Employment, Training & Rehabilitation (DETR) with a subpoena requesting any employment records for Engstrom. No business entity operating in Nevada has reported paying any wages to Engstrom. As mentioned above, three empty and non-operating ATMs were found in the stash location. Investigators learned that these ATMs belonged to Engstrom. Investigators also learned that Engstrom had an ATM previously installed at Reality Vape in 2018 and 2019 as well as another ATM installed at BitLiquid in 2020 and 2021.[12] Law enforcement obtained receipts for the two ATMs Engstrom had installed and they showed the following amounts moved through those ATMs between 2018 and 2021:[13]

| Year | Amount |
|------|--------|
| 2018 | $1,300 |
| 2019 | $17,780 |
| 2020 | $10,200 |
| 2021 | $8,300 |

    In short, law enforcement has been wholly unable to identify any legitimate source for Engstrom's funds.

///

---

[12]    It is unknown at this time whether the two ATMs Engstrom had installed between 2018 and 2021 were the same or different than the ATMs that were recovered during the search warrant.
[13]    This table does not depict the amount of income Engstrom received from operating the ATMs, but only the amount of U.S. currency that was withdrawn from the ATMs. The income Engstrom received appears to be based on a surcharge fee per withdrawal. Based on the records received, there were only between 13 and 28 withdrawals triggering a surcharge each year between 2018 and 2020. In 2021, there were 172 withdrawals triggering a surcharge. Based on the investigation, an ATM surcharge is typically approximately $3.00 and Engstrom would have likely had to provide some of his surcharge profit to the location where the ATMs were installed.

### III.   Relevant Procedural Background

Based on the above investigation, a criminal complaint was filed on June 22, 2021, charging Engstrom with one count of Conspiracy to Distribute Cocaine and one count of Conspiracy to Commit Money Laundering.[14] In preparation for his detention hearing, Engstrom reported to Pretrial Services that he owned eight to ten million dollars' worth of cryptocurrency. Given the ongoing investigation, and the fact that Engstrom appears to have no legitimate source of income, the government questioned the source of Engstrom's purported cryptocurrency holdings and contended that any cryptocurrency owned by Engstrom is likely proceeds of drug trafficking.[15]

The grand jury subsequently returned a nine-count indictment, which charged Engstrom with eight counts relating to illegal distribution of cocaine and one count of conspiracy to commit money laundering.[16] The indictment also contained four separate forfeiture allegations as related to Engstrom.[17] On May 10, 2022, the government filed a bill of particulars more specifically identifying some items it will seek to forfeit in this case.[18] The bill of particulars also includes a money judgment in the amount of $1,715,577.[19]

---

[14]   ECF No. 1.

[15]   *See* ECF No. 35. Engstrom later told the Court he could not afford an attorney and submitted a financial affidavit that the Court relied upon to find that he qualified for court-appointed counsel. *See* ECF No. 4 (Minutes). The government is not privy to the contents of Engstrom's financial affidavit.

[16]   ECF No. 17.

[17]   *Id.*

[18]   ECF No. 136. The bill of particulars contains five forfeiture allegations, instead of four as listed in the indictment. However, the distinction is Forfeiture Allegation Two in the original indictment was divided into two separate allegations in the bill of particulars to more clearly delineate which statutes were being invoked to forfeit the listed firearms as compared to the ammunition. *Compare* ECF No. 17, Forfeiture Allegation Two, *with* ECF No. 136, Forfeiture Allegations Three and Four.

[19]   *Id.*

On August 26, 2021, Engstrom filed a motion to represent himself.[20] After an extensive canvass where Engstrom affirmed he wished to represent himself, his motion was granted.[21]

On April 29, 2022, Engstrom filed the instant motion for return of property.[22] The government's response follows.

## IV.   Points and Authorities

### A. Relevant Properties

Engstrom seeks the return of the following property:

