JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
CHRISTOPHER BURTON
Nevada Bar No. 12940
KIMBERLY SOKOLICH
Assistant United States Attorneys
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Christopher.Burton4@usdoj.gov
Kimberly.Sokolich@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00190-ART-EJY |
| Plaintiff, | **Government's Response to Objections to Magistrate Judge's Report and Recommendation [ECF No. 143]** |
| vs. | |
| PAUL ENGSTROM, | |
| Defendant. | |

CERTIFICATION: This response is timely.[1]

## I.     Introduction

For at least two years, Defendant Paul Engstrom made millions of dollars selling cocaine for cryptocurrency over the dark web. He then undertook sophisticated laundering efforts to conceal the nature and source of those proceeds before exchanging them into U.S. currency, which he then used to purchase various items and pay for living expenses. As a

---

[1]     The government notes that Engstrom is not entitled to file a reply under LR IB 3-2(a) except with leave of this Court.

result of his crimes, Engstrom has been indicted and is awaiting trial on nine criminal counts, with five forfeiture allegations. As Engstrom has no right to the return of property that constitutes the fruits and instrumentalities of his crimes, his motion should be denied.

## II.      Factual Background

In late 2020, Drug Enforcement Administration agents began an investigation into suspicious financial transactions between Engstrom and a cryptocurrency exchange company named BitLiquid. During the investigation, DEA agents identified a physical location that was being used by Engstrom, as well as co-defendants Vincent Cuomo and Abraham Elliot, and suspected it of being a potential "stash location" where controlled substances were being stored and distributed. On December 29, 2020, law enforcement surveilled the location and observed Engstrom, Cuomo, and Elliot arrive within approximately two hours of each other to the stash location. After all were at the location for a short period of time, Elliot left and met with co-defendant Joseph Krieger in a nearby commercial parking lot. Elliot and Krieger both opened the hatchbacks of their respective vehicles and Elliot transferred something from his vehicle to Krieger's car. Elliot and Krieger both left the parking lot shortly after.

Krieger then proceeded to a U.S. Post Office where he deposited 15 Priority Mail envelopes containing prepaid postage. A canine unit alerted on four of those envelopes and each was found to contain between 66 and 104 grams of cocaine. Over the course of the next six months, DEA agents observed numerous incidents where Engstrom and his co-conspirators followed the same general pattern. Agents observed Engstrom, Elliot, and Cuomo arrive at the suspected stash location. Elliot would then leave and drive directly to Krieger, who would take possession of a black filing box before proceeding to a U.S. Post Office and deposit 20-40 envelopes at a time. All the envelopes were Priority Mail and

contained prepaid postage. The return addresses listed on the envelopes would be for different local businesses near the Post Office. DEA also identified a second stash location and continued to interdict and serve search warrants on some of the envelopes appearing to originate from both stash locations, finding cocaine in all envelopes searched.

During DEA's investigation, U.S. Postal Inspection Service agents indicated they believed there was a connection between the mailings and a prior investigation they had conducted into a person selling cocaine on the dark web under the name "Insta". On August 6, 2019, USPIS used an undercover identity to purchase cocaine from "Insta" on the dark web. The cocaine arrived in a Priority Envelope with prepaid postage and a return address for a commercial business in the Las Vegas area. USPIS agents took specific note of the fact that the envelope contained prepaid postage as opposed to metered postage paid for with cryptocurrency, which is more common in dark web transactions.

In March 2021, DEA tested the theory that Engstrom and his co-conspirators were selling cocaine on the dark web under the "Insta" account. They found "Insta" on a dark web marketplace called "White House Market" and used an undercover account to make two controlled purchases of cocaine. DEA observed that White House Market required Monero for all transactions. Monero is a cryptocurrency intended to provide more secrecy to its users because its blockchain hides most transaction details, unlike other more publicly accessible cryptocurrencies such as Bitcoin or Ether. To make undercover purchases from "Insta" on White House Market, agents set up an undercover account and added Monero. According to information provided by White House Market, once a buyer makes a purchase, the required Monero is placed in an escrow account controlled by White House Market. Once the cocaine (or other contraband) is received, the purchase is validated by

the buyer and the Monero in the escrow account is released to the vendor ("Insta" in this case).

On March 13, 2021, DEA purchased seven ounces of cocaine from "Insta" over White House Market. Although DEA was unable to surveil the delivery or intercept the package following the controlled purchase, four days after the order was placed and confirmed, the purchased cocaine arrived at the undercover address. It was in a Priority Mail envelope with the characteristic return address label, packaging, and prepaid postage as other envelopes that DEA intercepted during this investigation.

For the second controlled purchase, DEA successfully surveilled and intercepted the envelope. On March 25, 2021, DEA agents made a controlled purchase of cocaine from "Insta." Four days later, DEA surveilled the first identified stash location and observed vehicles belonging to Engstrom, Elliott, and Cuomo parked in the near vicinity. Agents then observed Elliott exit the garage and drive from the stash location to a nearby commercial parking lot where he met with Krieger. After a short period of time, Krieger left the parking lot and drove to two U.S. Post Offices, dropping off a total of 43 envelopes. Among the envelopes Krieger dropped off at the second Post Office, agents located a Priority Mail envelope addressed to the undercover identity. Inside, agents found the cocaine they purchased from "Insta." Agents were thus able to confirm that Engstrom and his co-conspirators were using the "Insta" moniker to sell cocaine on the dark web.[2]

---

[2]     On May 10, 2021, DEA agents performed a third undercover buy of seven grams of cocaine from "Insta" on White House Market. DEA agents thereafter surveilled the second identified stash location on May 11 and observed Cuomo, Elliott, and Krieger working in concert to mail 33 Priority Mail envelopes at two different U.S. Post Offices. One of the envelopes was addressed to the undercover identity and contained the cocaine agents ordered from "Insta."

