# EXHIBIT 4

(June 17 and 18, 2021, Warrant Application and Affidavit)

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED

DATED: 2:23 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

USPS PRIORITY MAIL ENVELOPES TO
BE OBTAINED ON JUNE 17, 2021

Case No. 2:21-mj-512-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 21 USC §§ 841(a) and 846 | Conspiracy to Traffic Cocaine | |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jared Jeppson, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means).*

Date: June 17, 2021

*Judge's signature*

City and state: Las Vegas, Nevada          Honorable Daniel J. Albregts, U.S. Magistrate Judge

*Printed name and title*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED

DATED: 2:24 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

USPS PRIORITY MAIL ENVELOPES TO BE OBTAINED ON JUNE 18, 2021

Case No. 2:21-mj-513-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see the Attachment A.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a) and 846 | Conspiracy to Traffic Cocaine |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: June 17, 2021

_____
*Judge's signature*

City and state: Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*



# SEALED

**Office of the United States Attorney**
District of Nevada
501 Las Vegas Boulevard, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

US-000879

1   CHRISTOPHER CHIOU
    Acting United States Attorney
2   District of Nevada
    Nevada Bar Number 14853
3   CHRISTOPHER BURTON
    Nevada Bar Number 12940
4   SUSAN CUSHMAN
    DANIEL CLARKSON
5   Assistant United States Attorneys
    501 Las Vegas Boulevard South, Suite 1100
6   Las Vegas, Nevada 89101
    (702) 388-6336
7   Christopher.Burton4@usdoj.gov
    Susan.Cushman@usdoj.gov
8   Daniel.Clarkson@usdoj.gov

9   *Attorneys for the United States of America*

FILED

DATED: 2:24 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

10           **UNITED STATES DISTRICT COURT**
             **DISTRICT OF NEVADA**

11

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR: | **Case No. 2:21-mj-** 512-DJA |
| USPS PRIORITY MAIL ENVELOPES TO BE OBTAINED ON JUNE 17, 2021 MEETING CRITERIA SPECIFIED BELOW | **AFFIDAVIT IN SUPPORT OF ANTICIPATORY SEARCH WARRANT** (Under Seal) |
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR: | **Case No. 2:21-mj-** 513-DJA |
| USPS PRIORITY MAIL ENVELOPES TO BE OBTAINED ON JUNE 18, 2021 MEETING CRITERIA SPECIFIED BELOW | **AFFIDAVIT IN SUPPORT OF ANTICIPATORY SEARCH WARRANT** (Under Seal) |

20      1.   I, Jared Jeppson, Special Agent (SA), Drug Enforcement Administration (DEA),

21   being duly sworn under penalty of perjury, do hereby state as follows:

22            **INTRODUCTION AND BACKGROUND OF AFFIANT**

23      2.   I am an "investigative or law enforcement officer" of the United States within the

24   meaning of Title 18, United States Code, Section 2510(7); that is, a deputized officer of the

I

1  United States who is empowered by law to conduct investigations of, and to make arrests for,

2  offenses enumerated in Title 18, United States Code, Section 2516. I have been a SA with the

3  DEA since August 2019 and am currently assigned to the Las Vegas District Office (LVDO),

4  Enforcement Group 3 (EG3). In connection with my DEA duties, I investigate criminal

5  violations of the Controlled Substances Act. Through the DEA, I have received specialized

6  training in the enforcement of federal narcotics laws. My training and experience have involved,

7  among other things: (1) the debriefing of defendants, witnesses and informants, as well as others

8  who have knowledge of the distribution and transportation of controlled substances; (2) the

9  planning, participation and/or management of field operations such as surveillance, arrests, the

10  purchase of controlled substances, the interception of wire communications and the execution of

11  search warrants; (3) the acquisition, processing and analysis of evidence; and (4) the tracking of

12  laundered narcotics proceeds.

13       3.       Based on my training and experience as a DEA agent, I have become familiar

14  with how narcotics trafficking enterprises manage their illicit activities both domestically and

15  internationally. These activities include: the importation, manufacturing and distribution of

16  narcotics, the use of electronic devices in furtherance of illicit activity, money laundering and

17  counterintelligence (such as coded language, counter-surveillance techniques and encrypted

18  devices).

19       4.       I have been involved in an investigation, which is the subject of this Affidavit.

