# EXHIBIT 5

(June 17, 2021, Warrant Applications and Affidavits)

Executed June 21, 2021

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Nevada

FILED.

DATED: 3:01 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

487 E PETAL DEW AVENUE,
LAS VEGAS, NEVADA 89183

)
)
)
)
)

Case No. 2:21-mj-514-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see the Attachment A-1.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jared Jeppson, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: June 17, 2021

*Judge's signature*

City and state: Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge

*Printed name and title*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Nevada

FILED.

DATED: 3:01 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

304 E. SILVERADO RANCH BOULEVARD, UNIT 1110
LAS VEGAS, NEVADA 89183

)
)
)
)
)

Case No.   2:21-mj-515-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see the Attachment A-2.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone *(specify reliable electronic means).*

Date:   June 17, 2021

City and state:   Las Vegas, Nevada

_____
*Judge's signature*

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

US-000938

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

District of Nevada

FILED

DATED: 3:01 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

6145 HARRISON DRIVE, SUITE 4, LAS VEGAS, NEVADA 89120

)
)
)
)
)

Case No.   2:21-mj-516-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A-3.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution  and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:   June 17, 2021

City and state:   Las Vegas, Nevada

_____
*Judge's signature*

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED.

DATED· **3:01 pm, June 17, 2021**

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

10388 MIDSEASON MIST STREET, LAS VEGAS, NEVADA 89183

)
)
)
)
)

Case No.  2:21-mj-517-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see the Attachment A-4.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means).*

Date:  June 17, 2021

City and state:  Las Vegas, Nevada

_____
*Judge's signature*

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED.

DATED: 3:01 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )      Case No.    2:21-mj-518-DJA
                                                  )
305 ST. AUGUSTINE LANE,                           )
HENDERSON, NEVADA 89014                           )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A-5.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC § 841(a)(1) | Distribution  and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:    June 17, 2021

_____
*Judge's signature*

City and state:  Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED.

DATED: 3:02 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No.  2:21-mj-519-DJA |
| 2017 CHEVROLET SILVERADO (VIN: 3GCUKREC0HG108984) NEVADA LICENSE PLATE VMD601 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A-6.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| 21 USC § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  June 17, 2021

_____
*Judge's signature*

City and state:  Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of Nevada

FILED.

DATED: 3:02 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

2007 BMW 328i (VIN: WBAVA33527KX79327)
NEVADA LICENSE PLATE 12345TH

Case No.   2:21-mj-520-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A-7.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:   June 17, 2021

*Judge's signature*

City and state:   Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED.

DATED: 3:02 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2019 NISSAN ROGUE (VIN: 5N1AT2MT9KC797793)<br>NEVADA LICENSE PLATE US263P | )<br>)<br>)<br>)<br>)<br>) |

Case No.    2:21-mj-521-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see the Attachment A-8.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC § 841(a)(1) | Distribution  and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jared Jeppson, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:    June 17, 2021

*Judge's signature*

City and state:  Las Vegas, Nevada

Honorable Daniel J. Albregts, U.S. Magistrate Judge

*Printed name and title*

US-000944

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED

DATED: 3:02 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

2016 CADILLAC CTS (VIN: 1G6AR5SS3G0195627)
NEVADA LICENSE PLATE AL7456

Case No.      2:21-mj-522-DJA

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Please see the Attachment A-9.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution  and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:
Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Jeppson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:    June 17, 2021

City and state:   Las Vegas, Nevada

_____
*Judge's signature*

Honorable Daniel J. Albregts, U.S. Magistrate Judge
*Printed name and title*

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Nevada

FILED.

DATED: 3:03 pm, June 17, 2021

In the Matter of the Search of

U.S. MAGISTRATE JUDGE

*(Briefly describe the property to be searched
or identify the person by name and address)*

Case No.     2:21-mj-523-DJA

2015 CHEVROLET SONIC
(VIN: 1G1JC6SG4F4213150)
NEVADA LICENSE PLATE 579N08

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see the Attachment A-10.

located in the _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see the Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1) | Distribution  and Possession with Intent to Distribute a Controlled Substance |
| 21 USC § 846 | Conspiracy to Commit Controlled Substance Offense |
| 21 USC § 843(b) | Unlawful Use of a Communication Facility |

The application is based on these facts:

Please see the attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jared Jeppson, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*

Date:     June 17, 2021

*Judge's signature*

City and state:   Las Vegas, Nevada          Honorable Daniel J. Albregts, U.S. Magistrate Judge

*Printed name and title*



# SEALED

**Office of the United States Attorney**
District of Nevada
501 Las Vegas Boulevard, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

US-000947

1  CHRISTOPHER CHIOU
   Acting United States Attorney
2  District of Nevada
   Nevada Bar Number 14853
3  CHRISTOPHER BURTON
   Nevada Bar Number 12940
4  SUSAN CUSHMAN
   DANIEL CLARKSON
5  Assistant United States Attorneys
   501 Las Vegas Boulevard South, Suite 1100
6  Las Vegas, Nevada 89101
   (702) 388-6336
7  Christopher.Burton4@usdoj.gov
   Susan.Cushman@usdoj.gov
8  Daniel.Clarkson@usdoj.gov

9  *Attorneys for the United States of America*

FILED

DATED: 3:03 pm, June 17, 2021

U.S. MAGISTRATE JUDGE

10        **UNITED STATES DISTRICT COURT**
              **DISTRICT OF NEVADA**
11

12 | IN THE MATTER OF AN APPLICATION
   | FOR A SEARCH WARRANT FOR:

**Case No. 2:21-mj- 514-DJA**

13 | THE PREMISES KNOWN AND
   | DESCRIBED AS 487 E PETAL DEW
14 | AVENUE, LAS VEGAS, NEVADA 89183

**AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT**

**(Under Seal)**

15

16 | IN THE MATTER OF AN APPLICATION
   | FOR A SEARCH WARRANT FOR:
17

**Case No. 2:21-mj- 515-DJA**

18 | THE PREMISES KNOWN AND
   | DESCRIBED AS 304 E. SILVERADO
   | RANCH BOULEVARD, UNIT 1110, LAS
19 | VEGAS, NEVADA 89183

**AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT**

**(Under Seal)**

20

21 | IN THE MATTER OF AN APPLICATION
   | FOR A SEARCH WARRANT FOR:

**Case No. 2:21-mj- 516-DJA**

22 | THE PREMISES KNOWN AND
   | DESCRIBED AS 6145 HARRISON DRIVE,
23 | SUITE 4, LAS VEGAS, NEVADA 89120

**AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT**

**(Under Seal)**

24

1

US-000948

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR:<br><br>THE PREMISES KNOWN AND DESCRIBED AS 10388 MIDSEASON MIST STREET, LAS VEGAS, NEVADA 89183 | **Case No. 2:21-mj-517-DJA**<br><br>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**<br><br>**(Under Seal)** |
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR:<br><br>THE PREMISES KNOWN AND DESCRIBED AS 305 ST. AUGUSTINE LANE, HENDERSON, NEVADA 89014 | **Case No. 2:21-mj-518-DJA**<br><br>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**<br><br>**(Under Seal)** |
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR:<br><br>THE VEHICLE KNOWN AND DESCRIBED AS A SILVER-COLORED 2017 CHEVROLET SILVERADO (VIN: 3GCUKREC0HG108984) BEARING NEVADA LICENSE PLATE VMD601 | **Case No. 2:21-mj-519-DJA**<br><br>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**<br><br>**(Under Seal)** |
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR:<br><br>THE VEHICLE KNOWN AND DESCRIBED AS A BLUE-COLORED 2007 BMW 328i (VIN: WBAVA33527KX79327) BEARING NEVADA LICENSE PLATE 12345TH | **Case No. 2:21-mj-520-DJA**<br><br>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**<br><br>**(Under Seal)** |
| IN THE MATTER OF AN APPLICATION FOR A SEARCH WARRANT FOR:<br><br>THE VEHICLE KNOWN AND DESCRIBED AS A SILVER-COLORED 2019 NISSAN ROGUE (VIN: 5N1AT2MT9KC797793) BEARING NEVADA LICENSE PLATE US263P | **Case No. 2:21-mj-521-DJA**<br><br>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**<br><br>**(Under Seal)** |

2

US-000949

| | |
|---|---|
| 1   IN THE MATTER OF AN APPLICATION<br>     FOR A SEARCH WARRANT FOR: | **Case No. 2:21-mj-522-DJA** |
| 2 | |
| 3   THE VEHICLE KNOWN AND<br>     DESCRIBED AS A GRAY-COLORED 2016<br>     CADILLAC CTS (VIN: | **AFFIDAVIT IN SUPPORT OF<br>SEARCH WARRANT** |
| 4   1G6AR5SS3G0195627) BEARING<br>     NEVADA LICENSE PLATE AL7456 | **(Under Seal)** |
| 5 | |
| 6   IN THE MATTER OF AN APPLICATION<br>     FOR A SEARCH WARRANT FOR: | **Case No. 2:21-mj-523-DJA** |
| 7   THE VEHICLE KNOWN AND<br>     DESCRIBED AS A BLACK-COLORED | **AFFIDAVIT IN SUPPORT OF<br>SEARCH WARRANT** |
| 8   2015 CHEVROLET SONIC (VIN:<br>     1G1JC6SG4F4213150) BEARING NEVADA | **(Under Seal)** |
| 9   LICENSE PLATE 579N08 | |

10       1.    I, Jared Jeppson, Special Agent (SA), Drug Enforcement Administration (DEA),

11   being duly sworn under penalty of perjury, do hereby state as follows:

12                **INTRODUCTION AND BACKGROUND OF AFFIANT**

13       2.    I am an "investigative or law enforcement officer" of the United States within the

14   meaning of Title 18, United States Code, Section 2510(7); that is, a deputized officer of the

15   United States who is empowered by law to conduct investigations of, and to make arrests for,

16   offenses enumerated in Title 18, United States Code, Section 2516. I have been an SA with the

17   DEA since August 2019 and am currently assigned to the Las Vegas District Office (LVDO),

18   Enforcement Group 3 (EG3). In connection with my DEA duties, I investigate criminal

19   violations of the Controlled Substances Act. Through the DEA, I have received specialized

20   training in the enforcement of federal narcotics laws. My training and experience have involved,

21   among other things: (1) the debriefing of defendants, witnesses and informants, as well as others

22   who have knowledge of the distribution and transportation of controlled substances; (2) the

23   planning, participation and/or management of field operations such as surveillance, arrests, the

24   purchase of controlled substances, the interception of wire communications and the execution of

US-000950

1   search warrants; (3) the acquisition, processing and analysis of evidence; and (4) the tracking of

2   laundered narcotics proceeds.