1) $15,500 U.S. Currency;
2) 0.33081041 Bitcoins (2);
3) 0.13613809 Bitcoins (2);
4) 10,214.4445896 Dogecoin;
5) 0.451462387496977257 Ethereum;
6) 1,165.68039959 Paxos Standard;
7) $3,500 U.S. Currency;
8) Three ATM machines;
9) 2018 Ducati Panigale Motorcycle, VIN ZDMDAGNW8JB003209;
10) 2020 smokey gray Harley-Davidson Touring, VIN 1HD1TEH23LB954585, bearing Nevada License plate number STINKS;
11) 2019 white Ducati Racer Motorcycle, VIN ZDMVABDS0KB007875, bearing Nevada License plate number KNZL;
12) 2019 black Ducati Cruiser Motorcycle, VIN ZDM13BKW2KB010548, bearing Nevada License plate number XDVL;
13) 2019 titanium gray and black Ducati X Diavel Motorcycle, VIN ZDM13BKW1MB000502, bearing Nevada License plate number NX191017;
14) 2021 black hole with pinstripe Harley Davidson Cruiser, VIN 1HD1TCL13MB952002, bearing Nevada License plate number 910044; and
15) 2020 red Ducati Superleggera Motorcycle, VIN ZDMDAGUW1LB000138.

///

///

---

[20]   ECF No. 47.
[21]   *See* ECF No. 55 (Minutes).
[22]   ECF No. 132.

The government has no objection to the return of the first nine items listed above.[23] However, the government opposes Engstrom's request to return items 10-15.[24] As it currently stands pursuant to the bill of particulars and the indictment filed in this case, the government will be seeking forfeiture as to those items.

**B. The Government is in Full Compliance with All Applicable Forfeiture Statutes**

Under 21 U.S.C. § 853, any person convicted of an offense listed in Chapter 13 of Title 21 that is punishable by more than one year in prison "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation [and] any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation[.]" The offenses charged in the instant indictment under 21 U.S.C. §§ 841 and 846 are included in Chapter 13.[25]

Similarly, under 18 U.S.C. § 982(a)(1), a person convicted of an offense in violation of 18 U.S.C. § 1956 shall likewise be ordered to forfeit to the United States "any property, real or personal, involved in such offense, or any property traceable to such property." Section 982

---

[23]     In reference to the U.S. currency listed above, Engstrom contends that he wants the physical currency itself returned, as opposed to a wire transfer of equivalent face value as offered by the DEA, consistent with its policy. *See* ECF No. 132, pp. 14-15, Ex. G. However, it is the government's understanding that the physical currency seized during the search warrant was deposited into a government-controlled account for safekeeping pursuant to DEA policy and is no longer in its possession. To the extent Engstrom believes the value of the physical currency exceeds its face value, his remedy lies in a civil claim against DEA, not a motion for return of property. *See Ordonez v. United States*, 680 F.3d 1135 (9th Cir. 2012) (finding a Rule 41(g) motion does not allow for money damages or any other form of remedy when the property requested to be returned is no longer in the possession of the government).

[24]     The bill of particulars also lists 284.742879735905 in Monero cryptocurrency and Engstrom does not request the return of any Monero cryptocurrency. In any event, the government also opposes any request that may be made for the return of any of the seized Monero.

[25]     *See* 21 U.S.C. §§ 841, 846; ECF No. 17 (Counts One thru Eight).

indicates that any forfeiture of property pursuant to that law, including any related judicial proceedings, shall be governed by 21 U.S.C. § 853.[26]

Proceedings regarding criminal forfeiture, as provided under 21 U.S.C. § 853 and 18 U.S.C. § 982 are governed by those statutes as well as Federal Rule of Criminal Procedure 32.2. Under Rule 32.2, notice of the government's intention to seek forfeiture must be provided to the defendant in order for a court to order forfeiture.[27] Notice can be provided by including a forfeiture allegation in an indictment or information, and '[t]he indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks."[28] After a finding of guilt is entered on the record, or after a plea of guilt is accepted, the court must determine what specific property is subject to forfeiture.[29] Under 21 U.S.C. § 853(d), there is a rebuttable presumption that property is subject to forfeiture if the United States shows by a preponderance of the evidence that the property was acquired by the defendant during the period of the controlled substance offense or within a reasonable time thereafter and there is no likely legitimate source for the property.[30]

---

[26]     18 U.S.C. § 982(b)(1).

[27]     FED. R. CRIM. PRO. 32.2(a); *see also United States v. Lo*, 839 F.3d 777, 791 (9th Cir. 2016) (relying on Rule 32.2(a) in rejecting an argument that the government provided insufficient notice and stating "[b]ecause Lo was not entitled to notification that the government was seeking specific property, the government's decision to seek a money judgment instead of the listed property does not render the government noncompliant with the statute"); *United States v. Hampton*, 732 F.3d 687, 690-91 (6th Cir. 2013) (relying on Rule 32.2(a) and finding an indictment that indicated an intent to seek criminal forfeiture, including a money judgment, sufficient notice despite the fact no specific property was listed) (citing *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986); *United States v. DeFries*, 129 F.3d 1293, 1315 n.17 (D.C. Cir. 1997); *United States v. Kalish*, 626 F.3d 165, 169 (2nd Cir. 2010); *United States v. Plaskett*, 355 Fed. Appx. 639, 644 (3rd Cir. 2009)).