1        On June 18, 2021, investigators executed an anticipatory search warrant to interdict

2    Priority Mail envelopes meeting certain descriptive requirements that Engstrom and his co-

3    conspirators attempted to mail. Law enforcement surveilled the conspirators and observed

4    a similar *modus operandi* as previously described. Engstrom, Cuomo, and Elliott arrived at

5    the stash location and, after some time, Elliott left and met up with Krieger at a nearby

6    commercial parking lot. There, Elliot and Krieger exchanged black plastic filing boxes and

7    Krieger then proceeded to two Post Offices where he deposited Priority Mail envelopes in

8    the drive-thru drop boxes. Investigators intercepted 29 total Priority Mail envelopes that

9    Krieger attempted to mail and executed the search warrant on all of them. Inside each

10    envelope, investigators found cocaine. In one envelope alone, law enforcement found over

11    300 grams of cocaine.

12        On June 21, 2021, law enforcement executed federal search warrants on three

13    residences and two stash locations associated with the drug trafficking conspiracy.

14    Engstrom, Cuomo, and Elliott were all present and in the process of packaging cocaine for

15    shipment at one of the stash locations when the search warrant was executed.

16        While searching the stash location itself, investigators found a white powdery

17    substance around a toilet bowl, two spoons in the toilet, and a metal tray with white

18    powdery residue on the floor near the toilet. It appeared that an unknown quantity of white

19    powder had been flushed down the toilet. Law enforcement officers also found multiple

20    open plastic zipper bags on a television tray filled with white powder. There was also paper

21    drinking cup filled with white powder next to two scales. Four pressed bricks of white

22    powder with the embedded insignia "BMW" were recovered from the same office where

23    ///

24    ///

Engstrom was located by law enforcement.[3] Two of the bricks were located in a freezer equipped with a lock. Engstrom's key ring included the key to open that lock. Law enforcement also found two cell phones, numerous flash drives, and two laptops in the same office. There were two large black filing cabinets that contained approximately 100 Priority Mail envelopes already packaged and sealed in containers labeled with various quantities of cocaine. Random field tests on samples of the white powder all returned positive for cocaine. In total, investigators seized 6,800 grams of presumed cocaine from the stash location.

Investigators also executed a search warrant at Engstrom's residence. During that search, they found a Monero "wallet"[4] later identified to belong to Engstrom and found to contain access to approximately 284 Monero cryptocurrency coins.

During the investigation, law enforcement attempted to determine how much cocaine Engstrom and his co-conspirators distributed and how much money they received for it. In reviewing the "Insta" account on White House Market, investigators noted it required a minimum purchase of 3.5 grams of cocaine, and the price at which Engstrom sold cocaine on the dark web under the "Insta" account was approximately three times the street value of cocaine in Las Vegas. White House Market also permits verified buyers to post reviews for vendors and products, similar to websites such as Yelp! Verified buyer reviews found on White House Market show that the "Insta" account made over 3,990

---

[3]    The embedded insignia "BMW" on the bricks of cocaine found at the stash location are consistent with photographs from the "Insta" account advertising the sale of cocaine.

[4]    Although cryptocurrency holdings remain on a blockchain, a cryptocurrency "wallet" stores keys that can be used to access an individual's cryptocurrency holdings. Without these keys, cryptocurrency cannot be accessed, exchanged, or transferred. *See* COIN BASE, https://www.coinbase.com/learn/crypto-basics/what-is-a-crypto-wallet (last visited May 10, 2022).

cocaine sales between February 1, 2020,[5] and July 24, 2021. Of those sales, 2,837 transactions had buyer reviews that specified the amount of cocaine purchased while the remaining 1,153 sales did not. Assuming the 1,153 sales for unspecified amounts were each for the minimum purchase of 3.5 grams, the most conservative estimate is that "Insta" sold over 26 kilograms of cocaine for more than $1.7 million on White House Market alone. Further, White House Market imported customer reviews for the "Insta" account from other dark web marketplaces, showing a total of 7,562 other confirmed completed sales.[6]

Agents were able to identify two wallets belonging to Engstrom that are on the public blockchain, meaning the associated transactions can be publicly viewed. Analysis of these two wallets revealed Engstrom received large amounts of cryptocurrency into the wallets from tumblers and coin swapping services. Tumblers, sometimes called mixers, are crypto services whereby users can input their cryptocurrency and then receive the same value of cryptocurrency back a short time later, but with a different code or in a different form.[7] This operation is carried out, in part, by the commingling of various user's cryptocurrency holdings.[8] Because they function to further anonymize cryptocurrency transactions and the sources of those transactions, they are frequently used by criminals to

---

[5]     The "Insta" account was created on White House Market in January 2020. However, as noted, the "Insta" account was previously on other dark web marketplaces and when the "Insta" account was opened on White House Market, customer reviews from prior sales that "Insta" made on other marketplaces were imported and viewable on White House Market.

[6]     To again provide the most conservative estimate, the sales "Insta" conducted on dark web marketplaces prior to White House Market are not being counted as part of the total sales for forfeiture purposes, except for the undercover sale to USPIS agents on August 6, 2019.

[7]     *See* Taylor Locke, *Criminals are Using 'Mixers' to Launder Millions in Crypto. They're Not Illegal Yet.*, FORTUNE (March 26, 2022, 5:30 AM PDT), https://fortune.com/2022/03/26/what-are-crypto-mixers/.

[8]     *Id.*

launder illegal proceeds.[9] The specific tumblers used by Engstrom are capable of transferring Monero into other publicly accessible forms of cryptocurrency, such as Paxos Standard. Monero, the form of cryptocurrency White House Market transactions require, is an "untethered" cryptocurrency, meaning its value is not pegged to the value of any commodity or fiat currency, and is subject to market fluctuations. To minimize those market fluctuations, dark web vendors frequently convert untethered cryptocurrency to tethered cryptocurrency, such as Paxos. After leaving these tumblers, investigators tracked Engstrom's cryptocurrency entering his two wallets before proceeding to other wallets, with a majority going into a wallet controlled by BitLiquid, a cryptocurrency exchange in Las Vegas. Law enforcement reviewed Currency Transaction Reports (CTRs) filed by BitLiquid, which showed Engstrom had exchanged large quantities of Paxos Standard for cash during the same time "Insta" was selling cocaine on White House Market.