20  Due to my personal participation in this investigation and reports made to me by other DEA

21  Agents and Law Enforcement Officers, and various sources of information, I am familiar with

22  all of the facts and circumstances surrounding the investigation. My training and experience as

23  a SA, including participation in this investigation, form the basis for opinions and conclusions

24  set forth below. While I have participated in the below described investigation, I have not

2

US-000881

1  provided every fact known within this Affidavit.  Rather, I include only those facts necessary to

2  establish probable cause in support of the search warrant requested herein.

3  **ANTICIPATORY NATURE OF THE SEARCH WARRANT**

4  5.      This affidavit demonstrates probable cause that Paul ENGSTROM, Vincent

5  CUOMO, Abraham ELLIOTT and Joseph KRIEGER, of the ENGSTROM Drug Trafficking

6  & Money Laundering Organization (DTMLO), are collectively and actively involved in a

7  conspiracy to traffic cocaine in violation of Title 21 U.S.C. Sections 841(a) and 846 (the

8  "Subject Offenses").

9  6.      In December 2020, EG3 investigators were able to corroborate that 304 E.

10  Silverado Ranch Blvd, Unit 1110 was a likely narcotics stash location (a location used to store

11  and/or package controlled substances) utilized by the ENGSTROM DTMLO. Approximately

12  four to six times per week, ENGSTROM, CUOMO, and ELLIOTT would typically arrive at

13  the stash location in the late morning or early afternoon. In the late afternoon, ELLIOTT

14  would typically depart the garage of the residence in a silver Nissan Rogue to meet KRIEGER

15  and provide him with a black file box suspected of containing numerous USPS Priority Mail

16  Envelopes. KRIEGER would then deposit these USPS Priority Mail Envelopes into US Post

17  Office drive through drop boxes at predetermined US Post Offices throughout Las Vegas,

18  North Las Vegas and/or Henderson.  On six surveillance occasions, EG3 located these

19  envelopes in a USPS drop box after observing an organization member make the deposits for

20  the day. Typically, KRIEGER deposited approximately 22 to 43 envelopes per day between

21  two or more post offices.  In total, law enforcement have photographed 203 such USPS Priority

22  Mail Envelopes believed to have originated from the organization.  Of the envelopes

23  photographed, fifteen have been interdicted by law enforcement.  All fifteen envelopes

24  contained a white, powdery substance that field tested and/or laboratory tested positive for the

3

1  presence of cocaine. Additionally, these USPS Priority Mail Envelopes have unique

2  characteristics specific to the ENGSTROM DTMLO.

3       7.     Based upon the probable cause noted below, affiant seeks a warrant to search any

4  SUBJECT PARCELS, observed by law enforcement to be deposited into a US Post Office

5  drive through drop box by a member of the ENGSTROM DTMLO on June 17 and June 18,

6  2021. The SUBJECT PARCELS to be searched are described in Attachment "B," will fit the

7  criteria below, and are reasonably likely to contain the items identified in Attachment "C,"

8  which is evidence of the organization's involvement and violations of Title 21 U.S.C. Sections

9  841(a) and 846 (the "enumerated offenses").

10  **<u>IDENTIFICATION OF THE PARCELS TO BE SEARCHED</u>**

11       8.     Each SUBJECT PARCEL to be searched must exhibit the following

12  characteristics:

13            (a) is a United States Postal Service Priority Mail Envelope measuring

14                 approximately 12.5" X 9.5";

15            (b) bear a computer printed sender address label of a purported business in the

16                 Las Vegas area and a computer printed recipient address label;

17            (c) bear one affixed stamp of $7.95 or one stamp of $7.75 plus additional postage

18                 stamps;

19            (d) will upon physical examination of the exterior of the envelopes appear to

20                 contain a pliable material consistent with a powdery substance;

21            (e) will have been obtained from a U.S. Post Office drive through drop box that

22                 was used by KRIEGER;

23

24

4

(f)  bear a USPS Label 400 tracking number sticker;[1]

(g)  will be in the company of at least seven other SUBJECT PARCELS which

bear the characteristics noted in (a) through (f) above.

## USE OF USPS TO TRAFFIC CONTROLLED SUBSTANCES

9.      Based on my training and experience, drug trafficking intelligence information gathered by the United States Postal Inspection Service ("USPIS"), and discussions and collaborative investigations with United States Postal Inspectors, I believe that the U.S. Postal Service Express Mail and Priority Mail are frequently utilized by drug traffickers for shipping controlled substances or proceeds/payments.  Use of Express Mail and Priority Mail are favored because of the speed (Express Mail - overnight; Priority mail – two-day delivery), reliability, free telephone and Internet package tracking service, as well as the perceived minimal chance of detection.  Express Mail and Priority Mail were originally intended for urgent, business to business, correspondence.  Intelligence obtained from prior similar packages, which were found to contain controlled substances or proceeds/payments, has indicated that these labels are usually from an individual to an individual.  Express Mail and Priority Mail are seldom used for individual to individual correspondence.  I also know that drug traffickers prefer delivery services such as Express Mail and Priority Mail because of their expedited service.