3       3.      Based on my training and experience as a DEA agent, I have become familiar

4   with how narcotics trafficking enterprises manage their illicit activities both domestically and

5   internationally. These activities include: the importation, manufacturing and distribution of

6   narcotics, the use of electronic devices in furtherance of illicit activity, money laundering and

7   counterintelligence (such as coded language, counter-surveillance techniques and encrypted

8   devices).

9                               **PURPOSE OF AFFIDAVIT**

10      4.      This Affidavit is made in support of an application pursuant to Rule 41 of the

11  Federal Rules of Criminal Procedure for warrants to search the premises and vehicles specified

12  below:

13      a.  487 E Petal Dew Avenue, Las Vegas, Nevada 89183 (hereinafter "SUBJECT

14          PREMISES 1") (See Attachment "A-1");

15      b.  304 E Silverado Ranch Boulevard, Unit 1110, Las Vegas, Nevada 89183 (hereinafter

16          "SUBJECT PREMISES 2") (See Attachment "A-2");

17      c.  6145 Harrison Drive, Suite 4, Las Vegas, Nevada 89120 (hereinafter "SUBJECT

18          PREMISES 3") (See Attachment "A-3");

19      d.  10388 Midseason Mist Street, Las Vegas, Nevada 89183 (hereinafter "SUBJECT

20          PREMISES 4) (See Attachment "A-4")

21      e.  305 St. Augustine Lane, Henderson, Nevada 89014 (hereinafter "SUBJECT

22          PREMISES 5") (See Attachment "A-5") (collectively, the "SUBJECT

23          PREMISES");

24

4

f.  a silver-colored 2017 Chevrolet Silverado (VIN: 3GCUKREC0HG108984) bearing Nevada license plate VMD601 (hereinafter "SUBJECT VEHICLE 1") (See Attachment "A-6");

g.  a blue-colored 2007 BMW 328i (VIN: WBAVA33527KX79327) bearing Nevada license plate 12345TH (hereinafter "SUBJECT VEHICLE 2") (See Attachment "A-7");

h.  a silver-colored 2019 Nissan Rogue (VIN: 5N1AT2MT9KC797793) bearing Nevada license plate US263P (hereinafter "SUBJECT VEHICLE 3") (See Attachment "A-8");

i.  a gray-colored 2016 Cadillac CTS (VIN: 1G6AR5SS3G0195627) bearing Nevada license plate AL7456 (hereinafter "SUBJECT VEHICLE 4") (See Attachment "A-9"); and

j.  a black-colored 2015 Chevrolet Sonic (VIN: 1G1JC6SG4F4213150) bearing Nevada license plate 579N08 (hereinafter "SUBJECT VEHICLE 5") (See Attachment "A-10") (collectively, the "SUBJECT VEHICLES")

for the items and information described in Attachment "B." This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5

US-000952

5.     This affidavit intends to demonstrate probable cause that Paul ENGSTROM, Vincent CUOMO, Abraham ELLIOTT and Joseph KRIEGER, of the ENGSTROM Drug Trafficking & Money Laundering Organization (DTMLO), are collectively and actively involved in a conspiracy to utilize the dark web and the United States Postal Service (USPS) to traffic cocaine and attempt to conceal the illicit nature of the resulting proceeds.

6.     The requested search warrants therefore seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956 (Money Laundering) and 21 U.S.C. §§ 841(a)(1) ( Distribution  and Possession with Intent to Distribute a Controlled Substance), 846 (Conspiracy to Commit Controlled Substance Offense), and 843(b) (Unlawful Use of a Communication Facility, Including the Mails, to Facilitate the Distribution of a Controlled Substance) (the "Subject Offenses") from the TARGET PREMISES and SUBJECT VEHICLES ("A-1" through "A-10") for the evidence described in Attachment "B" and incorporated herein.

## BACKGROUND OF DARK WEB MARKETPLACES AND CRYPTOCURRENCY

7.     Based on my training and experience, I am aware of the following concepts:

a.     "Dark web marketplaces," also called "dark net marketplaces" refer to extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). These online black-market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. A famous dark web marketplace, Silk Road, operated similar to legitimate

US-000953

1    commercial websites such as Amazon and eBay, but offered illicit goods and

2    services. Law enforcement shut down Silk Road in 2013. Cellular "smart

3    phones" can connect to the internet, including the dark web, and can be utilized

4    to manage a drug vendor account as well as conduct digital currency

5    transactions.

6    b.    "Vendors" are the dark web's sellers of goods and services, often of an illicit

7    nature, and they do so through the creation and operation of "vendor accounts."

8    Customers, meanwhile, operate "customer accounts."  It is possible for the same

9    person to operate one or more customer accounts and one or more vendor

10   accounts at the same time.  It is also possible for a vendor to operate multiple

11   accounts on different dark web marketplaces.

12   c.    Although many of the interactions between vendors and customers on dark

13   web marketplaces occur online, with respect to vendors selling drugs, the

14   distribution of those drugs requires the use of real-world facilities, like the Postal

15   Service, to deliver the product to customers.  In this way, the offline behavior of

16   dark web marketplace drug trafficking organizations (DTOs) parallels that of

17   their non-dark web marketplace counterparts.

18   d.    The "Tor network," or simply "Tor," is a special network of computers on

19   the Internet, located around the world, that is designed to conceal the true

20   Internet Protocol ("IP") addresses of the computers accessing the network, and,

21   thereby, the locations and identities of the network's users. Tor likewise enables

22   websites to operate on the network in a way that conceals the true IP addresses of

23   the computer servers hosting the websites, which are referred to as "hidden

24   services" on the Tor network.  Such "hidden services" operating on Tor have

7

US-000954

1    complex web addresses, generated by a computer algorithm, ending in ".onion"

2    and can only be accessed through specific web browser software, including a

3    major dark-web browser known as "Tor Browser," designed to access the Tor

4    network.  One of the logos, or "icons," for Tor Browser is a simple image of the

5    Earth with purple water and bright green landmasses with bright green concentric

6    circles wrapping around the planet to look like an onion.

7        e.    Cryptocurrency (also known as digital currency or virtual currency)[1] is

8    generally defined as an electronic-sourced unit of value that can be used as a

9    substitute for fiat currency (i.e., currency created and regulated by a government).

10   Digital currency exists entirely on the Internet and is not stored in any physical

11   form.  Digital currency is not issued by any government, bank, or company and

12   is instead generated and controlled through computer software operating on a

13   decentralized peer-to-peer network.  Digital currency is legal in the United States

14   and may be used for legitimate financial transactions.  However, digital currency

15   is often used for conducting illegal transactions, such as the sale of controlled

16   substances. Some examples of cryptocurrency are Bitcoin, Monero, and

17   Ethereum. Users store their cryptocurrency in digital "wallets," which are

18   identified by unique electronic "addresses."  A digital wallet essentially stores the

19   access code that allows an individual to conduct cryptocurrency transactions on a

20   public ledger.  To access cryptocurrency on a public ledger, an individual must

21   use a public address (or "public key") and a private address (or "private key").

22   The public address can be analogized to an account number while the private key

23

---

24   [1]    For purposes of this affidavit, "cryptocurrency," "digital currency," and "virtual
currency" relate to the same concept.

8

is like the password to access that account. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Cryptocurrency transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

f.    Although they are legal and have known legitimate uses, cryptocurrencies are also known to be used by cybercriminals for money-laundering purposes, and are believed to be the most oft-used means of payment for illegal goods and services on dark web websites operating on the Tor network. By maintaining multiple cryptocurrency wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplace.

g.    Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.

9

US-000956

h.    Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[2] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

i.    Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications.  Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates).

---

[2]    A QR code is a matrix barcode that is a machine-readable optical label.

10

US-000957

j.    As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

k.    Dark web marketplaces often only accept payment through digital currencies, such as Bitcoin, and operate an escrow whereby customers provide the digital currency to the marketplace, who in turn provides it to the vendor after a transaction is completed. Accordingly, large amounts of cryptocurrency sales or purchases by an individual can be an indicator that the individual is involved in drug trafficking or the distribution of other illegal items. Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for cryptocurrency. Further, individuals who have received cryptocurrency as proceeds of illegal sales on Silk Road-like websites need to sell that cryptocurrency to convert them to fiat (government-backed) currency.

## PROBABLE CAUSE

8.    In October 2020, an investigation was initiated by DEA Las Vegas, Enforcement Group 3 (EG3), into the drug trafficking and money laundering organization believed to be headed by Paul ENGSTROM. ENGSTROM was previously convicted in 2017 in the Federal

11

1  District of Nevada for his participation in selling MDMA to an undercover police officer (2:15-

2  cr-00255-JAD-PAL). EG3 also became aware that ENGSTROM was conducting large

3  quantity cryptocurrency for cash exchanges with Christopher DIEFENDERFER who owned

4  the cryptocurrency trading business BitLiquid, Inc.

5      9.      Upon conducting surveillance on ENGSTROM, it was soon determined that he

6  shared a residence with CUOMO at 487 E Petal Dew Avenue (SUBJECT PREMISES 1).

7  ELLIOTT resides approximately 200 feet east of SUBJECT PREMISES 1 at 10388 Midseason

8  Mist Street (SUBJECT PREMISES 4).  Despite this close proximity, ENGSTROM, CUOMO,

9  and ELLIOTT appeared to be meeting on a regular basis approximately 1.2 miles away at 304

10  E. Silverado Ranch, Unit 1110 (SUBJECT PREMISES 2).  By December 2020, EG3

11  investigators were able to corroborate that SUBJECT PREMISES 2 was a likely stash location

12  (a residence or other location used to store and/or package controlled substances) used by the

13  ENGSTROM DTMLO to prepare narcotics purchased on the dark web for distribution

14  through the United States Postal Service (USPS).

15      10.     On December 29, 2020, EG3 set up surveillance at SUBJECT PREMISES 2 and

16  observed the typical arrival pattern of ENGSTROM (in SUBJECT VEHICLE 2), CUOMO (in

17  SUBJECT VEHICLE 1) and ELLIOTT (in SUBJECT VEHICLE 4). They observed ELLIOTT

18  leaving the stash around 4:00 p.m. in a Nissan Rogue (SUBJECT VEHICLE 3; registered to

19  ENGSTROM) and meeting up with KRIEGER (in SUBJECT VEHICLE 5) to deliver a black

20  plastic file box. EG3 then followed KRIEGER to a US Post Office where he deposited several

21  USPS Priority Mail Envelopes. EG3, with the help of the US Postal Inspection Service

22  (USPIS), obtained the Priority Mail envelopes deposited by KRIEGER. EG3 then obtained the

23  assistance of a North Las Vegas Police Department canine unit. The canine, trained in narcotic

24  detection, alerted on four of the envelopes. EG3 obtained federal search warrants (2:20-mj-

12

1    1114-BNW, 2:20-mj-1115-BNW, 2:20-mj-1116-BNW and 2:20-mj-1117-BNW) for the four

2    envelopes the canine alerted on. Upon opening the four envelopes, EG3 discovered cocaine in

3    each envelope.