[28]     FED. R. CRIM. PRO. 32.2(a)

[29]     FED. R. CRIM. PRO. 32.2(b)(1)(A).

[30]     *See also*, *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1577 (9th Cir. 1989) (holding that forfeiture allegations must be proven by a preponderance of the evidence and if the presumption under 853(d) is not rebutted, then forfeiture must issue).

Here, the government filed an indictment on July 26, 2021.[31] That indictment contained four allegations of forfeiture.[32] Forfeiture Allegation One of the indictment states, in part, that the government is "seeking forfeiture of any property . . . which constitutes or is derived from proceeds traceable to" or "used, in any manner or part, to commit" the charged violations of Title 21 as well as 18 U.S.C. § 1956.[33] Similarly, Forfeiture Allegation Four of the indictment provides notice, in part, that Engstrom shall forfeit any property "which constitutes or is derived from proceeds traceable to" or is involved in violations under 18 U.S.C. § 1956 for which he is convicted.[34] These allegations provided sufficient notice to Engstrom under Rule 32.2.

Additionally, although not required under the rules and statutes, to provide additional information to Engstrom and the Court as to what specific properties the government is at this time intending to seek in forfeiture, the government filed a bill of particulars.[35] The government will continue to provide sufficient notice to Engstrom as to the forfeiture allegations in the indictment.

Engstrom spends considerable time arguing that forfeiture cannot occur under 18 U.S.C. § 983 and therefore his property must be returned.[36] In addition to criminal forfeiture statutes such as the ones described above and listed in the indictment, Congress has also provided for civil forfeiture under 18 U.S.C. § 983. To civilly forfeit property under that statute, a civil complaint must be filed within a certain time, depending on whether a claim for return of the property to be

---

[31]    ECF No. 17.
[32]    *Id.*
[33]    *Id.* at Forfeiture Allegation One.
[34]    *Id.* at Forfeiture Allegation Four.
[35]    ECF No. 136.
[36]    *See* ECF No. 132 at pp. 1-17.

forfeited has been filed.[37] However, by its own terms, 18 U.S.C. § 983 does not apply to criminal forfeiture actions.[38]

In this case, the government simply is not pursuing forfeiture Section 983, and the statute acknowledges by its own terms that it does not apply to criminal forfeiture. The indictment with forfeiture allegations was obtained well within the timeframes required under Section 983 and indeed even *before* Engstrom made any claim.[39] Because an indictment was obtained before the time allotted by Section 983 and the government took steps to preserve its right to maintain custody and forfeit the property under the applicable criminal forfeiture statutes, Section 983 is not applicable and Engstrom is not entitled to return of the property.[40] As such, a discussion of Section 983 and its interplay with 28 C.F.R. § 8.13 is not necessary or relevant to resolving the instant motion.

///

---

[37] *See* 18 U.S.C. § 983.

[38] 18 U.S.C. § 983(a)(3)(C) ("In lieu of, or in addition to, filing a civil forfeiture complaint, the Government may include a forfeiture allegation in a criminal indictment. If criminal forfeiture is the only forfeiture proceeding commenced by the Government, the Government's right to continued possession of the property shall be governed by the applicable criminal forfeiture statute."); *see also,* 18 U.S.C. § 983(a)(1)(A)(iii)(II) (providing that, if the government obtains an indictment containing a forfeiture allegation, it may terminate any nonjudicial civil forfeiture proceeding and pursue forfeiture exclusively under the applicable criminal forfeiture statute); 18 U.S.C. § 983(a)(3) (providing that, if the government obtains an indictment containing forfeiture allegations, it cannot be compelled to return property pursuant to the civil forfeiture statute).

[39] *Compare* ECF No. 17 (filed July 26, 2021), *with* ECF No. 132, Ex. F (claim for return of property submitted by Engstrom on September 18, 2021).