Based on a review of CTRs and subpoenaed transaction records from BitLiquid, Engstrom conducted more than 100 cryptocurrency-for-cash transactions with BitLiquid and its owner between October 2019 to June 2021. Investigators identified 99 CTRs filed for a total of $4,795,811. Another 14 transactions were identified that required a CTR, but for which one was not filed, totaling $414,338.[10] Finally, there were three transactions that did not require CTRs totaling $12,837. In total, Engstrom received $5,222,986 in cash/bank wires from BitLiquid and its owner in exchange for Engstrom's cryptocurrency. According to CTRs and subpoenaed documents, Engstrom received cash for the vast

---

[9]    *Id.*

[10]    The owner of BitLiquid was interviewed and admitted that he sometimes did not file CTRs, sometimes lumped several transactions into one CTR, and often would not specify on the CTR whether he provided cash or wired the money to Engstrom's bank account.

1    majority of his BitLiquid exchange transactions. Following the illegal proceeds that

2    Engstrom received from BitLiquid, he would then use that money to fund daily living

3    expenses as well as purchase substantial assets.

4         Given the significant amount of cocaine being sold by Engstrom and his co-

5    conspirators on White House Market and the substantial sums of money Engstrom

6    received from cryptocurrency exchanges, investigators attempted to identify any legitimate

7    employment or source for Engstrom's finances. Engstrom was released from prison for a

8    prior conviction in 2017 and an examination of his tax returns for 2017, 2018, 2019, and

9    2020, showed he reported no income. Investigators also served the Nevada Department of

10   Employment, Training & Rehabilitation (DETR) with a subpoena requesting any

11   employment records for Engstrom. No business entity operating in Nevada has reported

12   paying any wages to Engstrom. Three empty and non-operating ATMs were found in the

13   stash location and investigators learned that these ATMs belonged to Engstrom.

14   Investigators also learned that Engstrom had an ATM previously installed at Reality Vape

15   in 2018 and 2019 as well as another ATM installed at BitLiquid in 2020 and 2021.[11] Law

16   enforcement obtained receipts for the two ATMs Engstrom had installed and they showed

17   the following amounts moved through those ATMs between 2018 and 2021:[12]

18

---

19   [11]     It is unknown at this time whether the two ATMs Engstrom had installed between
     2018 and 2021 were the same or different than the ATMs that were recovered during the

20   search warrant.

     [12]     This table does not depict the amount of income Engstrom received from operating

21   the ATMs, but only the amount of U.S. currency that was withdrawn from the ATMs. The
     income Engstrom received appears to be based on a surcharge fee per withdrawal. Based

22   on the records received, there were only between 13 and 28 withdrawals triggering a
     surcharge each year between 2018 and 2020. In 2021, there were 172 withdrawals

23   triggering a surcharge. Based on the investigation, an ATM surcharge is typically
     approximately $3.00 and Engstrom would have likely had to provide some of his surcharge

24   profit to the location where the ATMs were installed.

| Year | Amount |
|------|--------|
| 2018 | $1,300 |
| 2019 | $17,780 |
| 2020 | $10,200 |
| 2021 | $8,300 |

In short, law enforcement has been wholly unable to identify any legitimate source for Engstrom's substantial funds.

### III.    Relevant Procedural Background

On July 6, 2021, the grand jury returned a nine-count indictment, which charged Engstrom with eight counts relating to illegal distribution of cocaine and one count of conspiracy to commit money laundering.[13] The indictment also contained four separate forfeiture allegations as related to Engstrom.[14] On May 10, 2022, the government filed a bill of particulars more specifically identifying some items it will seek to forfeit in this case.[15] The bill of particulars also includes a money judgment in the amount of $1,715,577.[16]

On April 29, 2022, Engstrom filed the instant motion for return of property.[17] The government filed a timely response.[18] The magistrate judge issued a report and

---

[13]    ECF No. 17.
[14]    *Id.*
[15]    ECF No. 136. The bill of particulars contains five forfeiture allegations, instead of four as listed in the indictment. Forfeiture Allegation Two in the original indictment was divided into two separate allegations in the bill of particulars to more clearly delineate which statutes were being invoked to forfeit the listed firearms as compared to the ammunition. *Compare* ECF No. 17, Forfeiture Allegation Two, *with* ECF No. 136, Forfeiture Allegations Three and Four.
[16]    *Id.*
[17]    ECF No. 132.
[18]    ECF No. 137.

recommendation (R&R) to deny Engstrom's motion.[19] Engstrom's reply was filed the same day as the R&R.[20]

Engstrom filed objections to the R&R on June 15, 2022.[21] The government's response to Engstrom's objections follows.

### IV.   Points and Authorities

**A. The Magistrate Judge Correctly Found the Government in Compliance with all Applicable Forfeiture Statutes.**

Under 21 U.S.C. § 853, any person convicted of an offense listed in Chapter 13 of Title 21 that is punishable by more than one year in prison "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation [and] any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation[.]" The magistrate judge correctly found the offenses charged in the instant indictment under 21 U.S.C. §§ 841 and 846 are included in Chapter 13.[22]

Similarly, under 18 U.S.C. § 982(a)(1), a person convicted of an offense in violation of 18 U.S.C. § 1956 shall likewise be ordered to forfeit to the United States "any property, real or personal, involved in such offense, or any property traceable to such property." Section 982 indicates that any forfeiture of property pursuant to that statute, including any related judicial proceedings, shall be governed by 21 U.S.C. § 853.[23]

---

[19]   ECF No. 139.
[20]   ECF No. 140.
[21]   ECF No. 143.
[22]   *See* ECF No. 139, at 2.
[23]   18 U.S.C. § 982(b)(1).

1    The magistrate judge correctly found that proceedings regarding criminal forfeiture

2  as provided under 21 U.S.C. § 853 and 18 U.S.C. § 982 are governed by those statutes as

3  well as Federal Rule of Criminal Procedure 32.2.[24] And under Rule 32.2, the government

4  provides sufficient notice of its intention to seek forfeiture by including forfeiture

5  allegations in an indictment or information.[25] "The indictment or information need not

6  identify the property subject to forfeiture or specify the amount of any forfeiture money

7  judgment that the government seeks."[26] The magistrate judge correctly found that the

8  indictment filed in this case on July 6, 2021, which included forfeiture allegations, satisfied

9  the requirements of the applicable criminal forfeiture statutes under which it seeks

10  forfeiture.[27]

11    Engstrom contends more notice is required and cites to *Gete v. I.N.S.*, 121 F.3d 1285

12  (9th Cir. 1997), and *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965

13  (9th Cir. 2012).[28] However, neither *Gete* nor *Al Haramain* deal with criminal forfeiture.