10.      In an effort to combat the flow of controlled substances through the overnight delivery services, the USPIS has established interdiction programs in cities throughout the United States.  These cities have been identified as known sources of controlled substances.  The USPIS conducted an analysis of prior packages mailed through overnight delivery and two-day delivery

---

[1]      A USPS "Label 400" tracking number stickers usually accompany priority mail stamps; if both are affixed on a USPS Priority Mail Envelope, the parcel can be deposited in a U.S. Post Office drop box without the shipper leaving an online footprint or being subject to being captured on video surveillance footage at a U.S Post Office counter.

US-000884

1   services which were found to contain controlled substances or proceeds/payments of controlled

2   substance sales.  The analysis of these prior packages found that these labels were usually

3   addressed from an individual to another individual.  In the fewer cases when overnight delivery

4   packages containing controlled substances or proceeds/payments and have displayed a business or

5   company name, it was usually proven to be a fictitious business or front company.

6       11.    A source city or state is a location identified by USPIS that ships narcotics

7   outside of the identified city or state, and which receives shipments of proceeds from the sale of

8   narcotics.  A destination city or state is a location identified by USPIS that receives narcotics

9   from source cities or states, and in turn ships proceeds from the sale of narcotics back to the

10  source cities or states.  Based on my training and experience and the training and experience of

11  other Inspectors, I believe Las Vegas to be a source city due to its state laws regarding

12  marijuana, and due its proximity to Arizona and California which are adjacent to Mexico and

13  house increased drug trafficking.

14      12.    Articles found to bear the characteristics described above are further scrutinized

15  by inspectors.  Address verifications are conducted and the return addresses listed on the

16  articles are often either fictitious, or postal personnel familiar with the addresses are not familiar

17  with the listed sender name(s).  Based on my training and experience, I know drug traffickers

18  will often use fictitious names or incomplete names and/or addresses in an attempt to conceal

19  their identity from law enforcement.  It has been my experience in some instances where the

20  article contains a "valid" return address, it is an attempt to lend a legitimate appearance to the

21  article.  In addition to address verifications, the articles are often subject to trained narcotic-

22  detecting canine examination.

23

24

6

US-000885

1  **PROBABLE CAUSE**

2       13.     In October 2020, an investigation was initiated by DEA Las Vegas, Enforcement

3  Group 3 (EG3), into the narcotics trafficking organization believed to be headed by Paul

4  ENGSTROM. ENGSTROM was previously convicted in 2017 in the Federal District of

5  Nevada for his participation in selling MDMA to an undercover police officer (2:15-cr-00255-

6  JAD-PAL). It is believed that ENGSTROM, CUOMO, and ELLIOTT, previously utilized 304

7  E. Silverado Ranch Blvd, Apt. 1110 and now utilize 6145 Harrison Dr., Ste. 4, Las Vegas, NV

8  to prepare narcotics purchased on the dark web for distribution through the USPS. It is also

9  believed that Christopher DIEFENDEFER, his business BitLiquid, Inc., and other

10  DIEFENDEFER associates, comprise one of the ways this organization launders its money.

11  This belief is based on EG3's training and experience, surveillance, criminal history checks,

12  utilities checks, seizures of narcotics, reviews of financial documents and controlled deliveries.

13       14.     Initially, EG3 began investigating ENGSTROM for money laundering related to

14  large quantity cryptocurrency-for-cash exchanges. Upon conducting surveillance on

15  ENGSTROM, it was soon determined that he met up with CUOMO and ELLIOTT at 304 E.

16  Silverado Ranch, Unit 1110, roughly four to six times a week in the afternoon. The three would

17  remain at the location for varying amounts of time, usually a few hours. ELLIOTT would leave

18  the stash location around 4:00 p.m., always driving the same Nissan Rogue (registered to

19  ENGSTROM), and deliver what appeared to be a black plastic filing box to KRIEGER.

20  KRIEGER would then deposit approximately 15-20 USPS Priority Mail envelopes at two or

21  three US Post Office drop boxes in various locations around the Las Vegas Valley.

22       15.     On December 29, 2020, EG3 set up surveillance on the suspected stash location.