4        11.    From December 2020 through February 2021, EG3 conducted surveillance on

5    the organization on approximately 12 occasions, including two extended periods of video

6    surveillance at 487 Petal Dew Avenue (SUBJECT PREMISES 1) and SUBJECT PREMISES

7    2. EG3 observed a clear pattern of the ENGSTROM DTMLO method of operation.

8    Approximately four to six times per week, ENGSTROM (using SUBJECT VEHICLE 2),

9    CUOMO (using SUBJECT VEHICLE 1), and ELLIOTT (using SUBJECT VEHICLE 4)

10   would arrive at various times from the late morning to the early afternoon at the Silverado

11   Ranch stash location (SUBJECT PREMISES 2). ENGSTROM was typically carrying a black

12   backpack slung over one shoulder. He would place it in his trunk while driving and remove it

13   from the trunk when exiting his vehicle (SUBJECT VEHICLE 2). At approximately 4:00 p.m.,

14   ELLIOTT would depart the garage of the stash location in the Nissan Rogue (SUBJECT

15   VEHICLE 3) and meet KRIEGER, usually a half-mile down the road in the parking lot of a

16   Walmart. ELLIOTT would deliver a black file box to KRIEGER. KRIEGER would then

17   drive (in SUBJECT VEHICLE 5) to deposit USPS Priority Mail envelopes at two or three US

18   Post Office drop boxes in various locations around the Las Vegas Valley. The envelopes were

19   always marked with return addresses belonging to actual legitimate local businesses in the

20   vicinity of the US Post Office where the envelopes were deposited. The envelopes utilized

21   tracking number stickers that had been pre-purchased as well as pre-paid Priority postage

22   stamps. EG3 determined that the primary purpose of SUBJECT VEHICLE 5 was for

23   delivering the prepared cocaine parcels to KRIEGER. I believe that the totality of

24

13

1     characteristics of the USPS Priority Mail Envelopes distributed by the ENGSTROM DTMLO

2     as described above make them readily identifiable.

3            12.     On six surveillance occasions between December 2020 and May 2021, EG3

4     located USPS Priority Mail Envelopes matching the above physical description in a U.S. Post

5     Office drop box after observing KRIEGER (and on one occasion, CUOMO) make the

6     envelope deposits for the organization.  EG3 estimates from these surveillances that the

7     DTMLO (specifically KRIEGER or CUOMO) deposits approximately 22 to 43 envelopes per

8     day, between two or more post offices, four to six days per week.

9            13.     During this time, the USPIS alerted EG3 to a previous investigation with some

10    common attributes. In 2019, USPIS learned that an individual in the Las Vegas area was

11    selling cocaine on the dark web under the moniker "Insta" and utilizing the USPS to deliver

12    the orders. USPIS made an undercover purchase of cocaine from "Insta" and received the

13    delivery to their undercover post office box but were unable to determine "Insta's" identity.

14    The envelope and packaging material used by "Insta" back in 2019 was similar to the

15    packaging and material used by the ENGSTROM DTMLO as described above. USPIS also

16    indicated that in its experience, most dark web distributors utilized postage purchased with

17    cryptocurrency and that it was unique for ENGSTROM DTMLO to utilize a pre-paid Priority

18    postage stamp just like "Insta." USPIS suggested that perhaps the ENGSTROM DTMLO was

19    utilizing the moniker "Insta" to sell cocaine on the dark web.

20           14.     In March 2021, EG3 was able to locate "Insta" on White House Market on the

21    dark web. EG3 quickly discovered that "Insta" had conducted thousands of cocaine sales on

22    the dark web through White House Market as well as other dark web market places. Reviews

23    left for "Insta" by certified buyers attested to the speedy and reliable service provided by

24    "Insta." Many reviews indicated they had followed "Insta" from other dark web market places

14

to White House Market. EG3 performed two undercover buys from "Insta" of seven grams each of cocaine. As part of the controlled purchases, EG3 provided "Insta" with an undercover identity and shipping address belonging to an undercover PO Box provided by USPIS. For the first undercover buy, the organization shipped the cocaine late on a Saturday afternoon before EG3 could establish surveillance on the ENGSTROM DTMLO stash house (SUBJECT PREMISES 2). For the second undercover buy, EG3 was able to set up surveillance on the stash location (SUBJECT PREMISES 2). EG3 observed the established pattern of the ENGSTROM DTMLO as previously described, with ENGSTROM, CUOMO, ELLIOTT and KRIEGER working in concert. Between approximately 2:00pm and 3:00pm, EG3 observed SUBJECT VEHICLES's 1, 2, and 4 in the vicinity of the Silverado stash location (SUBJECT PREMISES 2). At approximately 3:40pm, EG3 observed ELLIOTT exit the stash location (SUBJECT PREMISES 2) driving the Nissan Rogue (SUBJECT VEHICLE 3). EG3 observed ELLIOTT meet up with KRIEGER at the usual meeting spot on the east side of the Walmart parking lot by the pharmacy. EG3 then surveilled KRIEGER leave the Walmart parking lot and drive directly to multiple post offices. Ultimately, KRIEGER transported multiple Priority Mail envelopes from SUBECT PREMISES 2 to two different US Post Offices. EG3 subsequently obtained the Priority Mail envelopes that KRIEGER deposited at those two US Post Offices. Among the envelopes obtained at the second Post Office, EG3 located the envelope addressed to the undercover identity and shipping address, thus confirming that "Insta" is the moniker the ENGSTROM DTMLO utilizes to sell cocaine on the dark web.

15.     In April 2021, the investigation learned that the lease agreement for the stash location located at 304 E. Silverado Ranch Boulevard (SUBJECT PREMISES 2) expired at the end of March 2021 and was being retained by the organization on a month-to-month basis. With the information from GPS locations of ENGSTROM's cellular phone and CUOMO's

US-000962

1 vehicle and several surveillances, EG3 learned that the ENGSTROM DTMLO established a

2 second stash location at 6145 Harrison Dr., Suite 4, Las Vegas, Nevada (SUBJECT

3 PREMISES 3). While ENGSTROM initially made numerous visits to this new stash location

4 in April, he appeared to have withdrawn from the daily activity of being present when the

5 cocaine parcels depart the stash location.

6      16.    On May 10, 2021, EG3 performed its third undercover buy of seven grams of

7 cocaine from "Insta" on White House Market in order to obtain an illicit order coming directly

8 from the new stash location. EG 3 used the same undercover identity and PO Box as were used

9 in the previous undercover purchases.

10      17.    The following day, EG3 established surveillance at 6145 Harrison Dr., Ste. 4.

11 (SUBJECT PREMISES 3) With the exception of ENGSTROM, EG3 again observed

12 CUOMO, ELLIOTT and KRIEGER working in concert. On this occasion, EG3 observed

13 CUOMO leave his residence at 487 Petal Dew (SUBJECT PREMISES 1) with a black file box

14 in hand and surveilled him drive the silver Nissan Rogue (SUBJECT VEHICLE 3) directly to

15 the stash location at 6145 Harrison Drive (SUBJECT PREMISES 3). Approximately an hour

16 later, EG3 observed CUOMO depart the stash location (SUBJECT PREMISES 3) in the silver

17 Nissan Rogue (SUBJECT VEHICLE 3). EG3 observed CUOMO drive directly from the stash

18 to a nearby post office on Sunset Drive. EG3 observed CUOMO deposit multiple USPS

19 Priority Mail envelopes in the drop box. Immediately after CUOMO departed the post office,

20 EG3 contacted post office management in order to search the drop box container. With the

21 help of USPIS, EG3 easily located three US Priority Mail envelopes at the top of the drop box

22 mail container that mirrored other envelopes intercepted by the ENGSTROM DTMLO.

23 Among the envelopes located, EG3 found an envelope addressed to the undercover identity

24 used by EG3 to make a dark web purchase of cocaine from "Insta." The ENGSTROM

16

US-000963

1    DTMLO therefore filled and delivered the cocaine ordered by EG3 from "Insta", taking it

2    directly from 6145 Harrison Dr., Ste. 4 (SUBJECT PREMISES 3) to a US Post Office drop

3    box. After CUOMO deposited the envelopes at the post office, he drove the silver Nissan

4    Rogue (SUBJECT VEHICLE 3) to ELLIOTT's residence at 10388 Midseason Mist (SUBJECT

5    PREMISES 4). CUOMO left the silver Rogue (SUBJECT VEHICLE 3) and walked over to his

6    residence at 487 Petal Dew Avenue (SUBJECT PREMISES 1) a few houses down the block.

7    Shortly after, ELLIOTT entered the silver Nissan Rogue (SUBJECT VEHICLE 3) and drove to

8    the nearby Walmart to meet up with KRIEGER. EG3 observed ELLIOTT meet with

9    KRIEGER and exchange black file boxes. EG3 surveilled KRIEGER leave the Walmart

10   parking lot in the black Chevy Sonic (SUBJECT VEHICLE 5) and drive directly to multiple US

11   Post Offices around the Las Vegas Valley. KRIEGER first drove to two post offices in the north

12   of the valley. KRIEGER drove through the drop box lanes but did not appear to deposit any

13   envelopes. With the help of USPIS, EG3 searched the drop box containers but did not find any

14   envelopes that appeared to come from the ENGSTROM DTMLO. KRIEGER then drove

15   down to the US Post Office on Sunset Drive near the airport. At this post office, EG3 observed

16   KRIEGER deposit numerous envelopes in the drop box. Immediately after KRIEGER left the

17   post office, EG3 made contact with the post office management and with the help of USPIS

18   was able to locate 30 USPS Priority Mail envelopes that mirrored the envelopes previously

19   intercepted by EG3. With CUOMO's three envelopes and KRIEGER's 30 envelopes, EG3

20   intercepted a total of 33 envelopes from the ENGSTROM DTMLO on May 11, 2021.

21           18.      On June 7, 2021, EG3 conducted surveillance on the ENGSTROM DTMLO.