[40] *See* 18 U.S.C. 983(a)(3). *See also* ECF No. 132 ("After a party properly files a claim, all administrative forfeiture proceedings cease and the United States Attorney for the appropriate district must, not later than 90 days after the claim has been filed, initiate judicial forfeiture proceedings by either filing a civil forfeiture complaint; or by obtaining a criminal indictment containing an allegation that the property is subject to forfeiture, and taking the steps necessary to preserve the right to maintain custody of the property as provided by the applicable forfeiture statute.").

## C. Engstrom is Not Entitled to Return of the Motorcycles Listed in the Bill of Particulars Under Rule 41(g)

Federal Rule of Criminal Procedure 41(g) provides that a person aggrieved by deprivation of property taken during a search warrant may move for its return. However, such a motion "may be denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues."[41] Property is no longer needed for evidentiary purposes when the trial is complete, the defendant has pleaded guilty, or the government has abandoned its investigation.[42] Further, it is "well-settled" that a motion for return of property must be denied if the government can demonstrate the property is subject to forfeiture.[43] Evidence that the government has a cognizable claim of ownership or right to possession adverse to the defendant is sufficient to defeat a motion for return of property.[44]

Here, Engstrom is not entitled to the return of the six motorcycles listed in the bill of particulars because they are subject to forfeiture proceedings in this case. The forfeiture allegations included in the indictment and bill of particulars demonstrates the government has asserted a cognizable claim of ownership and right to possession adverse to Engstrom.[45] Engstrom contends that his request under Rule 41(g) should be entertained because "there are no forfeiture proceedings pending."[46] That is simply incorrect. In accordance with Rule 32.2, upon a finding of

---

[41]   *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991).
[42]   *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987).
[43]   *United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996).
[44]   *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993).
[45]   *See* 21 U.S.C. § 853(c) ("All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section."); 21 U.S.C. § 881(h) (same); 18 U.S.C. § 981(f) (same).
[46]   ECF No. 132, p. 20.

guilt, this Court will have to determine what, if any, property is forfeitable.[47] That determination may include consideration of evidence and, if the criminal forfeiture is contested, requires a hearing.[48] Those are the pending criminal forfeiture proceedings that apply by function of the indictment.

Engstrom also contends that because the motorcycles were not specifically listed in Attachment B of the applicable search warrants, they were "illegally seized" and should be returned. However, that the motorcycles were not specifically listed in the search warrant is not alone fatal to the government's seizure of them. Indeed, law enforcement is statutorily permitted to seize any property found during a lawful search when it has probable cause to believe it is subject to forfeiture.[49] Here, at the time of the search warrant, law enforcement had evidence that Engstrom was selling cocaine over the dark web and receiving millions of dollars in return and that he had no legitimate employment or identified source of income. They were also aware that one of Engstrom's residences had multiple motorcycles parked in the garage and they determined those vehicles belonged to Engstrom and had been purchased during the date range of the conspiracy. The affiant for the search warrant executed on June 21 even opined that "it is believed

///

///

---

[47]   FED. R. CRIM. PRO. 32.2(b)(1)(A).
[48]   FED. R. CRIM. PRO. 32.2(b)(1)(B).
[49]   18 U.S.C. 981(b)(2)(B)(i) ("Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if . . . there is probable cause to believe that the property is subject to forfeiture and the seizure is made pursuant to a lawful arrest or search."); *see also United States v. Roth*, 912 F.2d 1131, 1134 (9th Cir. 1990) (finding that, in the context of criminal forfeiture, probable cause can be demonstrated by "an aggregate of the facts" and is "less than prima facie proof but more than mere suspicion" and holding that evidence of a purchase of property during the time of the charged crime absent "significant credible evidence" of a legitimate source meets the burden of showing probable cause).

that ENGSTROM used illicit proceeds to purchase the motorcycles kept in the garage of SUBJECT PREMISES 5."[50] During the course of the search warrant, law enforcement found further evidence of Engstrom's recent purchases of the motorcycles previously seen as well as other motorcycles found at different locations. Based on the investigation up to that point, agents had sufficient probable cause to seize the motorcycles as being subject to forfeiture. And an indictment obtained just over a month later on July 26 that included forfeiture allegations further corroborates that probable cause.[51] Additionally, outside of his contention that Attachment B of the search warrants did not specifically list the motorcycles, Engstrom does not challenge the legality of the search warrants the agents were executing at the time they saw the motorcycles.[52]

Further, the motorcycles cannot be returned under Rule 41(g) because they have evidentiary value. The government has a right to present unexplained assets to a jury as evidence of the charged offenses in this case. Engstrom was released from prison for a prior conviction in 2017 and has reported no taxable income since that time. Based on the financial investigation to date, he has made a small pittance from a minor ATM business. And yet, he has purchased substantial personal assets. Evidence of those assets supports the government's case that Engstrom entered a conspiracy to sell large amounts of cocaine on the dark web and launder the proceeds through cryptocurrency methods before spending it. The evidentiary value of the motorcycles Engstrom purchased with tainted drug proceeds will remain until trial.