14  ///

15  ///

16

---

17  [24]    ECF No. 139, at 2-3.

[25]    FED. R. CRIM. PRO. 32.2(a); *see also United States v. Lo*, 839 F.3d 777, 791 (9th Cir.

18  2016) (relying on Rule 32.2(a) in rejecting an argument that the government provided
insufficient notice and stating "[b]ecause Lo was not entitled to notification that the

19  government was seeking specific property, the government's decision to seek a money
judgment instead of the listed property does not render the government noncompliant with

20  the statute"); *United States v. Hampton*, 732 F.3d 687, 690-91 (6th Cir. 2013) (relying on
Rule 32.2(a) and finding an indictment that indicated an intent to seek criminal forfeiture,

21  including a money judgment, sufficient notice despite the fact no specific property was
listed) (citing *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986); *United States v.*

22  *DeFries*, 129 F.3d 1293, 1315 n.17 (D.C. Cir. 1997); *United States v. Kalish*, 626 F.3d 165,
169 (2nd Cir. 2010); *United States v. Plaskett*, 355 Fed. Appx. 639, 644 (3rd Cir. 2009)).

23  [26]    FED. R. CRIM. PRO. 32.2(a)

[27]    ECF No. 139, at 3.

24  [28]    ECF No. 143, at 5-7.

*Gete* concerned what process is due when a party chooses to litigate the *administrative* forfeiture of their property.[29] INS took the position that it was required only to provide the property owner notice of the seizure and their ability to choose between judicial and administrative proceedings.[30] If they elected to pursue administrative relief, INS further contended the only additional process due to the litigant was the timely processing of their claim and no additional notice of the legal or factual basis for the forfeiture was necessary.[31] These arguments were rejected and the *Gete* Court held that additional process was due.[32]

But the criminal forfeiture proceeding at issue here is governed by an entirely different set of rules and compliance with those rules have consistently been found to provide sufficient notice.[33] These authorities were included in the government's response and remain unaddressed by Engstrom.[34] The government has provided Engstrom with sufficient notice regarding forfeiture of six motorcycles and will continue to provide notice of forfeiture throughout the proceedings.

///

---

[29]      121 F.3d at 1289-91.
[30]      *Id.* at 1296.
[31]      *Id.*
[32]      *Id.* at 1296-97. *Al Haramain* is even further from the mark as it concerns what process is due to an organization that has been labeled a "specifically designated terrorist organization" resulting in the freezing of assets. 686 F.3d at 984-88.
[33]      *See* Fed. R. Crim. Pro. 32.2(a); *Lo*, 839 F.3d at 791; *Hampton*, 732 F.3d at 690-91; *Amend*, 791 F.2d at 1125; *DeFries*, 129 F.3d at 1315 n.17; *Kalish*, 626 F.3d at 169; *Plaskett*, 355 Fed. Appx. at 644.
[34]      In addition to an Indictment which complies with the notice required under Rule 32.2 and a Bill of Particulars providing additional specificity as to some of the items the government intends to seek in criminal forfeiture, the government notes it has also provided Engstrom with significant discovery related to the facts upon which the government intends to rely as summarized above. This is also in stark contrast to *Gete* and *Al Haramain* where no such discovery was provided.

13

The magistrate judge also correctly found Engstrom's reliance on 18 U.S.C. § 983 flawed because the government is not pursuing civil forfeiture in this case.[35] Engstrom objects and contends that because the DEA sent him letters notifying him of potential administrative forfeiture, the government "subjected itself to the requirements of 18 U.S.C. § 983" and must seek forfeiture only under that statute.[36] But the government may initially seek forfeiture of an item through multiple avenues and abandonment of one does not in and of itself preclude others.[37] As the government has previously represented, a civil forfeiture proceeding was never commenced[38] and it is not seeking civil forfeiture in this case.[39] Therefore, Section 983 is irrelevant.

Engstrom now contends that he is not litigating forfeiture, but instead the pretrial restraint of his property.[40] But Engstrom's newly raised argument is also without merit. Engstrom argues that the government must take additional steps to retain physical possession of the property under 21 U.S.C. § 853 and implies that it must have done so within the 90-day time limit imposed by 18 U.S.C. § 983. However, Engstrom has provided

---

[35] ECF No. 139, at 3.
[36] ECF No. 143, at 5-6.
[37] *See United States v. Goodchild*, 347 F. Supp. 3d 258, 261-62 (E.D. Pa. 2018) (finding that even when a civil forfeiture complaint is filed and then dismissed as untimely, that does not preclude a criminal forfeiture action against the same property).
[38] *See id.* at 264 (defining "commencement" within the context of civil forfeiture as the filing of a civil complaint) (citing *United States v. One Piper Aztec F Deluxe Model Aircraft*, 321 F.3d 355, 359 (3rd Cir. 2003)).
[39] To the extent Section 983 requires the government to file a civil complaint or obtain a grand jury indictment that includes forfeiture allegations within 90 days of an administrative claim being filed and take the steps necessary to preserve its right to maintain custody of the property as provided in criminal forfeiture statutes, the magistrate judge correctly found that the government did so here. ECF No. 139, at 3.
[40] *See* ECF No. 143, at 3. *But see* ECF No. 132, at 8-17 (arguing instead that the property must be returned because the government did not file a civil complaint within the 90 days required under 18 U.S.C. § 983 and that 28 C.F.R. 8.12(a) is unconstitutional).

no authority, and the government is not aware of any, for this proposition. Instead, a plain reading of Sections 983 and 853 show that efforts to retain possession of property pending criminal forfeiture can be undertaken at any point. In *United States v. Kramer*, 2006 WL 3545026 (E.D.N.Y. 2006) (unpublished), relied upon by Engstrom, the Court found that the government had not taken the necessary additional steps to retain possession of items subject to forfeiture and that the time for the filing of a civil complaint had lapsed.[41] However, the *Kramer* Court did not preclude the government from subsequently taking those steps it deemed necessary to retain possession of the property and even stayed its order to return the property to allow the government an opportunity to seek pretrial restraint.[42] Other districts across the country have similarly allowed pretrial restraint under 21 U.S.C. § 853 without regard to the irrelevant time limit imposed in 18 U.S.C. § 983.[43]

///

///

---

[41]    *Id.* at *8-10.