23  They observed the pattern of ENGSTROM, CUOMO, and ELLIOTT arriving at the stash

24  house. They observed ELLIOTT leaving the stash house around 4:00 p.m. in the Nissan Rogue

7

1   and meeting up with KRIEGER to deliver a black plastic file box. EG3 then followed

2   KRIEGER to a US Post Office where he appeared to deposit USPS Priority Mail envelopes.

3   EG3, with the help of the US Postal Service, obtained the Priority Mail envelopes deposited by

4   KRIEGER. EG3 then obtained the assistance of a North Las Vegas Police Department canine

5   unit. The canine, trained in narcotic detection, alerted on four of the envelopes. EG3 obtained

6   federal search warrants (2:20-mj-1114-BNW, 2:20-mj-1115-BNW, 2:20-mj-1116-BNW, and

7   2:20-mj-1117-BNW) for the four envelopes the canine alerted on. Upon opening the four

8   envelopes, EG3 discovered cocaine in each.



8

US-000887

16.     As depicted in the above image, each of the packages were United States Postal Service Priority Mail Envelopes measuring approximately 12.5" X 9.5". Each had printed labels attached to the "To" and "From" areas of the envelope and bore a single affixed stamp of $7.75, as well as a USPS Label 400 tracking number sticker. The return address is for a business in the Las Vegas area near the post office that KRIEGER dropped the package off at. All of the packages were pliable based upon a physical examination of the exterior of the envelopes.

17.     The USPIS alerted EG3 to a previous investigation with some common attributes. In 2019, an individual in the Las Vegas area was selling cocaine on the dark web under the moniker "Insta" and utilizing the USPS to deliver the orders. As part of that investigation, USPIS made an undercover purchase of cocaine from "Insta" and received the delivery to their undercover post office box. The envelope and packaging material used by "Insta" was similar to that used by the ENGSTROM DTMLO as described above. In 2019, USPIS was unable to determine the true identity of "Insta".

9

US-000888



18.    Similar to the envelopes that were intercepted in December of 2020, the 2019 envelope depicted above measures approximately 10" X 6"" and had a computer-printed label for the address and return address. The 2019 envelope also bore a single affixed Priority postage stamp of $7.35, as well as a USPS Label 400 tracking number sticker. The return address was again for a business in the Las Vegas area near the post office. The package was similarly pliable based upon a physical examination of the exterior.

19.    From December 2020 through February 2021, EG3 conducted surveillance on the organization on approximately 12 occasions, including two extended periods of video surveillance at 487 Petal Dew Avenue (a CUOMO/ENGSTROM residence) and 304 E. Silverado Ranch (stash location). EG3 observed a clear pattern of the ENGSTROM DTMLO method of operation. ENGSTROM, CUOMO, and ELLIOTT would convene at the Silverado Ranch stash location in the afternoon. At approximately 4:00 p.m., ELLIOTT

10

US-000889

1   would depart the stash in the Nissan Rogue and meet KRIEGER a half-mile down the road in

2   the parking lot of a Walmart where ELLIOTT would deliver a black file box to KRIEGER.

3   KRIEGER would then drive to two or three US Post Offices and deposit several Priority Mail

4   envelopes at each location. The envelopes were always marked with return addresses

5   belonging to actual local businesses in the vicinity of the US Post Office where the envelopes

6   were deposited. If different post offices were used to drop off envelopes on the same day, the

7   return addresses for the envelopes dropped off at the first post office would generally be for a

8   business near that post office, while the return addresses for the envelopes dropped off at the

9   second post office would generally be for a different business located near the second post

10  office. The envelopes utilized tracking number stickers that had been pre-purchased as well as

11  pre-paid Priority postage stamps. USPIS noted that "Insta" utilized the same method back in

12  2019. USPIS indicated that most dark web distributors utilized postage purchased with

13  cryptocurrency and that it was unique for the ENGSTROM DTMLO to utilize a pre-paid

14  Priority postage stamp just like "Insta." USPIS suggested that perhaps the ENGSTROM

15  DTMLO was utilizing the moniker "Insta" to sell cocaine on the dark web.

16      20.     Of the 13 USPS Priority Mail Envelopes originating from the ENGSTROM

17  DTMLO that were interdicted by EG3 and the USPIS noted above, most could be considered

18  "user amounts". During a March 29, 2021 surveillance, however, two envelopes were

19  recovered after the usual ENGSTROM DTMLO pattern of distribution.  These two envelopes

20  were addressed to the same individual at the same location in Pullman, WA. A federal search

21  warrant in Washington was obtained and each of these parcels contained approximately 117