22   EG3 set up surveillance on 487 Petal Dew (SUBJECT PREMISES 1), 10388 Midseason Mist

23   (SUBJECT PREMISES 4) and 6145 Harrison Drive (SUBJECT PREMISES 3). EG3 observed

24   CUOMO's and ELLIOTT's respective vehicles (SUBJECT VEHICLES 1 and 4) at the

17

US-000964

1    Harrison stash location (SUBJECT PREMISES 3). EG3 also observed ENGSTROM at 487

2    Petal Dew (SUBJECT PREMISES 1) put his black backpack into the trunk of his vehicle

3    (SUBJECT VEHICLE 2), enter his vehicle, and drive directly to the Harrison stash location

4    (SUBJECT PREMISES 3) where ELLIOTT and CUOMO were located. ELLIOTT left the

5    Harrison stash location (SUBJECT PREMISES 3) at approximately 3:01pm. Then, at

6    approximately 4:13pm, EG3 observed KRIEGER arrive at the Harrison stash location

7    (SUBJECT PREMISES 3) and drive directly inside the premises in his black Chevy Sonic

8    (SUBJECT VEHICLE 5) while ENGSTROM and CUOMO were still inside. EG3 surveilled

9    KRIEGER thereafter depart the Harrison stash location (SUBJECT PREMISES 3) and deposit

10   a total of 33 USPS Priority Mail envelopes at two separate US Post Office drop boxes. EG3

11   seized two of the parcels that KRIEGER deposited and obtained search warrants to open and

12   search the packages under Case Numbers 2:21-MJ-00486-VCF and 2:21-MJ-00487-VCF. Upon

13   executing the search warrants on both parcels, EG3 found that they contained approximately

14   119 grams of a white powdery substance that field tested positive for cocaine.

15        19.    It is my belief, based upon my training and experience, that ENGSTROM, like

16   leaders of other drug trafficking organizations have been known to do, has apparently removed

17   himself from always being physically present during the cocaine packaging operations of the

18   business in order to mitigate his risk. The primary reasons he is able to do so are: he has

19   established operational partners; he now has the financial means to do so; and he can conduct a

20   significant portion of his business remotely from a laptop or desktop computer. To the latter

21   point, I believe that the backpack that EG3 has observed ENGSTROM carrying to and from

22   both of his residences (SUBJECT PREMISES 1 and SUBJECT PREMISES 5) and the 304 E

23   Silverado Ranch stash location (SUBJECT PREMISES 2) contains, among other possible

24   evidentiary items, a laptop computer. This belief is based upon my training and experience, the

18

1    perceived role of ENGSTROM as a principal, the efficiency and business-like operations of the

2    organization, the many reviews on White House Market praising "Insta's" ability to fill orders

3    quickly and the turnaround time of EG3's second undercover cocaine purchase taking less than

4    three hours from the time it was ordered to the time it was shipped—on a Saturday.  I believe

5    ENGSTROM responds to his White House Market customers throughout the day and carries a

6    laptop with him constantly in order to do so.

7         20.    Over the course of this investigation, law enforcement has located and

8    photographed 203 USPS Priority Mail Envelopes believed to have originated from the

9    ENGSTROM DTMLO.  Of the envelopes photographed, 15 have been interdicted by EG3 and

10   the USPIS. All 15 envelopes contained a white, powdery substance that field tested and/or

11   laboratory tested positive for the presence of cocaine. The cocaine seized in eleven of the 15

12   envelopes are consistent with amounts for personal use. During a March 29, 2021, surveillance,

13   however, two envelopes were located after the usual ENGSTROM DTMLO pattern of

14   distribution.  These two envelopes were addressed to the same individual at the same location

15   in Pullman, WA. A federal search warrant in Washington was obtained and each of these

16   parcels contained approximately 117 gross grams of field tested positive cocaine.  Law

17   enforcement has observed "Insta" listing 112 grams of cocaine on White House Market, a dark

18   website commonly used to sell and distribute controlled substances, for the cryptocurrency

19   equivalent of approximately $5,985.00 US Dollars. The two envelopes each containing 117

20   gross grams of cocaine that were recovered on March 29, 2021, appear to correlate with the

21   White House Market listing. Because the controlled substance is related to such a large amount

22   of money for this single purchase, the 234 grams of cocaine at a cost of approximately $11,970

23   (before shipping fees) may be considered in excess of a personal use amount.  Regardless of the

24   amount, the cocaine in each USPS Priority Mail Envelope is contained within numerous layers

19

1  of wrappings, such as heat sealed plastic and mylar, that I believe is used to try and prevent the

2  cocaine's odor from being detected by a trained police canine unit.

3      21.    While investigating and establishing the ENGSTROM DTMLO pattern and

4  method of operation, EG3 was also investigating the financial background of Paul

5  ENGSTROM and the other members of the DTMLO. Of the members of the ENGSTROM

6  DTMLO, Paul ENGSTROM was the one obtaining large amounts of cryptocurrency and large

7  cash deposits into his bank accounts, presumably from the organization's dark web cocaine

8  sales. The investigation revealed numerous large quantities of cryptocurrency for cash

9  exchanges in amounts of tens of thousands to over a hundred thousand dollars with

10  Christopher DIEFENDERFER and his business BitLiquid, Inc. EG3 surveilled ENGSTROM

11  on one occasion leaving the Silverado stash house (SUBJECT PREMISES 2) with a black

12  backpack and drive directly to BitLiquid, Inc. located on Spring Mountain Road. ENGSTROM

13  was observed leaving BitLiquid, Inc. with an envelope in hand.

14      22.    Law enforcement also examined financial records for bank accounts belonging to

15  ENGSTROM. Records from one of ENGSTROM's bank accounts alone show 15 separate

16  incoming wires between January and June 2020 from DIEFENDERFER and other employees

17  or associates of BitLiquid, Inc. totaling $273,025.00. Subsequently, on June 12, 2020,

18  ENGSTROM then transferred $325,772.70 to Clear Title Company for the purchase of a piece

19  of land.

20      23.    Based on your affiant's training and experience, and review of the listed prices on

21  "Insta's" White House Market posts, "Insta" sells cocaine on the dark web for approximately

22  twice the street value of cocaine in Las Vegas. White House Market alone shows that "Insta"

23  has made over 3,280 cocaine sales from February 1, 2020, until May 23, 2021. This equates to

24  205 sales per week or approximately 34 sales per day in a 6 day work week, corroborating the

20

1   surveillance estimates of KRIEGER's daily envelope deposits noted above. Based on the 2,310

2   buyer reviews from verified purchases on White House Market (as of May 23, 2021), and

3   assuming the remaining 970 sales were each for the minimum purchase of 3.5 grams of cocaine,

4   a conservative estimate is that "Insta" has sold over 20 kilograms of cocaine for more than $1.9

5   million in less than a four-month period (ending May 23, 2021). Further, White House Market

6   imported purchaser feedback for "Insta" from other dark web market places showing a total of

7   7,562 other completed sales.

8        24.     These types of illicit dark web sales require cryptocurrency as a medium of

9   exchange. Based on the investigation, one of the people ENGSTROM turned to in order to get

10  that cryptocurrency converted into U.S. Dollars was DIEFENDERFER.  After identifying one

11  of the cryptocurrency wallets used by DIEFENDERFER, EG3 used an internet website to

12  analyze his wallet's activities on the Ethereum Blockchain. Two separate cryptocurrency

13  wallets used by ENGSTROM were identified in that analysis.

14       25.     The first ENGSTROM wallet saw the cryptocurrency equivalent of

15  approximately $1.8 million dollars pass through it between August 2020 and February 2021.

16  Approximately $765,000 of it went to DIEFENDERFER in exchange for U.S. Dollars.

17  The second ENGSTROM wallet saw the cryptocurrency equivalent of approximately $1.2

18  million dollars in inflows between February 2021 and April 2021. Approximately $1.05 million

19  dollars went to DIEFENDERFER in exchange for U.S. Dollars.

20       26.     EG3's financial investigation has been unable to locate any plausible source of

21  the large quantities of income that Paul ENGSTROM receives other than from dark web sales

22  under the moniker "Insta." Employers in the state of Nevada are required to report

23  employment income to the Nevada Department of Employment, Training & Rehabilitation

24  (DETR) for any employees in the state of Nevada for benefit purposes. EG3 subpoenaed

21

1  Nevada DETR for employment records on members of the ENGSTROM DTMLO. Any

2  reported employment for an individual would show up on DETR's "Wage Detail Report."

3  Regarding the inquiry for Paul ENGSTROM, DETR reported that there was "no information

4  available." No business entity operating in the state of Nevada pays ENGSTROM wages.

5  **ADDITIONAL PROBABLE CAUSE FOR THE SPECIFIC SUBJECT PREMISES**

6  **& SUBJECT VEHICLES**

7  27.  SUBJECT PREMISES 1 - 487 E Petal Dew Avenue, Las Vegas, Nevada 89183:

8  a.  As indicated by EG3 surveillance operations and by their respective

9  Nevada Driver's licenses, SUBJECT PREMISES 1 is a residence used by

10  ENGSTROM and CUOMO. I believe it is a part-time residence for

11  ENGSTROM (in addition to SUBJECT PREMISES 5) and a full time residence

12  for CUOMO. The residence is owned by Frank FAMLIANO and the utilities are

13  in FAMLIANO's name. ENGSTROM lists SUBJECT PREMISES 1 as his

14  residence on his driver's license. ENGSTROM also lists the address of SUBJECT

15  PREMISES 1 as his residence on his other assets and bank accounts.

16  b.  For the month of February 2021 alone, the tracking device EG3 placed on

17  CUOMO's vehicle reported that CUOMO drove directly between SUBJECT

18  PREMISES 1 and the stash location at SUBJECT PREMISES 2 approximately

19  31 times. (The use of the word "directly" is based upon approximately five

20  minutes travel time between the two locations.)

21  c.  As noted in the SUBJECT PREMISES 4 section below, on March 16,

22  2021, ELLIOTT is believed to have removed cocaine, packaging materials

23  and/or other material evidence from SUBJECT PREMISES 1 immediately

24

22

1    before transferring USPS Priority Mail Envelopes containing cocaine to

2    KRIEGER.

3        d.    On May 11, 2021, EG3 observed CUOMO exit SUBJECT PREMISES 4

4    carrying a black file box like the ones observed being exchanged between

5    ELLIOTT and CUOMO used to carry and conceal USPS Priority Mail

6    Envelopes containing cocaine. CUOMO exited the neighborhood in the Nissan

7    Rogue (SUBJECT VEHICLE 4) and drove to the new stash location at 6145

8    Harrison Drive, Suite 4 (SUBJECT PREMISES 3).  From the new stash

9    location, CUOMO drove to a U.S Post Office and appeared to make three

10   deposits of USPS Priority Mail Envelopes into the drive through drop box of that

11   Post Office. Shortly thereafter, EG3 and USPIS located three USPS Priority Mail

12   Envelopes in the drop box.  One of the USPS Priority Mail Envelopes was

13   addressed to the undercover identity ordered from "Insta" the day prior. I believe

14   these events increase the likelihood that cocaine, packaging materials and/or

15   other material evidence are actively present in SUBJECT PREMISES 1.