///

///

---

[50]     Government's Exhibit 2, at p. 29. SUBJECT PREMISES 5 is identified as 305 Saint Augustine Lane, where five of the motorcycles listed in the bill of particulars were found.
[51]     ECF No. 17.
[52]     *See* ECF No. 132, pp. 19-23.

**D. Engstrom has Failed to Sustain His Initial Burden of Demonstrating the Need for the Return of Property to Fund Counsel of Choice**

The Sixth Amendment right to counsel of choice does not allow a defendant to use tainted funds to retain an attorney.[53] The government has a superior property interest to proceeds of illegal activity over a defendant and a defendant has no constitutional right "to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice."[54]

A defendant's Sixth Amendment right to counsel is also not implicated if the defendant has other assets which are sufficient to fund his attorney of choice.[55] Thus, to be entitled to a hearing, a defendant must make a sufficient evidentiary showing that he wishes to retain counsel and there are no unrestrained assets with which to pay.[56] A defendant meets this burden with moving papers that are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented."[57]

///

---

[53]     *Caplin & Drysdale, Chtd. v. United States*, 491 U.S. 617, 626 (1989).
[54]     *Id.* at 626-27.
[55]     *See United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998); *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001).
[56]     *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993); *Jones*, 160 F.3d at 647; *Farmer*, 274 F.3d at 804; *United States v. E-Gold, Ltd.*, 521 F.3d 411, 421 (D.C. Cir. 2008); *see also United States v. Lindell*, 766 Fed. Appx. 525, 528-29 (9th Cir. 2019) (unpublished) (holding that the defendants failed to show that seized funds were necessary to pay for counsel of choice when they previously stated they were seeking the same funds to pay various living expenses).
[57]     *Unimex*, 991 F.2d at 551; *see also Jones*, 160 F.3d at 647 (holding a hearing is warranted only upon a "properly supported motion by defendant"); *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (holding that a defendant's "bare-bones affidavit asserting he personally lacked sufficient funds to obtain counsel of his choice" was insufficient to warrant a hearing); *United States v. Approximately $144,001 in U.S. Currency*, 2011 WL 5345266 (N.D. Cal. 2011) (unpublished) (holding that mere argument that a defendant has no assets, in the absence of evidence to support the claim, does not entitle defendant to a hearing).

If a defendant demonstrates that property within the government's possession is necessary to fund their defense, he is nevertheless not entitled to release of any property where there is probable cause to support its forfeiture.[58] The probable cause inquiry for such a hearing is separated into two inquiries: "(1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime."[59] However, if a criminal indictment has been obtained in the case, the court cannot re-consider the conclusion of the grand jury as to whether the defendant has committed an offense permitting forfeiture.[60] Thus, any hearing to determine whether a defendant should have access to seized property should only address whether there is probable cause to find that the property at issue has the requisite nexus to the charged offenses. If it is determined that there is insufficient probable cause to show that the seized or restrained items are traceable to the charged offenses, and the defendant seeks their release in order to retain counsel of choice, the property should be released even if there are applicable substitute forfeiture provisions.[61] When there is a rebuttable presumption under Section 853(d) because the government has demonstrated by a preponderance of evidence that the property was purchased during or reasonably soon after a violation of Title 21 and there is no

---

[58]   *See United States v. Monsanto*, 491 U.S. 600, 612-15 (1989).

[59]   *Kaley v. United States*, 571 U.S. 320, 323-24 (2014).

[60]   *Id.* at 330 ("If judicial review of the grand jury's probable cause determination is not warranted (as we have so often held) to put a defendant on trial or place her in custody, then neither is it needed to freeze her property."); *see also Jones*, 160 F.3d at 648 ("The government may describe and explain the underlying charge, it simply bears no burden of persuasion on the issue. The district court must take those allegations of the indictment as true and assume at the hearing that the underlying offense has been committed.").