[42]    *Id.* at *13.

[43]    *See United States v. Martin*, 460 F. Supp. 2d 669, 676 (D. Md. 2006) ("The criminal forfeiture statutes do not include a time limit; even if this Court required that the property be released today, the Government could turn right around, get a new criminal forfeiture warrant, and proceed with criminal forfeiture under the Fourth (or Fifth) Superseding Indictment."); *United States v. $16,072.00 in United States Currency*, 374 F. Supp. 3d 205, 213 n.12 (N.D.N.Y. 2019) ("Courts have allowed the government to cure its failure to initially seek a required order under 21 U.S.C. § 853 in the criminal forfeiture context only because, unlike CAFRA, the criminal forfeiture statutes do not include time limits."); *But cf. Goodchild*, 347 F. Supp. 3d at 264-65 ("[Section] 983(a)(3)(B) limits the effect of failing to properly commence civil forfeiture, but, with respect to the continued possession of the property seized pursuant to a civil seizure warrant, § 983(a)(3)(C) only allows the criminal statutes to govern such continued possession where the Government never filed a civil forfeiture complaint" and distinguishing other cases where no civil complaint was ever filed).

1    That is because failure to comply with the time limit imposed in § 983 precludes only

2    subsequent *civil* forfeiture actions.[44] Importantly, other courts have also held that no

3    additional steps under Section 853 need be taken when the government holds the item as

4    evidence.[45]

5            The property here has evidentiary value. All the motorcycles were purchased during

6    the conspiracy and the government has identified no legitimate source of income.

7    Additionally, the motorcycles were purchased close in time to Engstrom's receipt of

8    laundered money from BitLiquid. The rules of evidence allow for admission of

9    unexplained assets to demonstrate a defendant's profit from, and therefore involvement in,

10   the alleged crimes.[46]

11           Engstrom's reliance on the unpublished decision in *United States v. Harvey*, 78 Fed.

12   App'x 13 (9th Cir. 2003), for the argument that an item cannot have evidentiary value if it

13   can be photographed is flawed. The *Harvey* Court noted that there were no criminal

14

15   [44]     18 U.S.C. 983(a)(3)(A)(B) (stating that the government's failure to comply with the
       statutory requirements in the statute within 90 days results in "promptly release[ing] the
16     property pursuant to regulations promulgated by the Attorney General," and "not tak[ing]
       any further action to effect the *civil* forfeiture of such property in connection with the
17     underlying offense") (emphasis added); *see also Goodchild*, 347 F. Supp. 3d at 261-62 ("I
       therefore read § 983(a)(3)(B) to preclude further efforts to effect civil but not criminal
18     forfeiture."); *Martin*, 460 F. Supp. 2d at 675-76 ("Section 983(a)(3)(B) does bar the
       Government from effecting a civil forfeiture of Martin's property; the Government has
19     missed its deadline under CAFRA to do so. However, the directive that the Government
       'shall promptly release the property' assumes that the Government has not 'take[n] the steps
20     necessary to preserve its right to maintain custody of the property' under the criminal
       forfeiture statutes.").
21   [45]     *$16,072.00 in United States Currency*, 374 F. Supp. 3d at 209-10 (citing multiple
       authorities for the proposition that a property's evidentiary value may provide an
22     independent basis to maintain possession of it pending criminal forfeiture).
     [46]     *See* FED. R. EVID. 401; *see also e.g.*, *United States v. Anderson*, 642 F.2d 281, 284-85 (9th
23     Cir. 1981) (finding evidence of large expenditures made by an individual alleged to traffic
       drugs is relevant because it creates a reasonable inference that the money for those
24     expenditures came from the narcotics conspiracy).

proceedings pending where the items could be evidence and there was no support for a rule

allowing the government to retain property as speculative evidence in a recently filed tort

action.[47] In the face of such a speculative evidentiary need, the *Harvey* Court ordered the

property returned, but noted that the government was able to photograph the property

beforehand.[48] Here, in contrast to *Harvey*, there is a criminal proceeding pending and the

government's evidentiary value is not speculative. And the ability to photograph potential

evidence alone does not eliminate its evidentiary value, otherwise the evidentiary exception

would be frustrated for a vast majority of forfeitable property.

Further, concurrent with this filing, the government also submits a motion for a

protective order on the property under 21 U.S.C. § 853(e). This request is supported by the

relevant authorities and seeks an order allowing the government to retain possession of the

property pending the criminal forfeiture proceeding. Such is appropriate because the

government contends the property is tainted[49] and in fact proceeds of the charged offenses

and such a protective order maintains the status quo of the property pending the criminal

forfeiture proceeding which will occur after either a finding of guilt or this Court's

acceptance of a guilty plea.[50] Returning the property to Engstrom without such a protective

---

[47]     *Id.* at *2.

[48]     *Id.*

[49]     Engstrom's assertion that the government is seeking to forfeit the motorcycles solely as substitute property is wrong as demonstrated by the indictment and the bill of particulars. *See* ECF Nos. 17, 136.

[50]     FED. R. CRIM. PRO. 32.2(b)(1)(A). Under 21 U.S.C. § 853(d), there is a rebuttable presumption that property is subject to forfeiture if the United States shows by a preponderance of the evidence that the property was acquired by the defendant during the period of the controlled substance offense or within a reasonable time thereafter and there is no likely legitimate source for the property. *See also*, *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1577 (9th Cir. 1989) (holding that forfeiture allegations must be proven by a preponderance of the evidence and if the presumption under 853(d) is not rebutted, then forfeiture must issue).