22  gross grams of field tested positive cocaine.  Law enforcement has observed "Insta" listing 112

23  grams of cocaine on White House Market, a dark website commonly used to sell and

24  distribute controlled substances, for the cryptocurrency equivalent of approximately $5,985.00

11

US-000890

US Dollars. The two envelopes each containing 117 gross grams of cocaine that were recovered on March 29, 2021, appear to correlate with the White House Market listing. Because the controlled substance is related to such a large amount of money for a single purchase, your affiant believes the 234 grams of cocaine, at a cost of approximately $11,970 (before shipping fees), may be considered in excess of a personal use amount.  Regardless of the amount, the cocaine in each USPS Priority Mail Envelope recovered so far in this investigation has been contained within numerous layers of wrappings, such as heat sealed plastic and mylar, that your affiant believes is used to try and prevent the cocaine's odor from being detected by a trained police canine unit.

21.     As indicated above, in March 2021, EG3 was able to locate "Insta" on White House Market dark website. EG3 performed two undercover buys from "Insta" of seven grams each of cocaine during March. EG3 provided an undercover identity and shipping address to "Insta" as part of the transaction. The undercover shipping address was for an undercover PO Box provided by USPIS. The first undercover purchase was made on March 12, 2021. "Insta" shipped the cocaine late on a Saturday afternoon before EG3 could establish surveillance on the Silverado Ranch stash location. The second undercover purchase was made on March 25, 2021. Based on transaction information provided by White House Marketplace, EG3 anticipated the ENGSTROM DTMLO would process the purchase and deposit it at the post office on Monday March 29, 2021. EG3 was able to set up surveillance on the stash location on the March 29. EG3 observed the established pattern of the ENGSTROM DTMLO, with ENGSTROM, CUOMO, ELLIOTT and KRIEGER working in concert. ENGSTROM, CUOMO and ELLIOTT's vehicles were all observed in the vicinity of the stash location between 2:00pm and 3:00pm.  At approximately 3:40pm, EG3 observed ELLIOTT depart the stash location in the silver Nissan Rogue. A few minutes later, ELLIOTT met KRIEGER at

12

1   their usual spot, on the east side of the Walmart parking lot by the pharmacy. EG3 then

2   surveilled KRIEGER depart the Walmart parking lot, drive directly to two US Post Offices and

3   deliver numerous USPS Priority Mail envelopes in drop boxes of two separate US Post Offices.

4   At each location, EG3 made contact with post office management minutes after the drops.

5   With the assistance of USPIS, EG3 located the deposited envelopes at the top of the drop box

6   mail container. The envelopes were easily identifiable by the previously mentioned

7   characteristics. Among the envelopes obtained at the second Post Office, EG3 located the

8   envelope addressed to the undercover identity.



22.     The envelope KRIEGER attempted to mail to the undercover post office box in

response to the undercover transaction EG3 conducted on White House Market with "Insta,"

13

1   measures approximately 12.5" X 9.5" and had a computer-printed label for the address and

2   return address. The envelope also bore a single affixed stamp of $7.75 plus an additional $.20

3   postage stamp for an "additional ounce", as well as a USPS Label 400 tracking number sticker.

4   The return address was for a business in the Las Vegas area near the post office. The package

5   was also pliable based upon a physical examination of the exterior. All of this is consistent with

6   the envelopes EG3 intercepted from the ENGSTROM DTMLO in December 2020, as well as

7   with the envelope "Insta" sent to the undercover USPIS post office box in 2019. EG3 was able

8   to therefore confirm that "Insta" is the moniker the ENGSTROM DTMLO utilizes to sell

9   cocaine on the dark web and that the ENGSTROM DTMLO utilized 304 E. Silverado Ranch

10   Boulevard as a location to prepare and package narcotics.

11        23.   In April 2021, the investigation learned that the stash location located at 304 E.

12   Silverado Boulevard was being retained by the organization on a month-to-month basis since

13   the lease expired at the end of March 2021.  With the information from GPS locations of

14   ENGSTROM's cellular phone and CUOMO's vehicle and several surveillances, EG3 learned

15   that the ENGSTROM DTMLO established a second suspected stash location at 6145 Harrison

16   Dr., Ste. 4, Las Vegas, NV.  While ENGSTROM initially made numerous visits to this new

17   stash location in April, he appeared to have withdrawn from the daily activity of being present

18   when the cocaine parcels departed the second suspected stash location.