16       e.    On no less than four occasions, EG3 observed ENGSTROM arriving

17   and/or departing from SUBJECT PREMISES 1 with a backpack I believe

18   contains items essential to the organization's illicit activities as described above

19   and thus, evidentiary.

20   28.   SUBJECT PREMISES 2 - 304 E Silverado Ranch Boulevard, Apt 1110, Las

21   Vegas, Nevada 89183:

22       a.    Financial records indicate ENGSTROM pays the rent for SUBJECT

23   PREMISES 2. The name on the lease for SUBJECT PREMISES 2 is Patricia

24

23

1    ENGSTROM, ENGSTROM's mother, and the property management is AMC,

2    LLC.[3]

3    b.    Since the inception of this investigation, there have been eight surveillance

4    operations which resulted in the seizure of 12 USPS Priority Mail Envelopes

5    containing cocaine which are believed to have originated from the ENGSTROM

6    DTMLO's stash location at 304 E Silverado Ranch Boulevard (SUBJECT

7    PREMISES 2). Generally, the pattern of the ENGSTROM DTMLO method of

8    operation noted in paragraph 25 was observed by EG3, with SUBJECT

9    PREMISES 2 involved on each occasion.

10   c.    On no less than six occasions, EG3 observed ENGSTROM arriving

11   and/or departing from SUBJECT PREMISES 2 with a backpack I believe

12   contained items essential to the organization's illicit activities as described above

13   and thus, evidentiary.

14   d.    I believe that from the inception of this investigation until April 2021,

15   SUBJECT PREMISES 2 was used as a stash location by the ENGSTROM

16   DTMLO; cocaine being processed, packaged and ready for shipment inside. The

17   patterns of behavior exhibited by ENGSTROM, CUOMO, and ELLIOTT

18   during surveillance operations of SUBJECT PREMISES 2 suggest to me

19   attempts to obfuscate the activity being conducted within: the three arrive and

20   depart at staggered times and in separate vehicles, despite all living within 200

21

22   [3] Your affiant has been in contact with the general counsel for AMC, LLC and the company is

23   aware that SUBJECT PREMISES 2 is involved in an investigation but they do not yet know of
     the instant effort to obtain a search warrant. In the event this search warrant application is

24   granted, investigators intend to contact the management office on the day of service to obtain a
     key.

24

feet of each other; the Rogue (SUBJECT VEHICLE 4) is used primarily for transporting the cocaine and stored in the garage when not in use; and the lease and power subscriber for SUBJECT PREMISES 2 are in the name of Patricia ENGSTROM, the mother of Paul ENGSTROM, who is believed to reside in Minnesota. Specifically, the address Patricia ENGSTROM provided on the lease paperwork includes a Minnesota address and records checks appear to show she currently resides there. Though I believe the primary stash location was moved to SUBJECT PREMISES 3, the apartment's leasing company provided information that the tenant, whose lease expired at the end of March 2021, is now in a month-to-month agreement that expires June 30, 2021.  I believe that evidence of ENGSTROM DTMLO's operations can still be recovered form SUBJECT PREMISES 2.

29.   SUBJECT PREMISES 3 - 6145 Harrison Drive, Suite 4, Las Vegas, Nevada 89120:

a.  I believe that in April 2021, the ENGSTROM DTMLO transitioned its primary stash location from SUBJECT PREMISES 2 to SUBJECT PREMISES 3; cocaine being processed, packaged and ready for shipment inside. This location is an industrial business suite which I believe provides the ENGSTROM DTMLO with the appearance of conducting licit day-to-day operations.  6145 Harrison Drive, Suite 4, is part of a larger business complex owned and managed by The Ribeiro Companies. EG3 served Ribeiro with an administrative subpoena and learned the lease agreement for SUBJECT PREMISES 3 is with a company titled White Hat Matrix, Inc., with the identified point of contact being Robert KWASNY. EG3 ran queries on White Hat Matrix, Inc. and Robert KWASNY in order to determine

25

1   whether there was a connection with the ENGSTROM DTMLO. White Hat

2   Matrix, Inc. is a registered entity with Secretary of State's Office for the State of

3   Wyoming. Robert KWASNY is listed as the Director and Secretary of the entity and

4   his personal address is listed as 2555 New Morning Avenue, Henderson, Nevada.

5   According to GPS tracking information on SUBJECT VEHICLE 1, Vincent

6   CUOMO was in close proximity of 2555 New Morning Ave, Henderson, Nevada on

7   at least two occasions: 1) February 16, 2021, from approximately 5:18pm to 6:46pm;

8   and 2) March 26, 2021, from approximately 1:05pm to 1:11pm. In addition, EG3

9   queried previously obtained toll records, including pen register data from 518-229-

10   3002, subscribed to and used by Vincent CUOMO. EG3 was able to identify a phone

11   number belonging to Robert KWASNY (505-908-7971) in the toll records for

12   CUOMO's phone number ending in 3002. A frequency report of calls between

13   CUOMO's phone and KWASNY's phone based on those same records reflect that

14   the two have been in contact approximately 366 times from February 11, 2021 and

15   June 10, 2021.

16   b.   Data from a GPS location device placed on CUOMO's vehicle (SUBJECT

17   VEHICLE 1) shows CUOMO visiting SUBJECT PREMISES 2 six times and

18   SUBJECT PREMISES 3 on 15 separate occasions in the same week in mid-April.

19   Though imprecise, with a radius sometimes exceeding 2,000 feet from the reported

20   location, GPS location data from a cellular phone used by ENGSTROM showed

21   him to be in the vicinity of SUBJECT PREMISES 3 at least 39 times in the month of

22   April 2021. I believe that for all of these reported GPS locations, ENGSTROM and

23   CUOMO were at SUBJECT PREMISES 3 preparing or using it as the new stash

24   location for the organization.

26

c. Paragraphs 15 through 19 above indicate, with the exceptions of ENGSTROM himself being physically present every time and the use of the new stash location, the patterns of cocaine trafficking operations for the organization remained the same. On May 11, 2021, EG3 interdicted a shipment of cocaine it had ordered from "Insta" that was observed to have been transported from SUBJECT PREMISES 3.

d. As mentioned above, EG3 conducted surveillance on the ENGSTROM DTMLO on June 7, 2021. EG3 observed all members of the DTMLO at SUBJECT PREMISES 3. EG3 surveilled KRIEGER leave SUBJECT PREMISES 3, and drive to ELLIOT's residence at SUBJECT PREMISES 4. KRIEGER and ELLIOT then had a short conversation in front of SUBJECT PREMISES 4 while KRIEGER remained in the vehicle. After the conversation ended, KRIEGER left SUBJECT PREMISES 4, and drove directly to two US Post Offices and deposited a total of 33 USPS Priority Mail envelopes. EG3 then obtained search warrants for two of the parcels, both containing a white powdery substance that field tested positive for cocaine.

30. SUBJECT PREMISES 4 - 10388 Midseason Mist Street, Las Vegas, Nevada 89183:

a. The surveillance activities noted above and power records indicate that SUBJECT PREMISES 4 is the residence of ELLIOTT. ELLIOTT has been observed traveling directly from SUBJECT PREMISES 4 to conduct ENGSTROM DTMLO activities.

b. On January 19, 2021, EG3 observed ELLIOTT depart the driveway of SUBJECT PREMISES 4 driving the Nissan Rogue (SUBJECT VEHICLE 3), the vehicle used primarily for transporting the packaged cocaine to KRIEGER. ELLIOTT made a stop at a private residence and shipping business, A&J Postal,

27

1  before driving into the garage of the stash location located at 304 E Silverado

2  Ranch Boulevard (SUBJECT PREMISES 2).

3      c.       On March 16, 2021, EG3 observed ELLIOTT exit the garage of stash

4  location located at 304 E Silverado Ranch Boulevard (SUBJECT PREMISES 2)

5  driving the Nissan Rogue (SUBJECT VEHICLE 3). ELLIOTT drove to the 487

6  Petal Dew residence (SUBJECT PREMISES 1). ELLIOTT entered the residence

7  twice to retrieve a large box and then a parcel, placing both in the back seat area

8  of the Rogue (SUBJECT VEHICLE 3). ELLIOTT then drove approximately 200

9  feet to the driveway of his 10388 Midseason Mist Street residence and appeared

10  to bring at least one of the items retrieved at 487 Petal Dew inside.

11  Approximately ten minutes later, KRIEGER arrived in front of ELLIOTT's

12  residence. ELLIOTT emerged and the two parties conducted the usual

13  transaction. This time, however, ELLIOTT retrieved two black file boxes from

14  the trunk of the Rogue (SUBJECT VEHICLE 3) and placed them in

15  KRIEGER's Sonic (SUBJECT VEHICLE 5) while KRIEGER retrieved a black

16  file box from his vehicle and placed it in the trunk of the Rogue (SUBJECT

17  VEHICLE 3).  This was the only ELLIOTT/KRIEGER cocaine parcel

18  transaction observed at SUBJECT PREMISES 4. I believe ELLIOTT's

19  unaccompanied access to ENGSTROM and CUOMO's residence at 487 Petal

20  Dew (SUBJECT PREMISES 1) indicates a high level of trust between these three

21  co-conspirators and raises the likelihood that cocaine, packaging materials, and

22  other material evidence will be found in both of these residences (SUBJECT

23  PREMISES 1 and SUBJECT PREMISES 4).

24      31.   SUBJECT PREMISES 5 - 305 St. Augustine Lane, Henderson, Nevada 89014

28

a.  From April 23, 2021, through May 20, 2021, video surveillance was established in the vicinity of SUBJECT PREMISES 5 that recorded activity in the front of the property. Though no consistent pattern of residency emerged, it appears that ENGSTROM resides overnight at SUBJECT PREMISES 5, with possible spouse and residence power subscriber ENGSTROM, approximately two to four times per week. Financial records indicate that ENGSTROM pays the rent for the residence. It is believed Paul ENGSTROM resides at 487 Petal Dew (SUBJECT PREMISES 1) on the other days of the week.

b.  During the time frame that video surveillance was established, it appeared that two or three motorcycles were being stored in the garage of the residence. Financial records indicate that ENGSTROM has purchased multiple motorcycles. Based on the financial analysis noted, it is believed that ENGSTROM used illicit proceeds to purchase the motorcycles kept in the garage of SUBJECT PREMISES 5. I believe that these and other assets acquired with the organization's illicit proceeds may be stored in SUBJECT PREMISES 5.

c.  Additionally, on three occasions during this time frame, ENGSTROM was observed arriving at SUBJECT PREMISES 5 in his BMW (SUBJECT VEHICLE 2), removing his black backpack from the trunk of the vehicle and entering the premises. On the first two of those occasions, ENGSTROM left the following day, putting the backpack in the trunk before departing. (On the third occasion, the video recording was terminated shortly after ENGSROM arrived.) EG3 observed ENGSTROM follow this same pattern at 487 E Petal Dew Avenue (SUBJECT PREMISES 1) and 304 E Silverado Ranch Boulevard, Apt 1110 (SUBJECT PREMISES 2). I believe that ENGSTROM's black backpack

29

1    contains some combination of a laptop computer, packaging materials, cocaine

2    and/or other items that are material to the cocaine distribution activities of the

3    organization.