[61]   *Luis v. United States*, 578 U.S. 5, 10-12 (distinguishing *Monsanto* and stating "[t]he relevant difference consists of the fact that the property here is untainted; i.e., it belongs to the defendant, pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime.").

likely legitimate source of funds for the purchase of the asset, failure to rebut that presumption by itself can constitute a showing of probable cause.[62]

Here, Engstrom fails to provide sufficient information to warrant a hearing under *Monsanto*. Engstrom's single paragraph addressing the need for return of the property to fund counsel of choice contains a bare allegation that the government "has made every attempt to restrain all of Mr. Engstrom's assets," leaving him indigent.[63] However, this representation is insufficiently specific and is belied by the fact that the government has indicated its willingness to return certain assets to Engstrom.[64] Based on the government's estimate, it stands ready to return just under $60,000 in total assets to Engstrom. Further, as represented above, the government has agreed to return three ATMs to Engstrom, ostensibly providing him with an additional potential revenue stream, even while he is detained pending trial.[65]

Further, Engstrom elected to forego appointed counsel and represent himself.[66] And in recorded jail calls made at the time of his decision, Engstrom indicated this was a strategic decision, not one borne of an inability to retain counsel.[67] As such, it seems Engstrom has already made his choice to not have counsel, appointed or retained. Considering this evidence, Engstrom must provide a more detailed accounting of why he needs the requested properties to secure counsel of choice to trigger a hearing.

---

[62]    *Roth*, 912 F.2d at 1134; *see also United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1576-77 (9th Cir. 1989) (holding that an unrebutted presumption under 853(d) requires forfeiture after a finding of guilt).

[63]    ECF No. 132, p. 23.

[64]    *See infra*; *see also* ECF No. 132, Ex. G (letter from DEA Asset Forfeiture Section Senior Attorney David A. Zekoski indicating the government's decision to return various properties seized from Engstrom).

[65]    *See* ECF No. 132, p. 8 (Engstrom representing that he uses the ATMs that he is seeking to be returned in his ATM business).

[66]    ECF Nos. 47, 55.

[67]    Government's Exhibit 3, at 4:00-5:30; Government's Exhibit 4, at 4:00-6:00.

Notwithstanding Engstrom's failure to provide a sufficiently specific and detailed claim so as to warrant a hearing, if an evidentiary hearing is nonetheless held, it should be confined to determining whether there is probable cause to find that the property at issue has the requisite nexus to the charged offenses, with the requisite nexus being defined by the applicable criminal forfeiture statutes. At that hearing, the government has the burden of proof and, as to Forfeiture Allegation One of the indictment, the rebuttable presumption in 21 U.S.C. 853(d) should be applied.[68] Additionally, as to Forfeiture Allegation Four of the indictment, forfeiture of money laundering proceeds requires consideration of commingling of funds to the extent untainted funds were "involved" in the offense.[69]

## V.   Conclusion

For all the foregoing reasons, this Court should deny the Motion.

DATED:  May 12, 2022

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/  Christopher Burton*
CHRISTOPHER BURTON
KIMBERLY SOKOLICH
Assistant United States Attorneys

---

[68]    *See* ECF No. 17, Forfeiture Allegation One (referencing violations of 21 U.S.C. § § 841 and 846 as charged in Counts One thru Eight).

[69]    *See* ECF No. 17, Forfeiture Allegation Four (referencing violation of 18 U.S.C. § 1956); 18 U.S.C. 982(a)(1); *United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009) ("[I]n a money laundering charge, the commingling of tainted money with clean money taints the entire account."); *United States v. Rutgard*, 116 F.3d 1270, 1292 (9th Cir. 1997) ("If § 1956 required tracing of specific funds, it could be wholly frustrated by commingling. For that reason, the statute not only proscribes any transaction whose purpose is to hide criminal funds but reaches any funds 'involved' in the transaction.").

1

## CERTIFICATE OF SERVICE

2      I certify that I am an employee of the United States Attorney's Office.   A copy of the

3   foregoing **Government's Response in Opposition to Defendant's Motion for Return of Property**

4   **[ECF No. 132]** was sent via Federal Express to:

5           Paul Engstrom  06870041
            Nevada Southern Detention Center
6           2190 E. Mesquite Avenue
            Pahrump, NV 89060
7

8      **DATED** May 13, 2022.

9

10                                              */s/ Christopher Burton*

11                                              _____
                                               CHRISTOPHER BURTON
                                               Assistant United States Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24