17

order in place would likely frustrate the government's property interest in the items and stymy criminal forfeiture efforts.[51]

**B. The Magistrate Judge Correctly Determined Engstrom is Not Entitled to Relief Under Rule 41(g).**

Federal Rule of Criminal Procedure 41(g) provides that a person aggrieved by the taking or retention of property seized during a search warrant may move for its return. However, such a motion "may be denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues."[52] Property is no longer needed for evidentiary purposes when the trial is complete, the defendant has pleaded guilty, or the government has abandoned its investigation.[53] Further, it is "well-settled" that a motion for return of property must be denied if the government can demonstrate the property is subject to forfeiture.[54] Evidence that the government has a cognizable claim of ownership or right to possession adverse to the defendant is sufficient to defeat a motion for return of property.[55]

Here, the magistrate judge correctly determined that Engstrom is not entitled to the return of the six motorcycles listed in the bill of particulars because they are subject to

---

[51]     *See* 21 U.S.C. § 853(c) ("All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section."); 21 U.S.C. § 881(h) (same); 18 U.S.C. § 981(f) (same).

[52]     *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991).

[53]     *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987).

[54]     *United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996).

[55]     *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993). *See also United States v. Wetselaar*, 2013 WL 8206582, *18 (D. Nev. 2013) (denying a pretrial motion for return of property under Rule 41(g) on the grounds the property was sought as forfeiture in the federal case).

forfeiture proceedings in this case.[56] Through the forfeiture allegations included in the indictment and bill of particulars, the government has asserted a cognizable claim of ownership and right to possession adverse to Engstrom.[57]

Again, Engstrom shifts his argument and claims he is not contesting forfeiture but instead challenging only the pretrial restraint of the property.[58] But if that is the case, Engstrom's Rule 41(g) argument essentially folds into the analysis included above regarding 21 U.S.C. § 853 and should be similarly rejected.

Engstrom complains that the criminal forfeiture proceeding that will take place under Rule 32.2 cannot occur until after a finding of guilt or acceptance of a guilty plea.[59] This is of course correct, but does not change the fact that the government has a cognizable property interest in the challenged items that vested at the time of Engstrom's criminal offense.[60] That the criminal forfeiture proceeding must occur after a finding of guilt also does not change the "well settled" rule that a motion for return of property must be denied if the government can demonstrate the property is subject to forfeiture.[61] Here, the magistrate judge correctly found that the government met its burden that there is probable cause the property is subject to forfeiture.[62]

---

[56]    ECF No. 139, at 3-4.
[57]    *See* 21 U.S.C. § 853(c); 21 U.S.C. § 881(h); 18 U.S.C. § 981(f).
[58]    ECF No. 143, at 9; *but see* ECF No. 132, at 17-22 (arguing that Rule 41(g) provided an alternative means to return Engstrom's property and that his property should be returned because it was not explicitly included in Attachment B of the relevant search warrants).
[59]    ECF No. 143, at 9-10.
[60]    *See* 21 U.S.C. § 853(c); 21 U.S.C. § 881(h); 18 U.S.C. § 981(f).
[61]    *Fitzen*, 80 F.3d at 389; *Mills*, 991 F.2d at 612.
[62]    ECF No. 139, at 4 (summarizing the government's proffered evidence and holding "[b]ased on the absence of credible evidence that Defendant has a source of funds to support the purchases of property at issue, the Court has no difficulty finding the Government met its burden of showing probable cause in this case.").

1    The magistrate judge also correctly found that the government's initial seizure of the

2  motorcycles was proper.[63] Law enforcement is statutorily permitted to seize any property

3  found during a lawful search when it has probable cause to believe it is subject to

4  forfeiture.[64] At the time of the valid search warrant, which has been unchallenged by

5  Engstrom, law enforcement had evidence that Engstrom was selling cocaine over the dark

6  web and receiving millions of dollars in return and that he had no legitimate employment

7  or identified source of income. They were also aware that one of Engstrom's residences

8  had multiple motorcycles parked in the garage and determined those vehicles belonged to

9  Engstrom and had been purchased during the date range of the conspiracy.[65] And

10  investigators had been wholly unable to find that Engstrom had any legitimate

11  employment.[66] During the course of the search warrant, law enforcement found in plain

12  view further evidence of Engstrom's recent purchases of the motorcycles previously seen as

13  ///

14  ///

15  ///

16

17

---

18  [63]    ECF No. 139, at 4.

     [64]    18 U.S.C. 981(b)(2)(B)(i) ("Seizures pursuant to this section shall be made pursuant
19  to a warrant obtained in the same manner as provided for a search warrant under the
     Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant
20  if . . . there is probable cause to believe that the property is subject to forfeiture and the
     seizure is made pursuant to a lawful arrest or search."); *see also United States v. Roth*, 912
21  F.2d 1131, 1134 (9th Cir. 1990) (finding that, in the context of criminal forfeiture, probable
     cause can be demonstrated by "an aggregate of the facts" and is "less than prima facie
22  proof but more than mere suspicion" and holding that evidence of a purchase of property
     during the time of the charged crime absent "significant credible evidence" of a legitimate
23  source meets the burden of showing probable cause).
     [65]    *See* ECF No. 137, Ex. 2, at 29.
24  [66]    *Id.* at 21-22.

well as other motorcycles found at different locations. Based on the investigation up to that

point, agents had sufficient probable cause to seize the motorcycles as being subject to

forfeiture.[67]

And the magistrate judge's determination of probable cause did not improperly shift

the burden, or even apply the rebuttable presumption that Engstrom contends cannot be

considered until after a finding of guilt. The magistrate judge never cited to 21 U.S.C.

§ 853(c) or articulated the rebuttable presumption. Instead, the magistrate judge examined

the facts provided by the government, along with the sworn search warrant included as an

exhibit, and determined it had met its burden of probable cause that the assets were

forfeitable. The absence of evidence showing Engstrom had legitimate sources of income to

purchase the assets was properly considered within that context.[68] Indeed, even plausible

innocent explanations do not vitiate probable cause.[69] Probable cause was met solely based

on the extensive investigation that showed Engstrom was directly involved in the

distribution of millions of dollars' worth of cocaine and had laundered that money through

---

[67]      The magistrate judge appropriately relied upon *Roth* in reaching this conclusion and Engstrom's reading of *Roth* is wrong. There is no mention of the rebuttable presumption under 21 U.S.C. 853(c) in *Roth* so when that presumption applies and its relationship to CAFRA is irrelevant. Instead, the *Roth* case stands for the proposition that the probable cause necessary to restrain an asset pretrial is a low burden and can be based on an aggregation of facts, to include evidence that the defendant purchased the assets during the charged conspiracy coupled with a lack of legitimate funds with which to make those purchases. *See also Kaley v. United States*, 571 U.S. 320, 338 ("Probable cause, we have often told litigants, is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act.") (internal quotation marks omitted).
[68]      *See generally United States v. Arvizu*, 534 U.S. 266, 277-78 (2002) (finding a lack of credible innocent explanations for suspicious activity relevant under the Fourth Amendment).
[69]      *District of Columbia v. Wesby*, 138 S. Ct. 577, 588-89 (2018) ("But probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts.").