19        24.   On May 10, 2021, EG3 performed its third undercover buy of seven grams of

20   cocaine from "Insta" on White House Market to obtain an illicit order coming directly from the

21   new stash location. The same undercover identity and PO Box as the previous undercover

22   purchases were utilized to place the order with "Insta" on the White House Market.

23        25.   The following day, EG3 established surveillance at 6145 Harrison Dr., Ste. 4.

24   With the exception of ENGSTROM, EG3 again observed CUOMO, ELLIOTT and

14

1   KRIEGER working in concert. On this occasion, EG3 observed CUOMO leave his residence

2   at 487 Petal Dew with a black file box in hand and surveilled him as he drove the silver Nissan

3   Rogue directly to the stash location at 6145 Harrison Drive. Approximately an hour later, EG3

4   observed CUOMO depart the stash location in the silver Nissan Rogue. EG3 observed

5   CUOMO drive directly from the stash to a nearby post office on Sunset Drive. EG3 observed

6   CUOMO deposit multiple USPS Priority Mail envelopes in the drop box. Immediately after

7   CUOMO departed the post office, EG3 contacted post office management in order to search

8   the drop box container. With the help of USPIS, EG3 easily located three US Priority Mail

9   envelopes at the top of the drop box mail container that mirrored other envelopes intercepted

10  by the ENGSTROM DTMLO. Among the envelopes located, EG3 found an envelope

11  addressed to the undercover identity used by EG3 to make a dark web purchase of cocaine

12  from "Insta." The ENGSTROM DTMLO therefore filled and delivered the cocaine ordered by

13  EG3 from "Insta", taking it directly from 6145 Harrison Dr., Ste. 4 to a US Post Office drop

14  box. The envelope had the same characteristics as the other envelopes described above.

15       26.     After CUOMO deposited the envelopes at the post office, he drove the silver

16  Nissan Rogue to ELLIOTT's residence at 10388 Midseason Mist. CUOMO left the silver

17  Rogue and walked over to his residence at 487 Petal Dew Avenue a few houses down the

18  block. Shortly after, ELLIOTT entered the silver Nissan Rogue and drove to the nearby

19  Walmart to meet up with KRIEGER. EG3 observed ELLIOTT meet with KRIEGER and

20  exchange black file boxes. EG3 surveilled KRIEGER leave the Walmart parking lot and drive

21  directly to multiple US Post Offices around the Las Vegas Valley. KRIEGER first drove to two

22  post offices in the north of the valley. KRIEGER drove through the drop box lanes but did not

23  appear to deposit any envelopes. With the help of USPIS, EG3 searched the drop box

24  containers but did not find any envelopes that appeared to come from the ENGSTROM

15

US-000894

1    DTMLO. KRIEGER then drove down to the US Post Office on Sunset Drive near the airport.

2    At this post office, EG3 observed KRIEGER deposit numerous envelopes in the drop box.

3    Immediately after KRIEGER left the post office, EG3 made contact with the post office

4    management and with the help of USPIS was able to locate thirty USPS Priority Mail

5    envelopes that mirrored the envelopes previously intercepted by EG3. With CUOMO's three

6    envelopes and KRIEGER's thirty envelopes, EG3 intercepted a total of thirty-three envelopes

7    from the ENGSTROM DTMLO on May 11, 2021.

8         27.    It is your Affiant's belief, based upon his training and experience, that

9    ENGSTROM, like leaders of other drug trafficking organizations have been known to do, has

10   removed himself from being physically present during the cocaine packaging operations of the

11   business in order to mitigate his risk of apprehension. Based on training and experience, your

12   Affiant believes the primary reasons he is able to do so are: he has established operational

13   partners; he can conduct a significant portion of his business remotely from a laptop or desktop

14   computer; and he now has the financial means to do so.

15        28.    While investigating and establishing the ENGSTROM DTMLO pattern and

16   method of operation, EG3 was also investigating the financial background of ENGSTROM

17   and the other members of the DTMLO. Of the members of the ENGSTROM DTMLO,

18   ENGSTROM was the one obtaining large amounts of cryptocurrency and large cash deposits

19   into his bank accounts, likely from the organization's dark web cocaine sales. Analysis of a

20   cryptocurrency wallet your Affiant believe belongs to ENGSTROM revealed numerous large

21   quantities of cryptocurrency-for-cash exchanges in amounts of tens of thousands to over a

22   hundred thousand dollars with DIEFNDERFER and his business BitLiquid, Inc. One way