4        32.    SUBJECT VEHICLE 1 - 2017 Chevrolet Silverado (VIN:

5    3GCUKREC0HG108984) bearing Nevada license plate VMD601 silver in color:

6            a.    SUBJECT VEHICLE 1 is registered to CUOMO.

7            b.    On four occasions beginning January 26, 2021, EG3 has procured

8    warrants for the installation of a GPS location tracking device on SUBJECT

9    VEHICLE 1 (2:21-mj-0094-BNW, 2:21-mj-00182-DJA, 2:21-mj-0326-BNW and

10   2:21-mj-00398-DJA). The GPS location data obtained from those devices have

11   assisted in the surveillance of the ENGSTROM DTMLO and helped EG3

12   understand the frequency and scope of its illicit activities. CUOMO's vehicle has

13   frequently traveled directly from his residence (SUBJECT PREMISES 1) to the

14   organization's stash locations (SUBJECT PREMISES 2 and SUBJECT

15   PREMISES 3).

16       33.    SUBJECT VEHICLE 2 - 2007 BMW 328i (VIN: WBAVA33527KX79327)

17   bearing Nevada license plate 12345TH blue in color:

18           a.    SUBJECT VEHICLE 2 is registered to ENGSTROM and appears to be

19   his primary vehicle, though he owns several motorcycles.

20           b.    Every time ENGSTROM was observed by EG3 at the stash location at

21   304 E Silverado Ranch (SUBJECT PREMISES 2) he used SUBJECT VEHICLE

22   2 to travel there.

23           c.    Of the no less than 15 times EG3 observed ENGSTROM with his

24   aforementioned backpack at either 487 Petal Dew Avenue (SUBJECT

30

1      PREMISES 1), 304 E Silverado Ranch (SUBJECT PREMISES 2), or 305 St.

2      Augustine Lane (SUBJECT PREMISES 5), most of those occasions

3      ENGSTROM had arrived at those locations in SUBJECT VEHICLE 2.

4      34.    <u>SUBJECT VEHICLE 3</u> - 2019 Nissan Rogue (VIN: 5N1AT2MT9KC797793)

5 bearing Nevada license plate US263P silver in color:

6      a.     SUBJECT VEHICLE 3 is registered to ENGSTROM.

7      b.     Based upon surveillance conducted throughout this investigation and

8      noted supra, I believe it has been demonstrated that the primary purpose of

9      SUBJECT VEHICLE 3 is the delivery of USPS Priority Mail Envelopes

10      containing cocaine to KRIEGER and CUOMO. I also believe the use of this

11      vehicle is an act of counterintelligence that seeks to conceal and

12      compartmentalize part of the activity (distribution) that presents the most risk for

13      the organization, in order to avoid detection by law enforcement.

14      c.     In addition to ELLIOTT's regular use of the vehicle, on May 11, 2021,

15      CUOMO used SUBJECT VEHICLE 3 to deposit three USPS Priority Mail

16      Envelopes into the drop box of a U.S. Post Office. One of those envelopes was

17      the controlled shipment of the order of cocaine from "Insta" to the undercover

18      PO Box.

19      35.    <u>SUBJECT VEHICLE 4</u> – 2016 Cadillac CTS  (VIN: 1G6AR5SS3G0195627)

20 bearing Nevada license plate AL7456 gray in color:

21      a.     SUBJECT VEHICLE 3 is registered to ELLIOTT.

22      b.     ELLIOTT has been observed driving SUBJECT VEHICLE 3 to both

23      stash locations, 304 E Silverado Ranch (SUBJECT PREMISES 2) and 6145

24      Harrison Drive, Suite 4 (SUBJECT PREMISES 3).

31

36. <u>SUBJECT VEHICLE 5</u> - 2015 Chevrolet Sonic (VIN: 1G1JC6SG4F4213150)

bearing Nevada license plate 579N08 black in color:

     a.    SUBJECT VEHICLE 5 is registered to KRIEGER.

     b.    Based upon surveillance conducted throughout this investigation and noted supra, I believe it has been demonstrated that KRIEGER uses SUBJECT VEHICLE 5 to deliver the cocaine prepared and packaged in USPS Priority Mail Envelopes by ENGSTROM, CUOMO and ELLIOTT, to various U.S. Post Office drop boxes throughout the Las Vegas Valley approximately four to six times per week.

## EVIDENCE ASSOCIATED WITH DRUG TRAFFICKING

37. Specifically with respect to trafficking organizations involved in the transportation and distribution of illegal drugs, I know based on my training and experience that drug distributors often reside at and store or maintain the following evidence at their residences:

     a.    Drugs, in any form, such as cocaine, methamphetamine, ecstasy, heroin, fentanyl, acid, and prescription drugs;

     b.    Paraphernalia for packaging, processing, cutting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, plastic bags, and heat-sealing devices;

     c.    Books, records, receipts, notes, ledgers, and other papers relating to the manufacture, distribution, and possession with intent to distribute controlled substances;

     d.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture,

32

US-000979

distribution, and possession with intent to distribute controlled substances and personal property tending to show the existence and/or location of other stored drugs, including, but not limited to, storage locker receipts, maps, safety deposit keys and corresponding records, and money-counting machines;

e.    Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and prepaid debit cards;

f.    Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

g.    Photographs, negatives, video tapes, films, undeveloped film, electronic storage devices and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

h.    Items of personal property that tend to identify the person(s) in residence, and the occupancy, control, or ownership of the subject premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

i.    Devices used to communicate with other individuals involved in the transportation, distribution, and possession with intent to distribute cocaine and other controlled substances, including cellular telephones, mobile telephones, phone answering machines, telephone answering machine tapes, beepers or

33

US-000980

pagers, and devices used to conduct counter-surveillance against law

enforcement, such as radio scanners, police radios, surveillance cameras and

monitors, anti-bugging devices and devices used to detect the presence of

wiretaps, recording devices or transmitters, and/or receipts or literature

describing the same; and,

j.      Assigned telephone numbers for telephone and cellular telephones, found

on the premises or vehicles, along with telephone toll records, papers, notebooks,

and other items, documenting the manufacture, distribution, or possession with

intent to distribute cocaine and other controlled substances, and communications

among co-conspirators.

k.      Based upon my training and experience, as well as the collective

knowledge and experience of other assisting agents, I am aware that it is a

common practice for individuals who traffic in illicit drugs to keep records,

proceeds from drug transactions, and other evidence at their residences.

l.      Based on my training, I know that records, in particular, are often

maintained by drug traffickers. Based on my training in investigating drug

trafficking organizations, I know that drug traffickers tend to keep their records

for a long period of time. Further, because drug traffickers in many instances will

"front" (that is, sell on consignment) controlled substances to their clients, or

alternatively, will be "fronted" controlled substances from their suppliers, such

record-keeping is necessary to keep track of amounts paid and owed, and such

records will also be maintained close at hand so as to readily ascertain current

balances. Often drug traffickers keep "pay and owe" records to show balances

due for drugs sold in the past ("pay") and for payments expected ("owe") as to

34

the trafficker's supplier and the trafficker's dealer(s).  Additionally, drug

traffickers must maintain records of clients and suppliers and keep them

immediately available in order to efficiently conduct their drug trafficking

business.

m.     It is also a common practice for drug traffickers to conceal at their

residences large sums of money, either the proceeds from drug sales or monies to

be used to purchase controlled substances or items associated with the production

of controlled substances.  Drug traffickers often make use of wire transfers,

cashier's checks, and money orders to pay for controlled substances.  Evidence of

such financial transactions and records relating to income and expenditures of

money and wealth in connection with drug trafficking is also often maintained in

their residences.  Further, drug traffickers often maintain cash hoards at their

residences.  Cash hoards are used for the purchase of drugs and are the result of

the sale of controlled substances.  Cash hoards are often stored in secured

environments, such as safes and vaults.

n.     Drug traffickers often possess firearms and other dangerous weapons to

protect their profits and supply of drugs from others who might attempt to

forcibly take the traffickers' profits and supply of drugs.

38.     In a number of searches of residences associated with drug traffickers in prior

investigations in which other agents and I have been involved, the above-referenced evidence

has typically been recovered from residences and other structures and areas on the property

being searched, such as storage sheds or parked vehicles on or around the premises.

39.     Further, based on my training and experience and familiarity with investigations

into drug trafficking conducted by other law enforcement agents, I know the following:

35

1     a. Drug traffickers usually do not voluntarily stop selling drugs and continue

2    to do so until they are stopped by law enforcement.

3     b. Drug traffickers maintain evidence of their activities (including types of

4    evidence specified above) for long periods of time, in order to track prior

5    transactions and/or maintain account histories.

6     c. Persons involved in drug trafficking conceal, in various locations, caches

7    of drugs, drug paraphernalia, amounts of jewelry, automobiles, automobile titles,

8    deeds to property, and other items of value and/or proceeds of drug transactions

9    and evidence of financial transactions relating to obtaining, transferring, secreting

10    or spending large sums of money acquired from engaging in drug trafficking

11    activities.

12     d. Drug traffickers maintain drug paraphernalia in much the same way

13    legitimate businesses will maintain their "tools of the trade," whether or not there

14    is contraband on the premises on any given day.

15   40. I know from my training and experience that drug traffickers often use non-

16 commercial vehicles, such as the SUBJECT VEHICLES, to transport drugs to and from

17 locations. I also know that non-commercial vehicles are often used to store records of drug

18 transactions and cash proceeds of such transactions. Such records and cash are often stored in

19 hidden compartments or inside the trunk of such vehicles.

20   41. From my background and experience, I know that individuals engaged in illegal

21 income producing businesses seek to conceal the income generated from such businesses. In

22 particular, individuals engaged in drug trafficking often conduct their transactions in cash to

23 avoid creating bank records related to such transactions.