1   BitLiquid shortly before purchasing various assets. The fact that Engstrom did not have

2   verifiable employment and had filed no tax returns between 2017 and 2020 only added to

3   that probable cause.

4          Engstrom now claims he obtained substantial legitimate cryptocurrency holdings in

5   2010 and sold those assets as his source of income.[70] Engstrom further claims there was

6   proof of this in his prior Presentence Investigation Report (PSR) and in his interactions

7   with his prior supervising officer.[71] A review of Engstrom's 2016 PSR shows he reported

8   being self-employed as a statistical modeling consultant for sports wagering, earning $5,000

9   per month and that he hoped to return to that work after his incarceration. Engstrom also

10  reported an additional $1,000 a month in "other" unspecified income. The PSR further lists

11  Engstrom's tattoos, including one of the Bitcoin symbol on his wrist. When asked about

12  that tattoo, Engstrom reported he simply liked technology and was offered $2,400 in

13  Bitcoin to get the tattoo. Following Engstrom's reply, government counsel spoke with

14  Engstrom's previous supervised release officer. The officer confirmed that Engstrom's

15  condition to secure and maintain full time employment was excused when Engstrom

16  showed the officer evidence that he had substantial cryptocurrency holdings in various

17  accounts. Engstrom provided no further proof as to where those substantial holdings

18  originated. To the extent Engstrom argues that discovery provided by the government

19  shows he was exchanging cryptocurrency in 2017 and 2018, Count One of the indictment

20  alleges the conspiracy began "*from a time unknown* but no later than August 2019," and the

21  *///*

22

23  _____

24  [70]     ECF No. 140, at 12.
    [71]     *Id.*

1   White House Market "Insta" account included thousands of prior but undated reviews

2   which had been imported from other dark web sites.

3       Although Engstrom contends permitting the seizure in this case would create a new

4   exception to the warrant requirement, "plain view" is a well-recognized basis for seizing

5   items not included in a search warrant.[72] Additionally, the Supreme Court has recognized

6   that the automobile exception as applied to seizure for forfeiture purposes permits law

7   enforcement to seize a vehicle from a location law enforcement otherwise has a legal right

8   to be when they have probable cause to believe it is forfeitable.[73] Both of these exceptions,

9   independently and in combination with each other, permitted the seizure in this case under

10   18 U.S.C. § 981(b)(2)(B)(i).

11       Even if Engstrom's argument that the motorcycles were illegally seized had merit

12   (which it does not), it would not alone prove fatal to the government's criminal forfeiture

13   proceeding. The Ninth Circuit Court of Appeals has repeatedly held that "the mere fact of

14   illegal seizure, standing alone, does not immunize the goods from forfeiture."[74] Therefore,

15   even if the magistrate judge erred in finding Engstrom's Rule 41(g) argument unpersuasive,

16   ///

17

18

19   [72]   *See Horton v. California*, 496 U.S. 128, 142 (1990).

[73]   *Florida v. White*, 526 U.S. 559, 564-65 (1999). Although the *White* Court noted that
20   the seizure occurred in a public place, they also held that the seizure "did not involve any
invasion of respondent's privacy." *Id.* at 565. Similarly, here the seizure of Engstrom's
21   motorcycles did not involve any invasion of his privacy above and beyond that legally
authorized by the search warrant itself. *See also Trent v. Wade*, 776 F.3d 368, 385 (5th Cir.
22   2015) (holding that a combination of the automobile exception as described in *White* and the
plain view doctrine permitted a law enforcement officer's seizure of an automobile from the
porte cochere of a residence).

23   [74]   *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1165-66 (9th Cir. 2008)
(quoting *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 450 (9th Cir. 1983) (internal
24   quotation marks omitted).

the pending criminal forfeiture proceeding would remain unscathed and the property is still properly retained by the government pending that proceeding.

Engstrom's objection that the magistrate judge improperly denied his 41(g) arguments without an evidentiary hearing on disputed issues of fact must be rejected as neither of the two items on which Engstrom requests this Court take evidence are disputed issues of fact. Engstrom specifically claims an evidentiary hearing is needed to determine: 1) Whether his motorcycles were illegally seized because they were not listed in Attachment B; and 2) Whether 28 C.F.R. 8.13(a) is unlawful. The factual assertions surrounding the first question are not in dispute. The relevant search warrants have been provided to the Court and the government has acknowledged the motorcycles were not listed in Attachment B.[75] Further, Engstrom has not challenged the lawful execution of the search warrant which allowed law enforcement to legally be on his property where they discovered the motorcycles in plain view. Instead, the dispute is rather the legal implications of those uncontested facts and, therefore, no evidentiary hearing is necessary on the issue. And the latter question is purely legal and wholly irrelevant to Engstrom's motion as the government is not proceeding with forfeiture under 18 U.S.C. § 983, to which 28 C.F.R. § 8.13(a) relates.

///

///

///

///

---

[75]   *See* ECF No. 137, at 17.

24

**C.** **The Magistrate Judge Properly Rejected Engstrom's Insufficient Showing that he Needed the Property Returned to Fund Counsel of Choice.**

In his objections, Engstrom does not contest the magistrate judge's findings and denial of his request for return of the property to fund counsel of choice.[76] However, if this Court chooses to interpret Engstrom's request to consider his reply as an objection, his argument must fail on the merits.