23   EG3 was able to identify ENGSTROM's wallet was through observable interaction with

24   DIEFENDERFER, his money launderer. Specifically, on January 28, 2021, EG3 surveilled

16

US-000895

1  ENGSTROM on one occasion leaving the stash house with a backpack and drive directly to

2  BitLiquid, Inc. located on Spring Mountain Road. ENGSTROM was then observed leaving

3  BitLiquid, Inc. with an envelope in hand. EG3, through toll analysis on ENGSTROM's phone,

4  was able to see that ENGSTROM communicated with DIEFENDERFER six times between

5  2:06pm and 2:21pm on that day. Further, EG3 was able to obtain DIEFENDERFER's crypto

6  wallet that utilizes the Ethereum platform. EG3 queried DIEFENDERFER's wallet on

7  etherscan.io (aka Etherscan) to search DIEFENDERFER's activity on the Ethereum

8  Blockchain at approximately the time ENGSTROM was observed at BitLiquid. Based on the

9  query, EG3 found that on January 28, 2021, at 4:58pm PST, 37,000 PAX (symbol for Paxos

10  Standard, a cryptocurrency asset that is tethered to the value of the US dollar) was sent from

11  ENGSTROM's wallet to DIEFENDERFER's wallet. The transaction amount was valued at

12  $37,000.00 USD. EG3 further confirmed the financial transaction verifying that on January 29,

13  2021, DIEFENDERFER, in accordance with his obligations as a Money Transmitting

14  Business, filed a Currency Transaction Report (CTR) for the transaction. The report noted that

15  on January 28, 2021, BitLiquid provided cash in the amount of $36,900.00 to ENGSTROM in

16  exchange for cryptocurrency at 3420 Spring Mountain Road. EG3 believes the $100

17  discrepancy is the commission amount received by DIEFENDERFER as a fee for the

18  transaction.

19      29.      EG3's financial investigation of ENGSTROM has been unable to locate any

20  plausible source of the large quantities of income that Paul ENGSTROM receives other than

21  from dark web sales under the moniker "Insta." Employers in the state of Nevada are required

22  to report employment income to the Nevada Department of Employment, Training &

23  Rehabilitation (DETR) for any employees in the state of Nevada for benefit purposes. EG3

24  subpoenaed Nevada DETR for employment records on members of the ENGSTROM

17

1  DTMLO. Any reported employment for an individual would show up on DETR's "Wage

2  Detail Report." Regarding the inquiry for Paul ENGSTROM, DETR reported that there was

3  "no information available." No business entity operating in the state of Nevada pays

4  ENGSTROM wages.

5      30.    Financial records from one bank account alone belonging to Paul ENGSTROM

6  show 15 incoming wires between January and June 2020 from Christopher DIEFENDERFER

7  himself or other employees or associates of BitLiquid, Inc., totaling $273,025.00. Following

8  these incoming wires, on June 12, 2020, ENGSTROM then transferred $325,772.70 to Clear

9  Title Company for the purchase of a piece of land.

10     31.    Based on training and experience, your Affiant knows that "Insta" sells cocaine

11  on the dark web for approximately three times the street value of cocaine in Las Vegas. White

12  House Market alone shows that "Insta" has made over 3,280 cocaine sales since February 1,

13  2020, until May 23, 2021. Based on the 2,310 buyer reviews from verified purchases on White

14  House Market (as of May 23, 2021), and assuming the remaining 970 sales were each for the

15  minimum purchase of 3.5 grams of cocaine, a conservative estimate is that "Insta" has sold

16  over twenty kilograms of cocaine for more than $1.9 million in less than a four-month period

17  (ending May 23, 2021). Further, White House Market imported feedback for "Insta" from

18  other dark web marketplaces, showing a total of 7,562 other confirmed completed sales.

19     32.    In your Affiant's training and experience, these types of illicit dark web sales

20  require cryptocurrency as a medium of exchange. One of the people ENGSTROM turned to in

21  order to get that cryptocurrency converted into U.S. dollars was DIEFENDERFER as

22  highlighted previously. After identifying one of the cryptocurrency wallets used by

23  DIEFENDERFER, as mentioned previously, EG3 used the same process to analyze his

24  wallet's activities again. Upon conducting further analysis on Etherscan and connecting

18

1   DIEFENDERFER's wallet exchanges with CTRs filed by DIEFENDERFER on

2   ENGSTROM, EG3 was able to identify a second cryptocurrency wallet belonging to

3   ENGSTROM.

4       33.    The first ENGSTROM wallet saw the cryptocurrency equivalent of

5   approximately $1.8 million dollars pass through it between August 2020 and February 2021.