24

36

42.     I am aware that the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped.  Thus, records reflecting income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

43.     Often, the method of drug distribution (when a criminal activity is or has been present) generates records of events as well.  These records can be in the form of bills of lading, contracts, air waybills, delivery receipts, billings, manifests, log books, fuel receipts, motel/hotel receipts, travel records, credit card charges and other related business documents.  Further, based on the fact that this investigation involves the use of "dark web" vendor platforms, as described in detail above, I believe that such records will include evidence of "darknet" or "dark web" accounts used by the occupant of the premises to be searched.

44.     Individuals who amass proceeds from legal or illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc.  I know from personal knowledge that individuals attempting to conceal income from the government often use a variety of methods to conceal the income including creating false business entities, using known and unknowing individuals, and hide assets, in order to disguise and conceal income.

45.     I know from my training and experience that individuals involved in drug trafficking will often keep track of cash and other resources by taking photos of such items.  Those photos may sometimes be taken or stored on cellular phones.  Individuals involved in such illegal activities will often need to keep track of cash and other resources by photos and other personal documentary means because they do not want to deposit funds into a bank

37

US-000984

1   account, which would create records of such cash. In addition, I know that individuals

2   involved in such illegal activities will take photos of their drug inventory to document amounts,

3   to provide to potential buyers, and for other personal reasons. I know that such photos may be

4   found on cellular phones of such individuals.

5                       **CONCLUSION**

6       46.    Based on the foregoing, I respectfully request the court to issue a warrant to seize

7   the items and information specified in Attachment "B" there is probable cause to believe that

8   evidence of violations of the Subject Offenses, as described above and in Attachment B of this

9   affidavit, will be found in a search of the Subject Premises and Subject Vehicles, as further

10   described above and in the various Attachment As of this affidavit.

11

12                         Respectfully Submitted,

13

14                         Jared Jeppson, Special Agent
                               Drug Enforcement Administration

15

16   Attested to by the applicant in accordance
     with the requirements of Fed. R. Crim. P. 4.1
17   by telephone on this 17th day of ___June___, 2021

18

19   HONORABLE DANIEL J. ALBREGTS
     UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

US-000985

1

**ATTACHMENT "A-1"**

2

**PREMISES TO BE SEARCHED – SUBJECT PREMISES 1**

3

    1.  The premises to be searched is described as follows, and include all locked and

4

closed containers, including safes, lockboxes, and vehicles found on or directly adjacent to the

5

property, found therein:

6

> 487 Petal Dew Avenue, Las Vegas, Nevada 89183 is a residential home
> leased by Paul ENGSTROM. Subject Premises is a two story, single

7

> family residence having primarily yellow beige stucco exterior with beige
> trim. The residence has a single car garage door that is beige in color and

8

> faces north. The numbers "487" are affixed to the east side of the
> residence above the garage. The front door of the residence is an

9

> unknown color encased by a white security door. Photo of Residence:

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

39

1

**ATTACHMENT "A-2"**

2

**PREMISES TO BE SEARCHED – SUBJECT PREMISES 2**

3

    1. The premises to be searched is described as follows, and include all locked and

4

closed containers, including safes, lockboxes, and vehicles found on or directly adjacent to the

5

property, found therein:

6

        304 East Silverado Ranch Boulevard, Building 8, Apartment 1110, Las
Vegas, Nevada 89183 is an apartment leased by Patricia ENGSTROM.

7

Subject Premises is a two story, multi-family apartment building having a
primarily tan stucco exterior with brown trim. The apartment has a

8

single car garage door, on the north side of the building that is tan in
color and faces north. The numbers "1110" are black in color on a white

9

placard and is affixed to the right side of the front door. The front door of
the residence is tan in color and faces the south. Photo of Residence:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



40

1

## ATTACHMENT "A-3"

2

## PREMISES TO BE SEARCHED – SUBJECT PREMISES 3

3      1. The premises to be searched is described as follows, and include all locked and

4   closed containers, including safes, lockboxes, and vehicles found on or directly adjacent to the

5   property, found therein:

6            6145 Harrison Drive Suite #4, Las Vegas, Nevada 89120 is a warehouse
             space primarily utilized by Paul ENGSTROM, Vincent CUOMO and
7            Abraham ELLIOTT. Subject Premises is a single story, warehouse and
             suite having a primarily brown stucco exterior.  The warehouse and suite
8            has a single car rollup door that is beige in color and faces north. The
             number "4" is affixed to the glass front door just above eye level. The
9            door of the warehouse and suite is glass with black trim and faces north.
             The address "6145 Harrison 1-12" is affixed to the north side of the
10           building on the far-east side and is black in color.  Photo of Warehouse
             and Suite:

11



12

13

14

15

16

17

18

19

20

21

22

23

24

41

1

**ATTACHMENT "A-4"**

2

**PREMISES TO BE SEARCHED – SUBJECT PREMISES 4**

3

    1.  The premises to be searched is described as follows, and include all locked and

4

closed containers, including safes, lockboxes, and vehicles found on or directly adjacent to the

5

property, found therein:

6

> 10388 Midseason Mist Street, Las Vegas, Nevada 89183 is the residential
> home of Abraham ELLIOTT. Subject Premises is a two story, single

7

> family residence having primarily beige stucco exterior with reddish
> brown trim. The residence has a single car garage door that is beige in

8

> color and faces west. The numbers "10388" are affixed to the south side
> of the residence above the garage. The front door of the residence is an

9

> unknown color encased by a white security door and faces west. Photo of
> Residence:

10



11

12

13

14

15

16

17

18

19

20

21

22

23

24

42

1

## ATTACHMENT "A-5"

2

### PREMISES TO BE SEARCHED – SUBJECT PREMISES 5

3          1.  The premises to be searched is described as follows, and include all locked and

4   closed containers, including safes, lockboxes, and vehicles found on or directly adjacent to the

5   property, found therein:

6
7
8
9

> 305 Saint Augustine Lane, Henderson, Nevada 89014 is a residential
> home leased by Virginia ENGSTROM. Subject Premises is a two story,
> single family residence having primarily beige stucco exterior with light
> brown trim. The residence has two separate garage doors that are beige
> in color and face east. The numbers "305" are affixed to the east side of
> the residence to the right side of the north garage door. The front door of
> the residence is brown in color and faces the east. Photo of Residence:



10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## ATTACHMENT "A-6"

## PREMISES TO BE SEARCHED – SUBJECT VEHICLE 1

1. The vehicle to be searched is described as follows, and include all locked and

closed containers, including safes and lockboxes, found therein:

> 2017 Chevrolet Pickup Truck, silver in color bearing Nevada license plate
> VMD601 VIN#3GCUKREC0HG108984. Current Registered Owner
> Vincent CUOMO, 487 Petal Dew Avenue, Las Vegas, Nevada 89183.
> Photo of vehicle:



44

US-000991

1

**ATTACHMENT "A-7"**

2

**PREMISES TO BE SEARCHED – SUBJECT VEHICLE 2**

3

    1. The vehicle to be searched is described as follows, and include all locked and

4

closed containers, including safes and lockboxes, found therein:

5

        2007 BMW 4 door sedan, blue in color bearing Nevada license plate
        12345TH VIN#WBAVA33527KX79327. Current Registered Owner

6

        Paul ENGSTROM, 487 Petal Dew Avenue, Las Vegas, Nevada 89183.
        Photo of vehicle:

7

8

9

10



11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## ATTACHMENT "A-8"

### PREMISES TO BE SEARCHED – SUBJECT VEHICLE 3

1.   The vehicle to be searched is described as follows, and include all locked and

closed containers, including safes and lockboxes, found therein:

> 2019 Nissan Rogue SUV, silver in color bearing Nevada license plate
> US263P VIN#5N1AT2MT9KC797793. Current Registered Owner Paul
> ENGSTROM, 487 Petal Dew Avenue, Las Vegas, Nevada 89183. Photo
> of vehicle:



46

US-000993

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## ATTACHMENT "A-9"

### PREMISES TO BE SEARCHED – SUBJECT VEHICLE 4

1. The vehicle to be searched is described as follows, and include all locked and

closed containers, including safes and lockboxes, found therein:

> 2016 Cadillac 4 door CTS, gray in color bearing Nevada license plate
> AL7456 VIN#1G6AR5SS3G0195627. Current Registered Owner
> Abraham ELLIOTT, 10388 Midseason Mist Street, Las Vegas, Nevada
> 89183. Photo of vehicle:



47

US-000994

1

**ATTACHMENT "A-10"**

2

**PREMISES TO BE SEARCHED – SUBJECT VEHICLE 5**

3

    1.  The vehicle to be searched is described as follows, and include all locked and

4

closed containers, including safes and lockboxes, found therein:

5

        2015 Chevrolet 4 door Sonic, black in color bearing Nevada license plate
        579N08 VIN#1G1JC6SG4F4213150.  Current Registered Owner Joseph

6

        KRIEGER, 6144 Camino De Rosa Drive #3, Las Vegas, Nevada 89108.
        Photo of vehicle:

7

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

48

**ATTACHMENT "B"**

**ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1956 (Money Laundering) and 21 U.S.C. §§ 841(a)(1) Distribution of and Possession with Intent to Distribute a Controlled Substance), 846 (Conspiracy to Commit Controlled Substance Offense), and 843(b) (Unlawful Use of a Communication Facility, Including the Mails, to Facilitate the Distribution of a Controlled Substance) (the "Subject Offenses"), namely:

    a.  Controlled substances, including cocaine and the items commonly associated with the packaging and sales of controlled substances, including commercial plastic wrap, plastic bags or zip lock bags, film canisters, scales, or other weighing devices.

    b.  Counterfeit controlled substances.

    c.  Records reflecting the use of a dark web moniker or handle, or other online monikers or pseudonyms, reflecting the use of vendor or buyer accounts on dark web marketplaces.

    d.  Records concerning the establishment or management of an online or dark web controlled substance retail business, including documents and other records relating to the creation or hosting of websites, evidence of dark web or Tor Browser access, merchant accounts for customer transactions, product vendors or sources of supply, invoices, order forms, and communications with co-conspirators and others about any of the aforementioned subjects.

    e.  Records concerning financial transactions associated with the operations or proceeds of an online or dark web controlled substance retail business, including any paper or

49

US-000996

1      digital account opening documents, statements, deposit slips, checkbooks, orders or

2      confirmations of wire transfers.

3    f.   Records of any accounts or transactions within the traditional banking or credit

4      systems or via cryptocurrencies.

5    g.   Digital currency, cryptocurrency (or digital currency) private keys, and digital

6      currency recovery seeds, as further explained in paragraph 4 below.