The magistrate judge correctly held the Sixth Amendment right to counsel of choice does not allow a defendant to use tainted funds to retain an attorney.[77] The government has a superior property interest to proceeds of illegal activity over a defendant and a defendant has no constitutional right "to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice."[78]

The Magistrate Judge correctly found that Engstrom failed to meet his *prima facie* burden to show he needs the requested property to pay for counsel. Other than a bare claim,[79] Engstrom provides no evidence that the funds currently available to him (including approximately $60,000 in property that the government has agreed to return) are insufficient.[80]

---

[76]    ECF No. 143. *See* LR IB 3-2(b) ("The district judge must conduct a de novo review of those portions of the specified findings or recommendations to which objections have been made."); LCR 47-3 ("The failure of a moving party to include points and authorities in support of the motion constitutes a consent to denying the motion.").

[77]    *Caplin & Drysdale, Chtd. v. United States*, 491 U.S. 617, 626 (1989).

[78]    *Id.* at 626-27.

[79]    Engstrom's unsupported claim that he wishes to retain counsel is also belied by the record. *See* ECF No. 137, Ex. 3, at 4:00-5:30; Ex. 4, at 4:00-6:00.

[80]    *See United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) (holding a defendant meets their burden for a hearing under *United States v. Monsanto* with moving papers that are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented"); *United States v. Jones*, 160 F.3d

1    And even if Engstrom did make out a sufficient *prima facie* showing (which he did

2    not), the magistrate judge nevertheless properly denied his motion because there is probable

3    cause to believe the property he seeks is forfeitable.[81] The magistrate judge properly found

4    probable cause based on the extensive proffer of the government in its response.[82] On this

5    basis, Engstrom's motion was properly denied and this Court should adopt the report and

6    recommendation of the Magistrate Judge.[83]

7    **D. The Magistrate Judge did not Err in Declining to Consider Engstrom's Reply.**

8    Engstrom has failed to show that his reply was timely filed. Although Engstrom has

9    consistently invoked the "prison mailbox rule," he has not provided any authority that it

---

641, 647 (10th Cir. 1998) (holding a hearing is warranted only upon a "properly supported motion by defendant"); *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (holding that a defendant's "bare-bones affidavit asserting he personally lacked sufficient funds to obtain counsel of his choice" was insufficient to warrant a hearing);*United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001); *United States v. E-Gold, Ltd.*, 521 F.3d 411, 421 (D.C. Cir. 2008); *United States v. Approximately $144,001 in U.S. Currency*, 2011 WL 5345266 (N.D. Cal. 2011) (unpublished) (holding that mere argument a defendant has no assets, in the absence of evidence to support the claim, does not entitle defendant to a hearing). *See also United States v. Lindell*, 766 Fed. Appx. 525, 528-29 (9th Cir. 2019) (unpublished) (holding that the defendants failed to show that seized funds were necessary to pay for counsel of choice when they previously stated they were seeking the same funds to pay various living expenses).

[81]    *See United States v. Monsanto*, 491 U.S. 600, 612-15 (1989).

[82]    ECF No. 139, at 4. *See* 21 U.S.C. 853(e)(3) ("The court may receive and consider . . . evidence and information that would be inadmissible under the Federal Rules of Evidence."). *See also generally United States v. Escobedo-Coronado*, 2022 WL 873615, *3-4 (N.D. Ok. 2022) (unpublished) (finding probable cause to issue a pretrial restraint on property subject to forfeiture based on proffer of government attorney).

[83]    Notwithstanding Engstrom's failure to provide a sufficiently specific and detailed claim so as to warrant a hearing, if an evidentiary hearing is nonetheless held, it should be confined to determining whether there is probable cause to find that the property at issue has the requisite nexus to the charged offenses, with the requisite nexus being defined by the applicable criminal forfeiture statutes. At that hearing, the government has the burden of proof and, as to Forfeiture Allegation One of the indictment, the rebuttable presumption in 21 U.S.C. 853(d) should be applied.[83] Additionally, as to Forfeiture Allegation Four of the indictment, forfeiture of money laundering proceeds requires consideration of commingling of funds to the extent untainted funds were "involved" in the offense.[83]

applies in the context of criminal pretrial filings, and the government is unaware of any

such authority.[84] Instead of adopting a bright line rule that the "prison mailbox rule"

applies to all *pro se* pleadings filed by an incarcerated person, the Ninth Circuit has instead

considered application of the rule in light of the specific procedural rules that otherwise

govern the filing.[85] And here it seems there is good reason why application of the "prison

mailbox rule" would be improper given that Federal Rules of Criminal Procedure 45 and

49 clearly provide for specific additional time in circumstances such as those presented by

Engstrom's status as an incarcerated defendant representing himself.[86]

But even if the magistrate judge erred in not applying the "prison mailbox rule" to

Engstrom's reply, such was not prejudicial. Consideration of Engstrom's reply on the

merits, as the government undertakes above, does not change the outcome and his motion

was properly denied.

///

///

///

///

---

[84]   *See* ECF No. 144, at n.10 (citations to various civil, post-conviction, and appellate proceedings where courts have chosen to apply the "prison mailbox rule").

[85]   *See Nigro v. Sullivan*, 40 F.3d 990, 994-95 (9th Cir. 1994) (refusing to impose the "prison mailbox rule" when the applicable procedural rules clearly define what constitutes a filing and the applicable deadlines).

[86]   Rule 45(c) provides Engstrom three additional days to file his pleadings given he receives service through the mail. *See also*, FED. R. CRIM. P. 49(b)(2)(B) (defining "filing" by nonelectronic means as "delivering" the filing to the clerk or "to a judge who agrees to accept it for filing, and who must then note the filing date on the paper and promptly send it to the clerk.").

## V.     Conclusion

For all the foregoing reasons, this Court should overrule Engstrom's objections and adopt the R&R.

DATED:  June 29, 2022

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/ Christopher Burton*
CHRISTOPHER BURTON
KIMBERLY SOKOLICH
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S RESPONSE TO OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [ECF No. 143]** was served upon defendant via Certified Mail addressed to:

> Paul Engstrom 06870041
> Nevada Southern Detention Center
> 2190 E. Mesquite Avenue
> Pahrump, NV 89060

**DATED:**  June 29, 2022.

*/s/ Christopher Burton*

_____
CHRISTOPHER BURTON
Assistant United States Attorney

29