6   Approximately $765,000 of it went to DIEFENDERFER in exchange for U.S. dollars.

7   The second ENGSTROM wallet saw the cryptocurrency equivalent of approximately $1.2

8   million dollars in inflows between February 2021 and April 2021. Approximately $1.05 million

9   dollars went to DIEFENDERFER in exchange for U.S. dollars.

10      34.    Your affiant believes that the ENGSTROM DTMLO must work with efficient

11  regularity on an almost daily basis in order to meet the high demand for its cocaine products,

12  stealth of delivery and customer anonymity.  Its patterns of distribution through the US Post

13  Office drop boxes have been a key part of that process.  Your affiant also believes that the

14  SUBJECT PARCELS (in the form of USPS Priority Mail Envelopes) distributed by the

15  organization can be readily identified in post office drop boxes as being associated with the

16  ENGSTROM DTMLO.

17                                  **CONCLUSION**

18      35.    Accordingly, I believe that there is probable cause to believe that the SUBJECT

19  PARCELS will contain controlled substances which constitute evidence of violations of the

20  enumerated offenses. As such, I seek this Court's authorization to conduct searches of the

21  SUBJECT PARCELS as fully described in Attachment "A" and pictorially represented in

22  Attachment "B" for the items sought to be seized as described in Attachment "C."

23      36.    The execution of the searches on June 17 and 18, 2021, will take place only if, on

24  each specified day, the following events also transpire:

19

US-000898

a. each of the SUBJECT PARCELS exhibit all the characteristics [noted in paragraph 10 as (a) through (g)] of having originated from the ENGSTROM DTMLO;

b. KRIEGER is observed either departing from an identified stash location (6145 Harrison Dr., Ste. 4 or 304 E. Silverado Ranch Blvd, Unit 1110) or meeting with another identified member of the ENGSTROM DTMLO and is observed making deposits into a U.S. Post Office drop box; and

c. surveillance is maintained on the U.S. Post Office drop boxes used by KRIEGER until the SUBJECT PARCELS are retrieved.

37.    While it is anticipated that USPIS will participate in locating and retrieving the SUBJECT PARCELS from U.S Post Office drop boxes, members of DEA EG3 will execute the search warrant on each parcel.

Respectfully Submitted,

JARED JEPPSON, Special Agent
Drug Enforcement Administration

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this 17th day of ____June____, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

20

1          **ATTACHMENT "A"**

2          **PREMISES TO BE SEARCHED**

3     **AN AS OF YET UNDETERMINED AMOUNT OF SUBJECT PARCELS**

4     1.  SUBJECT PARCELS will be:

5              a.  a United States Postal Service Priority Mail Envelope measuring approximately

6                  12.5" X 9.5";

7              b.  bearing a computer printed sender address label of a purported business and a

8                  computer printed recipient address label;

9              c.  bear one affixed stamp of $7.95 or one stamp of $7.75 plus additional postage

10                 stamps;

11             d.  upon physical examination of the exterior of the envelopes, appear to contain a

12                 pliable material consistent with a powdery substance ;

13             e.  obtained from a U.S. Post Office drive through drop box that was used by

14                 KRIEGER;

15             f.  bearing a USPS Label 400 tracking number sticker;[2]

16             g.  in the company of at least seven other SUBJECT PARCELS which bear the

17                 characteristics noted in (a) through (f) above.

18    Images of representative examples of envelopes matching the description provided above have

19    been included as Attachments A-1, A-2, and A-3. SUBJECT PARCELS matching the

20

21

22

23    [2]     A USPS "Label 400" tracking number stickers usually accompany priority mail stamps;
      if both are affixed on a USPS Priority Mail Envelope, the parcel can be deposited in a U.S. Post
24    Office drop box without the shipper leaving an online footprint or being subject to being
      captured on video surveillance footage at a U.S Post Office counter.

21

US-000900

1   description above and included in the attachments that follow will be searched for evidence of

2   the Subject Offenses as described in Attachment B.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

22

1

## ATTACHMENT "A-1"

2

## EXAMPLE OF SUBJECT PARCELS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



23

**ATTACHMENT "A-2"**

**SIEZED PARCEL FROM DECEMBER 29, 2020**



24

026583

US-000903

1

**ATTACHMENT "A-3"**

2

**SEIZED PARCEL FROM USPIS 2019 INVESTIGATION**

3



4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25

026584
US-000904

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ATTACHMENT "B"**

**ITEMS TO BE SEIZED**

Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (the "Subject Offenses"), will be found:

1. Controlled substances; and

2. Narcotics packaging materials.

26

US-000905