7    h.   Packing material or inserts relating to any transactions with any cash-for-

8      cryptocurrency exchange.

9    i.   Books, records, correspondence, narcotic customers lists, narcotic suppliers lists,

10      ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts,

11      letters and memoranda of agreements between potential co-conspirators, formulas,

12      receipts, phone records, phone books, address books, notations and other papers,

13      and any files relating to the transporting, ordering, purchasing, or distributing of

14      controlled substances.

15    j.   Indicia of occupancy, residency, and/or ownership of the previously described

16      property, premises, or vehicles, and any other property, premises, or vehicles,

17      including utility and telephone bills, canceled mail, deeds, leases, rental agreements,

18      photographs, personal telephone books, diaries, envelopes, registration, receipts, and

19      keys which tend to show the identities of the occupants, residents, and/or owners,

20      not to exceed 15 items for any residence.

21    k.   Records concerning the use of commercial mail receiving agencies and/or post office

22      boxes.

23    l.   Photographs and/or videotapes, in particular photographs and/or videotapes of

24      potential co-conspirators and their criminal associates, assets, and/or controlled

50

1        substances, along with personal address lists, and other documents with the names

2        and telephone numbers of potential co-conspirators.

3    m. Records relating to the use of and accumulation of proceeds derived from the sale of

4        illegal controlled substances, as well as the acquisition of property obtained from

5        drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment,

6        and/or expenditure of money obtained from drug sales, including precious metals,

7        jewelry, records of large purchases, receipts, keys and other items tending to establish

8        dominion and control of the location, canceled checks, bank records, credit card

9        records, wire transfers, wire transfer receipts, cashier's checks, cashier's check

10       receipts, addressed mail, express delivery receipts/envelopes, utility company

11       receipts, rent receipts, income tax returns, money drafts, money orders, and their

12       receipts.

13    n. Financial records including expenses incurred in obtaining the equipment and items

14       necessary for the transportation and/or distribution of controlled substances, income

15       derived from the sales of controlled substances, as well as records of legitimate

16       income or lack thereof, and general living expenses.

17    o. Financial records of persons in control of the property, premises, or vehicles,

18       including bank statements, bank receipts, passbooks, bank checks, money market or

19       similar accounts, money drafts, letters of credit, payroll documents, employer

20       information, income and expense records, Federal and State income tax returns,

21       money orders, cashier's checks, loan applications, credit card records, safe deposit

22       box and records, acquisitions, notes, and records reflecting vehicles, aircraft or

23       vessels owned, purchased, sold or leased.

24

51

US-000998

p. Money counting machines, money wrappers, and/or work sheets, tally sheets, or ledger sheets reflecting or accounting for money received, disbursed, or exchanged.

q. United States currency in excess of $2,000, including the first $2,000 if more than $2,000 is seized, digital currency such as Bitcoin stored on electronic wallets or other forms of wallets or other means, cryptocurrency private keys and recovery seed, and records relating to income derived from the transportation, sales, and distribution of controlled substances and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, antique or modern automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit narcotic trafficking.

r. Storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures.

s. Paraphernalia for packaging, processing, cutting, weighing, and distributing controlled substances, such as scissors, scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices and cutting agents.

t. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

u. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

52

US-000999

documents, browsing history, user profiles, e-mail, e-mail contacts, chat and

instant messaging logs, photographs, and correspondence;

   ii.  evidence of the presence or absence of software that would allow others to

control the device, such as viruses, Trojan horses, and other forms of

malicious software, as well as evidence of the presence or absence of security

software designed to detect malicious software;

  iii.  evidence of the attachment of other devices;

  iv.  evidence of counter-forensic programs (and associated data) that are designed

to eliminate data from the device;

   v.  evidence of the times the device was used;

  vi.  passwords, encryption keys, biometric keys, and other access devices that

may be necessary to access the device;

 vii.  applications, utility programs, compilers, interpreters, or other software, as

well as documentation and manuals, that may be necessary to access the

device or to conduct a forensic examination of it;

viii.  records of or information about Internet Protocol addresses used by the

device;

  ix.  records of or information about the device's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or

"favorite" web pages, search terms that the user entered into any Internet

search engine, and records of user-typed web addresses.

2.     As used herein, the terms "records," "documents," "programs," "applications,"

and "materials" include records, documents, programs, applications, and materials created,

53

1  modified, or stored in any form, including in digital form on any digital device and any forensic

2  copies thereof.

3         3.      As used herein, the term "digital device" includes any electronic system or device

4  capable of storing or processing data in digital form, including central processing units; desktop,

5  laptop, notebook, and tablet computers; personal digital assistants; wireless communication

6  devices, such as telephone paging devices, beepers, mobile telephones, and smart phones;

7  digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes);

8  peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and

9  drives intended for removable media; related communications devices, such as modems,

10  routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory

11  cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such

12  as VHS); and security devices.

13         4.      Seizure of any cryptocurrency/digital currency private keys and recovery seeds

14  shall also be construed to include seizure of any cryptocurrency related to any such seized

15  private keys and/or recovery seeds, and such seizure shall allow transfer of any such related

16  cryptocurrency to one or more government controlled accounts, or "wallets."

54

**ATTACHMENT "C"**
**PROTOCOL FOR SEARCHING THE ELECTRONIC DATA SEIZED**
**PURSUANT TO THIS SEARCH WARRANT**

1.      In executing this warrant, the government must make reasonable efforts to use methods and procedures that will locate and expose in the electronic data produced in response to this search warrant ("the Search Warrant Data") those categories of data, files, documents, or other electronically stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

2.      When the Search Warrant Data is received, the government will make a duplicate copy of the Search Warrant Data ("the Search Warrant Data Copy"). The original version of the Search Warrant Data will be sealed and preserved for purposes of: later judicial review or order to return or dispose of the Search Warrant Data; production to the defense in any criminal case if authorized by statute, rule, or the Constitution; for purposes of showing the chain of custody of the Search Warrant Data and the Search Warrant Data Copy; or for any other lawful purpose. The original of the Search Warrant Data will not be searched or examined except to ensure that it has been fully and completely replicated in the Search Warrant Data Copy.

3.      The investigating agents will then search the entirety of the Search Warrant Data Copy using any and all methods and procedures deemed appropriate by the United States designed to identify the information listed as Information to be Seized in Attachment B. The United States may copy, extract or otherwise segregate information or data listed as Information to be Seized in Attachment B. Information or data so copied, extracted or otherwise segregated will no longer be subject to any handling restrictions that might be set out in this protocol beyond those required by binding law. To the extent evidence of crimes not within the scope of this warrant appear in plain view during this review, a supplemental or "piggyback" warrant will be applied for in order to further search that document, data, or other item.

4.      Once the Search Warrant Data Copy has been thoroughly and completely examined for any document, data, or other items identified in Attachment B as Information to be Seized, and, if the

US-001002

United States pursues a criminal prosecution in this matter, all litigation including any appeal or collateral attack has been completed, the Search Warrant Data Copy will be sealed and not subject to any further search or examination unless authorized by another search warrant or other appropriate Court order. The Search Warrant Data Copy will be held and preserved for the same purposes identified above in Paragraph 2.

5.      The search procedures utilized for this review are at the sole discretion of the investigating and prosecuting authorities, and may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

      a.  examination of all of the data contained in the Search Warrant Data to view the data and determine whether that data falls within the items to be seized as set forth herein;

      b.  searching for and attempting to recover from the Search Warrant Data any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.  surveying various file directories and the individual files they contain;

      d.  opening files in order to determine their contents;

      e.  using hash values to narrow the scope of what may be found. Hash values are under-inclusive, but are still a helpful tool;

      f.  scanning storage areas;

      g.  performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

56

1          h.   performing any other data analysis technique that may be necessary to locate

2               and retrieve the evidence described in Attachment B.

3                                   **Return and Review Procedures**

          6.      Rule 41 of the Federal Rules of Criminal Procedure provides, in relevant part:

4          (e) Issuing the Warrant.

5           (2) Contents of the Warrant.
          (A) Warrant to Search for and Seize a Person or Property. Except for a tracking-device warrant,

6     the warrant must identify the person or property to be searched, identify any person or property to be
      seized, and designate the magistrate judge to whom it must be returned. The warrant must command

7     the officer to:
               (i) execute the warrant within a specified time no longer than 14 days;

8          (B) Warrant Seeking Electronically Stored Information. A warrant under Rule 41(e)(2)(A) may
      authorize the seizure of electronic storage media or the seizure or copying of electronically stored

9     information. Unless otherwise specified, the warrant authorizes a later review of the media or
      information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and

10    (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site
      copying or review.

11         (f) Executing and Returning the Warrant.
          (1) Warrant to Search for and Seize a Person or Property.

12          (B) Inventory. An officer present during the execution of the warrant must prepare and verify an
      inventory of any property seized. . . . In a case involving the seizure of electronic storage media or the

13    seizure or copying of electronically stored information, the inventory may be limited to describing the
      physical storage media that were seized or copied. The officer may retain a copy of the electronically

14    stored information that was seized or copied.

15         7.      Pursuant to this Rule, the government understands and will act in accordance with the

16    following:

17              a.   Pursuant to Rule 41(e)(2)(A)(iii), within fourteen (14) days of the execution of

18                   the warrant, an agent is required to file an inventory return with the Court, that

                     is, to file an itemized list of the property seized.  Execution of the warrant begins

19                   when the United States serves the warrant on the named custodian; execution is

20                   complete when the custodian provides all Search Warrant Data to the United

21                   States. Within fourteen (14) days of completion of the execution of the warrant,

22                   the inventory will be filed.

23              b.   Pursuant to Rule 41(e)(2)(B), Rule 41(e)(2)(A) governs the time within which

24                   the electronically stored information must be seized after the issuance of the

                                                        57

warrant and copied after the execution of the warrant, not the "later review of the media or information" seized, or the later off-site digital copying of that media.

c.  Under Rule 41(f)(1)(B), the inventory return that is to be filed with the court may be limited to a description of the "physical storage media" into which the Search Warrant Data that was seized was placed, not an itemization of the information or data stored on the "physical storage media" into which the Search Warrant Data was placed;

d.  Under Rule 41(f)(1)(B), the government may retain a copy of that information for purposes of the investigation. The government proposes that the original storage media on which the Search Warrant Data was placed plus a full image copy of the seized Search Warrant Data be retained by the government.

e.  If the person from whom any Search Warrant Data was seized requests the return of any information in the Search Warrant Data that is not set forth in Attachment B, that information will be copied onto appropriate media and returned to the person from whom the information was seized.

58

US-001005